

2003 WL 723285 (Del.Ch.)
(Cite as: 2003 WL 723285 (Del.Ch.))

satellite "Big LEO" system to provide two-way voice and data communications to customers equipped with mobile earth-station transceivers.

*5 The International Bureau granted the license over objections from several petitioners who argued that MCHI's license application should be denied for failure to show that it had access to funds sufficient to cover the cost of constructing the proposed system and operating it. The International Bureau granted MCHI's request for a waiver of such a requirement, but stressed that the license was conditioned on adherence to a construction progress-milestone schedule requiring that the system be constructed and put into service in a timely manner. The International Bureau stated that it would "carefully monitor [MCHI's] progress toward implementation," and would "not hesitate to cancel the license should it fail without justification to meet the milestone schedule." [FN9]

> FN9. *In re Mobile Communications Holdings, Inc.,* DA 01-1315, at 1 (F.C.C. May 31, 2001).

The license order prescribed the following milestone schedule: begin construction of at least two of MCHI's authorized satellites by July 1998; begin construction of the other satellites by July 2000; complete construction of the first two satellites by July 2001; and complete a fully operational system by July 2003. The license order provided that unless the schedule is extended for good cause, "this authorization will become null and void in the event that the licensee fails to meet [this] progress schedule." [FN10]

> FN10. *Id.* at 2.

Under the FCC's rules, each Big LEO licensee must file a statement within ten days of a progress milestone date specified in its license, either certifying that it has met the milestone requirement or giving notice that it has failed to meet it. To comply with this requirement, MCHI filed an affidavit on June 22, 1998, stating that it had met its July 1998 milestone by entering into a non-contingent contract with Boeing for construction of two satellites. In an affidavit filed on July 31, 2000, MCHI stated that "MCHI has entered into a binding, non-contingent contract with Teledyne Brown Engineering, Inc. relating to the construction of the

satellites consistent with the milestones and technical specifications set forth in MCHI's [license order]." [FN11]

> FN11. *Id.*

By Memorandum Opinion and Order dated May 31, 2001, the FCC rendered null and void the 1997 License. [FN12] The FCC concluded that Ellipso did not meet the milestone requirement to commence construction of all 16 satellites by the end of July 2000. The FCC found that the Boeing contract was not a non-contingent construction contract because the parties had adopted amendments that essentially nullified the contract. Specifically, on June 30, 1999, MCHI executed a third amendment to the Boeing contract, providing that Boeing could not perform any work thereafter except as subsequently authorized in writing by MCHI. [FN13] The FCC found that MCHI did not issue any work authorizations between then and October 12, 2000. The FCC then determined that between June 30, 1999 and October 12, 2000 Boeing was under no contractual duty to perform satellite construction for MCHI. [FN14]

> FN12. *Id.* at 2-3.

> FN13. *Id.*

> FN14. *See id.* at 3.

Based in part on these facts, the FCC concluded that MCHI did not meet the milestone requirement to commence construction of all of its proposed satellites by the end of July 2000. [FN15] The FCC stated that to meet a milestone deadline for commencement of satellite construction, a licensee relying on others to perform the required work must enter into a binding contract for construction of the satellites that is not subject to material contingencies that remain unresolved as of the deadline. [FN16] The FCC found that MCHI was not a party to a non-contingent contract for construction of 16 satellites at the end of July 2000 or at any other times prior to October 12, 2000. [FN17] In fact, the FCC found that MCHI's "contract with Boeing for construction of two satellites was essentially abrogated on June 30, 1999." [FN18]

> FN15. The FCC also determined that the contract with Teledyne Brown on which MCHI predicated

Westlaw.

Not Reported in A.2d                                                                                     Page 6
2003 WL 723285 (Del.Ch.)
**(Cite as: 2003 WL 723285 (Del.Ch.))**

its second milestone certification did not require Teledyne Brown to build or deliver satellites for MCHI. Although Teledyne Brown is involved in the aerospace industry, it does not manufacture or construct satellites. The FCC determined that the contract only engaged Teledyne Brown to provide consulting and managerial services in three successive phases. Further, the FCC found that the work schedule specified in the contract with Teledyne Brown was merely tentative because MCHI reserved the right to add to, change, or delete the work to be performed by Teledyne Brown and alter the times for performance. The FCC also noted that Teledyne Brown was to consult with MCHI in advance of each calendar quarter as to what work to perform in that period, and MCHI would not be liable for payment for any work performed without such prior approval. *See id.* All of these events, however, occurred well after Sahagen's investment in Ellipso.

FN16. *Id.* at 4.

FN17. *Id.*

FN18. *Id.*

### III.

*6 The original complaint in this action was brought by VGS, Inc. against Castiel, Ellipso, and VGHI seeking a declaratory judgment that a purported merger between VGS, Inc. and Virtual Geo was valid. Ellipso and VGHI then filed a counterclaim against VGS, Inc., Sahagen, Howard, Quinn and SST Global that alleged, among other things, that Sahagen and Quinn breached their fiduciary duty of loyalty. [FN19]

> FN19. *See, e.g., VGS, Inc., 2000 WL 1277372* for more details surrounding this transaction.

Ellipso, VGHI and counterclaim-plaintiff-intervener Virtual Geo (together with Castiel and MCHI, the "Castiel Parties") have moved for summary judgment on Count II of their original counterclaim, which seeks a finding that Sahagen and Quinn have breached their fiduciary duty of loyalty.

[FN20]

> FN20. Although this court has previously entered judgment in favor of Castiel, VGHI, Ellipso and Virtual Geo, that trial only resolved the corporate governance issue. *See generally VGS, Inc., 2000 WL 1277372*. The Castiel Parties still maintained duty of loyalty claims against Sahagen and Quinn.

Peter Sahagen and SST Global (collectively the "Sahagen Parties") then filed a cross-counterclaim against the Castiel Parties to recover their investment and to obtain an award of damages on behalf of Virtual Geo. [FN21] The Castiel Parties moved for summary judgment in their favor on the cross-counterclaims of the Sahagen Parties.

> FN21. The Sahagen Parties moved to amend, for a second time, their complaint in October of 2000. This court granted in part and denied in part their motion on October 26, 2001. Since that time, the Sahagen Parties have not re-filed the Second Amended Complaint in its approved form. Rather, the Sahagen Parties have filed Second Amended Counterclaims. For the sake of this motion, this court will treat the Second Amended Counterclaims as the most current set of claims against the Castiel Parties. In addition, although this opinion refers to the parties collectively as the Sahagen Parties and the Castiel Parties, it should be noted that the Sahagen Parties' "counterclaims" are not being asserted against Virtual Geo.
>
> The Sahagen Parties also previously filed many of these same claims under a different caption on April 19, 2000 (the "17997 action"). This court has taken the position that the 17997 action has been consolidated with the 17995 action.

There are eleven separate cross-counterclaims asserted by the Sahagen Parties. Counts I and X (which essentially replicate each other) allege common law fraud against the Castiel Parties based on statements and omissions made by Castiel, Ellipso, and VGHI. Counts II and XI (which essentially replicate each other) allege negligent misrepresentation against the Castiel Parties based on the same alleged statements and omissions in Counts I and X.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Count V is a claim of civil conspiracy against the Castiel Parties based on the same fraud alleged in Counts I and X.

Count III of the Sahagen Parties' cross-counterclaims attempts to allege a direct claim against Castiel for a breach of his fiduciary duties of loyalty and care. This claim is largely based on an assertion of waste and mismanagement. Count IV alleges that the remaining Castiel Parties aided and abetted Castiel's breach of fiduciary duties. Count VIII asserts a derivative claim by the Sahagen Parties on behalf of Virtual Geo for breaches of fiduciary duties by the Castiel Parties. Count IX alleges a derivative claim by the Sahagen Parties on behalf of Ellipso against Castiel for breaches of fiduciary duty. The Castiel Parties have not briefed Count IX, yet they still move for summary judgment on that Count. Due to this lack of briefing, however, the court will not grant the Castiel Parties' motion for summary judgment on Count IX.

The final two Counts of the Sahagen Parties' cross-counterclaim are for a "constructive trust" (Count VI) and injunctive relief against the Castiel Parties (Count VII). These "Counts" are remedies, not causes of action, and thus do not provide an independent basis for recovery. Moreover, the Sahagen Parties already attempted to enjoin the Castiel Parties from expending any of Virtual Geo's funds, and this court denied that motion. [FN22] Thus the court will grant summary judgment in favor of the Castiel Parties on these Counts.

> FN22. *See* Ruling on Pls.' Mot. For Prelim. Injunction, Lamb, V.C ., (Sept. 13, 2000).

### IV.

*7 Under Delaware law, summary judgment may be granted only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. [FN23] When considering a motion for summary judgment, the facts must be viewed in the light most favorable to the non-moving party, and the moving party has the burden of demonstrating that no material question of fact exists. [FN24] "When a moving party has properly supported its motion, however, the non-moving party must submit admissible evidence sufficient to generate a factual issue for

trial or suffer an adverse judgment." [FN25]

> FN23. *See Burkhart v. Davies*, 602 A.2d 56, 59 (Del.1991), *cert. denied*, 504 U.S. 912, 112 S.Ct. 1946, 118 L.Ed.2d 551 (1992).

> FN24. *See Tanzer v. Int'l General Indus., Inc.*, 402 A.2d 382, 385 (Del.1979).

> FN25. *Id.*; Ch. Ct. R. 56(e).

### V.

*A. The Sahagen Parties Are Not Entitled To A Trial On Their Fraud And Misrepresentation Claims*

In Counts I and X of their cross-counterclaims (which essentially replicate each other), the Sahagen Parties allege that they were fraudulently induced into investing in Virtual Geo and Ellipso based on several representations made by Castiel, Ellipso, and MCHI. Specifically, Castiel purportedly induced Sahagen's investment by: (1) representing that he would hire new management if Sahagen invested in Ellipso and Virtual Geo; (2) representing that there were no problems with Ellipso's antenna technology; (3) misrepresenting the status of Ellipso's FCC license; and (4) misrepresenting his intentions with respect to how he planned to use the money Sahagen invested in Virtual Geo. To establish a claim for fraud, the Sahagen Parties must demonstrate the following: "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." [FN26]

> FN26. *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970- 71 (2d Cir.1987). The court will apply New York law to the Sahagen Parties' substantive claims made in connection with a Unit Purchase Agreement and Stock Purchase Agreement that are at issue in this suit. *See* note 29, *infra*.

On January 29, 1999, Sahagen, on behalf of SST Global, entered into a Stock Purchase Agreement with Ellipso. That same day, Sahagen, on behalf of SST Global, entered into a Unit Purchase Agreement with Virtual Geo. The Castiel Parties argue that the explicit language of those Agreements



prevents the Sahagen Parties from pursuing a fraud in the inducement allegation as a matter of law. [FN27] For example, as part of the Stock Purchase Agreement, Ellipso made numerous representations and warranties to Sahagen. Moreover, Section 2.14 of that Agreement states:

> FN27. This argument applies to all of the alleged fraudulent statements except for those relating to Ellipso's FCC license, which was specifically warranted in the Stock Purchase Agreement. *See* Castiel Parties Reply Br., Ex. A. § 2.07.

[Ellipso] makes and has made no representations or warranties, express or implied, except as set forth in this Agreement. No representation or warranty of [Ellipso] shall be deemed to be made or enlarged as a result of disclosures made or information provided by [Ellipso] to [Sahagen] during the course of [Sahagen's] "due diligence" investigation of [Ellipso] or the Subsidiaries. [FN28]

> FN28. *Id.* at § 2.14. Identical language is contained in the January 29, 1999 Unit Purchase Agreement between SST Global and Virtual Geo. *See* Castiel Parties Reply Br., Ex. B. § 2.14.

Finally, Section 10.03 is an integration clause whereby Sahagen agreed that the terms of the written Agreement constituted the sole understandings of the parties. Specifically, the provision states:

This Agreement (including the Disclosure Schedule, which is incorporated herein by this reference) and the Related Agreements constitute the sole understanding of the parties with respect to the subject matter thereof. Matters disclosed by Seller to Buyer pursuant to any Section of this Agreement shall be deemed to be disclosed with respect to all sections of this Agreement. [FN29]

> FN29. *Id.* at § 10.03. Identical language is contained in the January 29, 1999 Unit Purchase Agreement between SST Global and Virtual Geo. *See* Castiel Parties Reply Br., Ex. B. § 10.03. Section 10.11 of both Agreements provides that New York law is the controlling law "for any litigation arising out of or relating to thus

Agreement and transactions contemplated hereby...." In addition, New York has a substantial relationship to the Agreements because Sahagen resided in New York at the time he negotiated and executed the Agreements. Moreover, aspects of the Agreements were actually negotiated in New York. Because under Delaware law the parties' choice of law governing their contract should be respected as long as the law of that state and the parties have some relation to that state, New York law must govern the interpretation of the Agreements. *See Wilmington Trust Co. v. Wilmington Trust Co., 24 A.2d 309, 313 (Del.1942).*

The law governing the Agreements also governs the effect, if any, that the Agreements may have on claims for fraud and negligent misrepresentation. *See* Restatement (Second) of Conflicts of Laws § 201 cmt. (a), (c) (1971) ("(a) Under the rule of this section, questions involving the effect of a misrepresentation, duress, undue influence and mistake upon a contract are determined by the law chosen by the parties, if they have made an effective choice .... (c) The fact that a contract was entered into by reason of misrepresentation, undue influence or mistake does not necessarily mean [sic] that a choice-of-law provision contained therein will be denied effect. This will be done if the misrepresentation, undue influence or mistake was responsible for the complainant's adherence to the provision"); *see also Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 309 (2d Cir.1994)* (holding that a choice of law clause applying New York law was sufficiently broad to encompass tort and contract claims when the agreement covered any controversy "arising out of or relating to" that agreement); *Woodling v. The Garrett Corp., 813 F.2d 543, 552 (2d Cir.1987)* (applying section 201 of the Restatement (Second) of Conflicts of Laws in recognizing that the validity and enforceability of a release are matters of substance).

\*8 Usually under New York law, general provisions such as the ones at issue in this case do not preclude claims for fraud in the inducement. [FN30] This general law, however,

Not Reported in A.2d                                                                     Page 9
2003 WL 723285 (Del.Ch.)
(Cite as: 2003 WL 723285 (Del.Ch.))

does not apply when (1) the transaction at issue is a multi-million dollar transaction executed following negotiations with sophisticated parties and, (2) the complaining party has the opportunity to discover information that would make reliance on such representations unreasonable. [FN31]

> FN30. *See Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597, 598-99 (N.Y.1959)* (holding that "the parol evidence rule is not a bar to showing the fraud ... despite an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made"); *Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir.1993)* (holding that when a contract specifically disclaims existence of or reliance upon certain representations, plaintiff cannot later claim fraudulent inducement based on reliance on those representations).

> FN31. *In re Cinar Corp. Sec. Litig., 186 F.Supp.2d 279, 314 (E.D.N.Y.2002); Emergent Capital Inv. Mgt., LLC v. Stonepath Group, Inc., 165 F.Supp.2d 615, 622-23 (S.D.N.Y.2001).*

1. *The Parties To The Stock Purchase Agreement And Unit Purchase Agreement Were Sophisticated Parties Engaged In A Multi-Million Dollar Transaction*

The general rule articulated by *Danann Realty Corp.* does not apply to multi-million dollar transactions involving sophisticated parties. In *Emergent Capital,* the plaintiff claimed fraud, following a $2 million stock purchase, with respect to an oral representation about the size of a future stock offering. The plaintiff was a limited liability company, 90% of which was owned by two individuals employed by Wall Street firms and familiar with the securities market. [FN32] Despite the use of a general integration clause and a representations and warranties clause that did not specifically mention the future offering, the court found that the fraud claim was barred. [FN33] The court specifically relied on the "sophistication and knowledge of the parties" and noted that the plaintiff's initial investment was "a multi-million dollar transaction executed following

negotiations between sophisticated business people...." [FN34]

> FN32. *Emergent Capital,* 165 F.Supp.2d at 619.

> FN33. *Id.* at 622-23.

> FN34. *Id.* at 622; *see also In re Cinar Corp. Sec. Litig.,* 186 F.Supp.2d at 314 (citing *Emergent Capital* for an exception to the general rule articulated in *Mfrs. Hanover Trust* and *Danann Realty Corp.*).

The exception to the general *Danann* rule provided in *Emergent Capital* applies to the transactions at issue in the current dispute. The Stock Purchase and Unit Purchase Agreements were multi-million dollar transactions negotiated at length by sophisticated parties that were represented by counsel. The Stock Purchase Agreement between Ellipso and Sahagen Satellite Technology Group, LLC was for the sale of 20,000 shares of Ellipso common stock for $4.2 million. Similarly, the Unit Purchase Agreement between Virtual Geo and Sahagen Satellite Technology Group, LLC was for the sale of 260 common units of Virtual Geo for $5.2 million. Moreover, Sahagen Satellite Technology Group, LLC warranted its "Sophistication" as an "accredited investor." [FN35] SST Global's own 30(b)(6) representative has admitted that Sahagen "is a very prolific investor," [FN36] and this court has found Sahagen to be "an aggressive and apparently successful venture capitalist." [FN37] Finally, Sahagen was represented by sophisticated counsel, and also admittedly engaged in extensive due diligence, including the hiring of a "technical expert" and the consultation of Ellipso employees. [FN38]

> FN35. *See* Castiel Parties Reply Br., Ex. A. § 3.08; Castiel Parties Reply Br., Ex. B. § 3.08.

> FN36. SST Global Dep. at 116.

> FN37. *VGS, Inc.,* 2000 WL 1277372, at *1.

> FN38. SST Global Dep. at 75-78; 32-35.

2. *The Sahagen Parties Had An Opportunity To Discover*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                                Page 10
2003 WL 723285 (Del.Ch.)
**(Cite as: 2003 WL 723285 (Del.Ch.))**

*Information That Would Make Reliance On The "Fraudulent" Representations Unreasonable*

When a complaining party has the opportunity to discover information that would make reliance on the alleged representations unreasonable, that party cannot thereafter take advantage of the *Danann* rule. [FN39] In *Belin*, when confronted with a disclaimer clause similar to the ones at issue in this litigation, the court held that where a representation about the amount of an insurance policy was allegedly fraudulent, the allegedly fraudulent information did not amount to an actionable claim because the correct information "was readily ascertainable had [plaintiff] asked to see the insurance policy prior to closing on his investment ." [FN40] The current litigation is highly analogous to the facts and issues of *Belin.*

> FN39. *Belin v. Weissler,* 1998 WL 391114, at *5-7 (S.D.N.Y.1998); *Emergent Capital,* 165 F.Supp.2d at 623 (holding that a sophisticated investor "must show that he or she has made an independent inquiry into all available information").

> FN40. *Id.,* at *7. *But cf. In re Cinar,* 186 F.Supp. at 285, 314 (holding that a general disclaimer clause was insufficient to defeat a fraud claim based on inflated estimates of the company's financial position as a result of improperly claimed tax credits because there was no way plaintiff could have discovered the improper tax credit).

*9 Here, it is undisputed that before entering into the Agreements Sahagen possessed information, or access to information, that demonstrated that the alleged oral representations made by Castiel were false. SST Global's Rule 30(b)(6) witness testified that Sahagen was well aware, before investing in Ellipso or Virtual Geo, that there were problems with the antenna technology and that Castiel would not seek new management, both in direct contradiction to alleged oral representations that underlie the Sahagen Parties' fraud claims. [FN41]

> FN41. *See* SST Global Dep. at 77-79; 60; 63; 68-69. *Cf. C.P. Kelco U.S., Inc. v. Pharmacia Corp.,* 2002 WL 31230816, at *9-10 (D.Del.2002)

(holding that a disclaimer did not preclude claims of fraud between highly sophisticated parties because the plaintiff had no opportunity to discover the alleged fraud before entering into the agreement).

Additionally, in *Belin,* the court held that the plaintiff could not pursue his fraud claim partly because he warranted that he had an opportunity to verify the representations given and could obtain whatever additional information he required. The court held that, "[h]aving explicitly represented that he had an opportunity to verify the accuracy of information provided to him, Belin cannot now be heard to complain that he relied on information that he declined to verify, although he could have determined the amount of [the insurance policy] simply be asking for a copy of the policy." [FN42] Similarly, SST Global warranted in both Agreements that it "conducted a reasonable investigation" of Ellipso and Virtual Geo, and had "received such information ... and ha[d] been given such opportunity to ask such questions of, and receive answers from, representatives of [Ellipso and Virtual Geo], as [SST Global] deems sufficient to make an informed investment decision with respect to the Stock." [FN43] Therefore, like the plaintiffs in *Belin* and *Emergent Capital,* the Sahagen Parties cannot take advantage of the *Danann* rule and summary judgment must be granted in favor of the Castiel Parties with regard to fraud claims stemming from statements or omissions that were not warranted in the Agreements. [FN44]

> FN42. *Belin,* 1998 WL 391114, at *8. *See also Emergent Capital,* 165 F.Supp.2d at 623 (finding it relevant that the plaintiff had access to information and executed a warranty that it had the opportunity to ask questions and receive answers from the defendant and to obtain any additional information it thought necessary before entering into the transaction).

> FN43. Castiel Parties Reply Br., Ex. A. § 3.09; Castiel Parties Reply Br., Ex. B. § 3.09.

> FN44. For the same reasons, the court will enter summary judgment in favor of the Castiel Parties on Counts II and XI of the Sahagen Parties'

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
2003 WL 723285 (Del.Ch.)
(Cite as: 2003 WL 723285 (Del.Ch.))

Page 11

counterclaims to the extent they allege negligent misrepresentations not warranted in the Agreements. These Counts allege that the same misrepresentations discussed above give rise to a claim for negligent misrepresentation. This is essentially a lesser-included offense of fraud. As already discussed, the integration and merger clauses of the Agreements, in connection with the actions of Castiel and Sahagen prior to executing the Agreements, make Counts I and X untenable as a matter of law and must also make Counts II and XI invalid as a matter of law.

Summary judgment must also be granted in favor of the Castiel Parties with respect to Count V (civil conspiracy) of the Sahagen Parties' counterclaim. Since the Sahagen Parties are unable to survive a summary judgment motion based on their underlying claims, a claim for civil conspiracy must fail as well.

3. *The Undisputed Facts Show That The Warranties Provided Regarding The Status Of The FCC License Were Correct When Sahagen Entered Into The Stock Purchase Agreement*

The Sahagen Parties argue that Castiel made several material misrepresentations regarding the status of Ellipso's FCC license. Specifically, the Sahagen Parties argue that Castiel misrepresented that (1) the license was in full force and effect; (2) that MCHI was in full compliance with the construction and certification schedules established by the FCC; (3) that the license was not subject to any limitations that could subject it to cancellation or revocation; and (4) that Ellipso was in full compliance and no further requirements needed to be meet.

The FCC required that construction begin on at least two satellites by July 1998, and that construction of the remaining satellites begin by July 2000. The FCC also required MCHI to report when those goals were achieved. MCHI entered into a non-contingent contract with Boeing in June 1998 for the construction of two satellites. This contract was subsequently amended in November 1998, February 1999, and June 1999. MCHI reported to the FCC in June 1998 that it was in compliance with the July 1998

milestone.

**\*10** The crux of the Sahagen Parties' claims that relate to the FCC license is the fact that the FCC revoked Ellipso's license in May 2001. The Sahagen Parties argue the FCC found that MCHI abrogated its contract with Boeing when the November 1998 amendment was executed, resulting in MCHI being out of compliance with the FCC license and subjecting its license to revocation. Since this all occurred before the Sahagen Parties invested in Ellipso, the argument goes, the Castiel Parties breached the specific warranties provided in the Stock Purchase Agreement.

The facts as plainly found by the FCC, however, do not support the Sahagen Parties' claims. It is true that the FCC found that the November 1998 amendment required Boeing to develop and submit a proposal for a re-negotiated contract and forbade it from performing any other tasks without prior authorization from MCHI. [FN45] The FCC did not determine, however, that this amendment resulted in an abrogation of MCHI's contract with Boeing. Rather, the FCC determined that *as of June 30, 1999*-approximately six months after the Sahagen Parties invested in Ellipso and Virtual Geo-the Boeing contract was abrogated by amendment. [FN46]

> FN45. *In re Mobile Communications Holdings, Inc.,* DA 01-1315, at 3.
>
> FN46. *See id.* at 3 ("It thus appears that between June 30, 1999 and October 12, 2000 Boeing was under no contractual duty to perform satellite construction for MCHI"); *see also id.* at 4 ("[MCHI's] contract with Boeing for construction of two satellites was essentially abrogated on June 30, 1999").

A plain reading of the FCC order demonstrates that there are no genuine issues of material fact related to Ellipso's warranties of the validity of its FCC license. The undisputed facts actually support the conclusion that MCHI and Ellipso were in compliance with the FCC's milestone and construction schedule at the time Sahagen invested in Ellipso and Virtual Geo. [FN47] There being no genuine issue of material fact, summary judgment in favor of the

Westlaw.

Not Reported in A.2d                                          Page 12
2003 WL 723285 (Del.Ch.)
(Cite as: 2003 WL 723285 (Del.Ch.))

Castiel Parties on Counts I and X is appropriate as no misrepresentations regarding the FCC license can be shown. [FN48]

> FN47. *See id* at 2 ("MCHI did, in fact, enter into a two-satellite construction contract with Boeing prior to the first milestone deadline").

> FN48. The same misrepresentations are relied on to allege both fraud (Counts I and X) and negligent misrepresentation (II and XI). Because this court has determined there were no misrepresentations whatsoever with respect to the FCC license, summary judgment must be granted as to both the Sahagen Parties' fraud claim and negligent misrepresentation claim to the extent they rely on the FCC license. Because there are no litigable claims based on the FCC license, the Sahagen Parties' civil conspiracy claims (Count V) must fail as well.

**B. *The Castiel Parties' Fiduciary Duty Claims Are Derivative And There Is No Evidence That Demand Would Have Been Futile***

**1. *The Sahagen Parties' Direct Claims For Breach Of Fiduciary Duty (Counts III And IV) Are Actually Derivative Claims***

In Count III of their cross-counterclaim, the Sahagen Parties allege a direct claim for breach of the fiduciary duty of loyalty against Castiel. [FN49] This Count alleges as follows:

> FN49. Count IV asserts alleges that Ellipso and MCHI aided and abetted this breach of fiduciary duty.

Castiel breached his fiduciary duties to SST Global by, among other things, diverting company funds (including SST Global's investments) to his own use, causing the company to pay for expenses which had no relationship to company business, engaging in acts of misfeasance and nonfeasance constituting gross negligence, wasting and depleting the cash and other assets of the company, and misrepresenting or failing to disclose material facts

regarding Virtual Geo LLC's business and finances. [FN50]

> FN50. Second Amended Reply, Answer, and Counterclaims of Peter D. Sahagen and SST Global, LLC at ¶ 79.

Essentially, the Sahagen Parties' claim appears to be nothing more than a claim for waste, mismanagement, and self-dealing. Such a claim is clearly derivative in nature and not a direct claim as the Sahagen Parties maintain. In deciding whether a claim is derivative or individual, a court looks to the "nature of the wrong alleged [not] the plaintiff's characterization of the claim in the complaint ." [FN51] To maintain a direct lawsuit, the injury alleged must affect a stockholder alone or affect a particular stockholder right "such as his preemptive rights as a stockholder, rights involving control of the corporation, or a wrong affecting the stockholders and not the corporation." [FN52] For these reasons, "claims of waste and self-dealing ... have been held to be derivative and not individual." [FN53] Thus, it is clear that the "individual" claims the Sahagen Parties assert are more appropriately characterized as derivative claims that are brought on Virtual Geo's behalf.

> FN51. *Kramer v. Western Pac. Indus., Inc.*, 546 A.2d 348, 352 (Del.1988).

> FN52. *In re Paxon Comm. Corp. S'holders. Litig.*, 2001 WL 812028, at *3 (Del.Ch. July 12, 2001).

> FN53. *In re Rexene Corp. S'holders. Litig.*, 1991 WL 77529, at *3 (Del.Ch. May 8, 1991); *Kramer*, 546 A.2d at 353 ("A claim of mismanagement resulting in corporate waste, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders.... Thus, the wrong alleged is entirely derivative in nature.").

**\*11** Responding to the Castiel Parties' arguments that Count III alleges solely derivative claims, the Sahagen Parties attempt in their answering brief to assert new breach of fiduciary duty claims that are more individual in nature. [FN54] These new claims are permitted, according to the Sahagen Parties, because "[i]n his Counterclaims, Sahagen

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
2003 WL 723285 (Del.Ch.)
(Cite as: 2003 WL 723285 (Del.Ch.))

Page 13

expressly states that Castiel's breaches include but are not limited to the breaches expressly enumerated therein." [FN55] In fact, this argument is based solely on the fact that Count III contains the words "among other things" when describing Castiel's alleged breaches of fiduciary duty. The court cannot permit a party, upon recognition that its original allegation standing alone cannot survive summary judgment as a direct claim, to assert for the first time in its answering brief new claims based solely on a clause containing the phrase "among other things." Therefore, the court will consider Count III, and the allegations set forth therein, as derivative in nature, requiring proof that demand would have been futile before permitting an individual stockholder to bring such a claim. The same is true for Count VIII, which explicitly alleges against the Castiel Parties a derivative claim for breach of fiduciary duty on behalf of Virtual Geo.

> FN54. See Sahagen Parties Ans. Br. at 38 ("Castiel also breached their [sic] fiduciary duties to keep Sahagen adequately informed about the business of Virtual Geo, failed to provide him with books and records, failed to hold meetings, and failed to protect the value of his investment").

> FN55. Id.

2. *The Sahagen Parties Have Failed To Establish A Genuine Issue Of Material Fact As To Whether Demand Would Have Been Futile*

The right of a member of a Delaware LLC to bring a derivative claim is governed by 6 *Del. C.* § 18-1000, which provides:

  A member or an assignee of a limited liability company interest may bring an action in the Court of Chancery in the right of a limited liability company to recover a judgment in its favor if managers or members with authority to do so have refused to bring the action *or if an effort to cause those managers or members to bring the action is not likely to succeed.* [FN56]

> FN56. Emphasis added.

This provision originates from the well-developed body of

Delaware law governing derivative suits by stockholders of a corporation. Accordingly, case law governing corporate derivative suits is equally applicable to suits on behalf of an LLC. [FN57]

> FN57. See *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.,* 1998 WL 832631, at *5 n. 14 (Del.Ch. Nov.10, 1998) ("The derivative suit is a corporate action grafted onto the limited partnership form, and I look to corporate precedent to distinguish between limited partnership derivative actions and direct limited partner claims").

The Sahagen Parties concede that no demand was made of Virtual Geo's board. [FN58] Under Delaware law, an individual plaintiff can only bring a derivative claim against an LLC without first making a demand of the board if such demand would have been futile. [FN59] A demand is considered futile when a reasonable doubt exists as to whether "(a) the [managers] were disinterested or independent, [or] (b) the challenged transaction was the product of a valid exercise of business judgment." [FN60] The presence of either situation excuses the lack of a demand. [FN61]

> FN58. See Sahagen Parties Ans. Br. at 34.

> FN59. See 6 *Del. C.* § 18-1001; *Rales v. Blasband,* 634 A.2d 927, 932 (Del.1993) ("Because directors are empowered to manage, or direct the management of, the business and affairs of a corporation, the right of a stockholder to prosecute a derivative suit is limited to situations where the stockholder has demanded that the directors pursue the corporate claim and they have refused or where demand is excused because the directors are incapable of making an impartial decision regarding such litigation").

> FN60. *Aronson v. Lewis,* 473 A.2d 805, 814 (Del.1984).

> FN61. See *Brehm v. Eisner,* 749 A.2d 244, 256 (Del.2000) ("These prongs [of the *Aronson* test for

Westlaw.

Not Reported in A.2d
2003 WL 723285 (Del.Ch.)
(Cite as: 2003 WL 723285 (Del.Ch.))

Page 14

determining whether demand is excused] are in the disjunctive. Therefore if either prong is satisfied, demand is excused.").

Both the Castiel Parties and the Sahagen Parties concede that the sole issue relating to whether demand on the Virtual Geo board would have been futile depends on whether Ambassador (Ret.) Gerald Helman would be disinterested and independent in a demand made by Sahagen to pursue litigation against Castiel for breach of fiduciary duty. This is because Castiel and Sahagen are the other two members of Virtual Geo's three-person Board of Managers. To support their argument that Helman was not disinterested or independent, the Sahagen Parties argue that Helman "is entirely dependent upon Castiel because his only other employment is as an officer in Ellipso, which Castiel controls." [FN62] The Sahagen parties also allege beholdeness on the part of Helman because he and Castiel are close friends. [FN63] In the same breath, however, the Sahagen Parties argue that Helman is beholden to Castiel because Helman once before acted to remove Castiel from a position of authority at Ellipso and Castiel terminated Helman. Helman is now allegedly afraid of similar reprisals. These arguments are all insufficient to satisfy the requirement that individual plaintiffs demonstrate futility before bringing a derivative claim on behalf of an LLC.

FN62. Sahagen Parties Ans. Br. at 36.

FN63. Id. at 37.

*12 It may be true that Helman's sole *employment* is as an officer of Ellipso, but this misses the point that Helman has other substantial sources of *income*. In his sworn affidavit, Helman stated that "I am not dependent on my Ellipso salary. My Ellipso salary is a supplement to my chief source of income. I am retired from a senior position in the Foreign Service of the Department of State and am receiving a full annuity that includes medical and other benefits." [FN64] The Sahagen Parties' second claim that because they are friends Helman is incapable of initiating a suit against Castiel, is defeated by their third claim that argues Helman has opposed Castiel, to the point that Castiel chose to fire Helman, at times prior to this litigation. Clearly their friendship has not stood in the way of their past business

dealings and there is no reason to think that it should in the future. Finally, the Sahagen Parties' third contention does not prove that Helman is beholden to Castiel. If anything, this argument supports an inference that Helman is not beholden to Castiel. The very fact that Helman supposedly was willing to risk his job to vote his conscience, and against Castiel, in the past demonstrates that he is not beholden to Castiel and is willing to vote against him again should the situation call for it.

FN64. Helman Aff. ¶ 2.

For all these reasons, the court will grant summary judgment in favor of the Castiel Parties on Counts III, IV, and VIII of the Sahagen Parties' counterclaim for failure to seek demand and an inability to demonstrate that such demand would have been futile. [FN65]

FN65. The court will allow the Sahgen Parties to re-file their derivative action if demand is made and it is wrongfully refused.

C. *Summary Judgment Should Be Entered Against Sahagen And Quinn For Breach Of Their Duty Of Loyalty*

Count II of the complaint of Virtual Geo and Count II of the Castiel Parties' counterclaims allege that Sahagen and Quinn breached their duty of loyalty when, in the context of a merger, they attempted to wrest control of Virtual Geo from Castiel without his consent. Then-Vice Chancellor Steele, in a trial on a corporate governance issue, has already held that Sahagen and Quinn "owed a duty of loyalty to [Virtual Geo], its investors and Castiel, their fellow manager," and "that the actions of Sahagen and Quinn, in their capacity as managers constituted a breach of their duty of loyalty." [FN66] This holding, according to the Castiel Parties, is the "law of the case" and, consequently, summary judgment should be entered in favor of the Castiel Parties on Count II of their counterclaims. [FN67]

FN66. *VGS, Inc. v. Castiel,* 2000 WL 1277372, at *4, *5. *See also VGS, Inc. v. Castiel,* 2001 WL 1154430, at *1 (Del.Ch. Sept.25, 2001) ("In his August 31, 2000 decision, then Vice Chancellor Steele found that Peter Sahagen and Tom Quinn

Westlaw.

Not Reported in A.2d
2003 WL 723285 (Del.Ch.)
(Cite as: 2003 WL 723285 (Del.Ch.))

Page 15

breached their duty of loyalty when they secretly executed a written consent to the merger of [Virtual Geo] with and into VGS, Inc., for the purpose of eliminating the majority control over the enterprise of the third manager, David Castiel").

FN67. See *Kenton v. Kenton,* 571 A.2d 778, 784 (Del.1990) ("The 'law of the case' is established when a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation") (citation omitted).

The doctrine of "law of the case" is not a hard and fast rule, however. [FN68] The Delaware Supreme Court has stated that "[t]he law of the case doctrine is not inflexible in that, unlike *res judicata,* it is not an absolute bar to reconsideration of a prior decision that is clearly wrong, produces an injustice, or should be revisited because of changed circumstances." [FN69] The Sahagen Parties urge this court not to apply the "law of the case" doctrine because to do so would "create an injustice." [FN70]

FN68. See *Gannett Co., Inc. v. Kanaga,* 750 A.2d 1174, 1181 (Del.2000).

FN69. *Id.* (citations omitted).

FN70. Sahagen Parties Ans. Br. at 39.

**\*13** The court does find that any such injustice would occur if the "law of the case" doctrine were applied only with respect to whether or not a breach of the duty of loyalty occurred. There have been no changed circumstances since then-Vice Chancellor Steele issued his opinion. It also was not clearly wrong since the Delaware Supreme Court has subsequently affirmed the decision. [FN71] Thus, the court concludes that the "law of the case" doctrine does apply to the current facts, and Sahagen and Quinn will be held to have breached their duty of loyalty. Otherwise, the Castiel Parties would be forced to call witnesses to testify about what happened with respect to the attempted merger-testimony with which this court is all too familiar. Any such requirement would be redundant and serve to

waste this court's time.

FN71. *VGS, Inc.,* 781 A.2d 696 (Del.2001).

The Sahagen Parties argue that even if the "law of the case" is applied to Sahagen's and Quinn's breaches, important issues remain for trial as to questions of cause in fact, proximate cause, damages, setoff, comparative fault, estoppel, unclean hands, and contribution. The Castiel Parties do not disagree. [FN72] Accordingly, the court will only grant summary judgment on Count II of the Castiel Parties' complaints to the extent that the "law of the case" doctrine instructs this court to find that Sahagen and Quinn breached their fiduciary duty of loyalty.

FN72. See Castiel Parties Reply Br. at 9-10.

VI.

For the foregoing reasons, summary judgment is granted in favor of the Castiel Parties on the Sahagen Parties' cross-counterclaim, except as to Count IX of that counterclaim. Summary judgment is granted in part in favor of the Castiel Parties on Count II of its counterclaim to the extent that the court finds that Quinn and Sahagen breached their duty of loyalty. The parties shall consult and present a conforming order within 10 days of this opinion.

2003 WL 723285 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**6**

Westlaw.

Not Reported in B.R.                                                                                          Page 1
2004 WL 957958 (Bankr.N.D.Ill.)
(Cite as: 2004 WL 957958 (Bankr.N.D.Ill.))

**H**
Only the Westlaw citation is currently available.

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

In re CONSECO, INC., Debtor.
Stephen C. Hilbert, Plaintiff,
v.
Conseco, Inc., et al., Defendants.
Conseco, Inc., Counterclaim-Plaintiff,
v.
Stephen C. Hilbert, et al., Counterclaim and Third-Party
Defendants.

Bankruptcy No. 02 B 49672.
Adversary No. 03 A 04283.

Jan. 28, 2004.

Dann, Pecar, Newman & Kleiman; Freeman, Freeman &
Salzman, for Movant or Plaintiff.

Kirkland & Ellis, for Respondent or Defendant.

Sugar, Friedberg & Felsenthal, Trustee or Other Attorneys.

*MEMORANDUM OPINION*
CAROL A. DOYLE, Bankruptcy Judge.

*1 This matter is before the court on Stephen C. Hilbert's
Motion to Abstain and Remand State Court Action. [FN1]
For the reasons stated below, the motion is denied.

> FN1. Hilbert filed this motion on behalf of himself,
> the plaintiff, as well as seven family trusts that
> have been named as third party defendants by
> Conseco, all of which are represented by Hilbert's
> counsel.

I. Issue

Hilbert filed a two-count complaint in the circuit court of
Cook County, Illinois on September 15, 2003, seeking a
declaratory judgment against Conseco, Inc. ("Conseco") and
Conseco Services, L .L.C. [FN2] In Count I, Hilbert asks

the court to declare that, pursuant to his pre-petition
Termination Agreement, he must receive the same rights
and benefits that other employees enjoyed under the
Directors & Officers Loan Program ("D & O Program").
Count II seeks a declaration that certain changes at Conseco
constituted a "change of control" under the D & O Program
that required Conseco to purchase Hilbert's stock at his
purchase price plus interest. Conseco answered the
complaint and filed a counterclaim seeking to recover
approximately $155 million in unpaid loans from Hilbert.
On October 15, 2003, Conseco removed this action from
Illinois state court to this court as an adversary proceeding.
The issue presented by Hilbert's motion is whether the court
is required to abstain under 28 U.S.C. § 1334(c)(2) and, if
not, whether the court should abstain on a permissive basis.
The court concludes that neither mandatory nor permissive
abstention is appropriate. The issues raised in this adversary
include matters within the court's core jurisdiction, so
mandatory abstention does not apply. Permissive abstention
is also inappropriate because of the significant bankruptcy
issues presented in this case. Hilbert's motion to abstain and
remand is therefore denied.

> FN2. Conseco Services, L.L.C. is an affiliate of
> Conseco that has never been a debtor in the
> Conseco-related bankruptcy cases. Apparently, it is
> the entity that paid interest on behalf of participants
> in the D & O Program. It has filed suit against
> Hilbert in state court in Indiana to pursue its
> alleged rights against Hilbert in connection with
> the D & O Program loans.

II. Background

Hilbert was the CEO of Conseco until his employment was
terminated on April 20, 2000. On June 17, 2003, Conseco
rejected Hilbert's Termination Agreement to the extent it
could be deemed an executory contract. While he was
employed at Conseco, Hilbert participated in the D & O
Program. Under this program, Conseco arranged,
guaranteed, and advanced the interest payments on loans
from various banks. Hilbert's loans became due on the day
that Conseco filed for bankruptcy (December 17, 2002)
because bankruptcy was an "event of default" under the loan
documents. As part of the reorganizing debtors' Sixth

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in B.R.                                                                                              Page 2
2004 WL 957958 (Bankr.N.D.Ill.)
(Cite as: 2004 WL 957958 (Bankr.N.D.Ill.))

Amended Plan of Reorganization ("Plan"), the banks
assigned their rights in the promissory notes to the
reorganized Conseco ("New Conseco"). Conseco's
counterclaim seeks to collect on the notes and loan
agreements assigned by the bank, and to recover other
certain agreements between Hilbert and Conseco (relating
primarily to loans given to Hilbert's family members). A
portion of any money collected from Hilbert will be paid to
the holders of Trust Original Preferred Shares of Conseco
(referred to as TOPrS) who participated in a settlement with
the TOPrs that was incorporated into the Plan.

Conseco's confirmed Plan discharged all individual claims
against Conseco and the other reorganizing debtors.
However, prior to confirmation, Hilbert, Conseco and
CIHC, Inc. (another reorganizing debtor) entered into an
agreement regarding Hilbert's claims against Conseco
("Stipulation"). This Stipulation provided that, in exchange
for Hilbert withdrawing his claims against the debtor,
"nothing in the discharge of claims against Conseco and
CIHC... under the Debtors' plan of reorganization shall
constitute a waiver, discharge, or release of any of
[Hilbert's] valid rights or defenses to any claim of Conseco."
Stipulation, ¶ 2. The parties disagree over whether the
Stipulation preserved Hilbert's defenses and rights of set-off
against a second Conseco, Inc., referred to as New Conseco,
which was formed to serve as the post-confirmation
corporate vehicle, or whether the Stipulation applied only to
claims against Old Conseco and CIHC. The parties also
disagree over whether the discharge injunction bars Hilbert
from asserting the causes of action alleged in his declaratory
judgment action if the Stipulation is determined not to apply
to New Conseco.

*2 Hilbert argues that this case is fundamentally a contract
action that falls only within the "related to" jurisdiction of
this court, and is therefore subject to mandatory abstention
under 28 U.S.C. § 1334(c)(2). In the alternative, he asserts
that the court should abstain under principles of permissive
abstention. Conseco argues that the issues Hilbert raises fall
with the court's core jurisdiction, so that mandatory
abstention does not apply, and that the court should not
abstain on a permissive basis because of the importance of
the bankruptcy issues raised.

III. Abstention

A. Mandatory Abstention under § 1334(c)(2)

Section 1334(c)(2) mandates abstention where: 1) the suit is
based on a state law cause of action related to, but not
arising under or in, a case Under Title 11; 2) there is no
separate basis for federal jurisdiction apart from the
bankruptcy; 3) an action has already commenced in state
court; and 4) the case could be timely adjudicated in state
court. 28 U.S.C. § 1334(3)(2).

The first issue to be determined is whether the issues raised
in this case are within the core jurisdiction of this court.
Hilbert concedes that this case is within the "related to"
jurisdiction of the court, because the amount recovered will
affect the amount of money distributed to the TOPrS under
the Plan. He also concedes that at least one issue is within
the core jurisdiction of the court. In Count II of his
complaint, Hilbert claims that there has been a change of
control at Conseco that triggers an obligation by Conseco to
purchase his now worthless Conseco stock back from him at
the price he paid for it. Conseco contends that Paragraph 47
of the confirmation order nullifies this alleged right. Hilbert
acknowledges that the court has core jurisdiction to interpret
its own confirmation order, and the court agrees. In re
Chicago, Milwaukee, St. Paul and Pacific R.R. Co., 6 F.3d
1184, 1194 (7th Cir.1993) ( "the reorganization court is
clearly in the best position ... to interpret the consummation
order ..."); In re Kewanee Boiler Corp., 270 B.R. 912, 917
(Bankr.N.D.Ill.2002) (bankruptcy courts have core
jurisdiction to interpret and enforce their orders); In re
Forty-Eight Insulations, Inc., 212 B.R. 938, 941
(Bankr.N.D.Ill.1997) ("Bankruptcy courts have inherent
authority to interpret their own confirmation orders."), citing
In re Weber, 25 F.3d 413, 416 (7th Cir.1994) (bankruptcy
court's interpretation of own confirmation order entitled to
deference).

The court also has core jurisdiction to determine whether
the debtors' discharge and the discharge injunction prohibit
Hilbert from asserting defenses and set-off rights against
New Conseco. Conseco argues that the Stipulation preserves
Hilbert's right to raise these issues against Old Conseco, not
New Conseco. It alleges that, under the Plan and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in B.R.
2004 WL 957958 (Bankr.N.D.Ill.)
(Cite as: 2004 WL 957958 (Bankr.N.D.Ill.))

Page 3

discharge injunction in 11 U.S.C. § 524(e), Hilbert's affirmative claims against Old Conseco cannot be asserted against New Conseco. Hilbert, on the other hand, argues that the Stipulation preserves his right to assert defenses and set-offs against both Old Conseco and New Conseco. The parties dispute whether Hilbert's claims are defenses or affirmative claims of set-off. Count II, in which Hilbert contends that Conseco is obligated to purchase his stock back from him at his purchase price plus interest, is clearly an affirmative claim of a set-off. Count I, in which Hilbert asserts he must be treated the same as other employees whose loans were forgiven, is more difficult to characterize. However, whether Count I is considered a defense or a claim for set-off, significant bankruptcy issues are raised.

*3 To decide the merits of either of Hilbert's claims, the court must first decide whether the Stipulation preserves his right to raise them against New Conseco. Interpretation of the Stipulation may determine the extent to which the Plan and discharge injunction bar Hilbert's claims, and is therefore within the core jurisdiction of the court. If the Stipulation does not preserve Hilbert's right to assert these claims, the court will then need to determine whether the confirmed plan and discharge injunction bar Hilbert from proceeding, or whether defenses and set-off rights survive the discharge. [FN3] It is beyond dispute that a bankruptcy court has core jurisdiction to determine whether a plan or the discharge injunction bars claims against a debtor. Cox v. Zale Delaware, Inc., 239 F.3d 910, 917 (7th Cir.2001); In re Kewanee Boiler Corp., 270 B.R. at 917, 920; In re Forty-Eight Insulations, Inc., 212 B.R. at 941; Pettibone Corp. v. Payne (In re Pettibone Corp.), 151 B.R. 166, 169 (Bankr.N.D.Ill.1993). The court therefore has core jurisdiction to determine the effect of the Stipulation, the Plan and the discharge injunction on Hilbert's claims in this case. Because the court has core jurisdiction, mandatory abstention under 28 U.S.C. § 1334(c) does not apply.

> FN3. Courts are divided on the question of whether set-off rights survive a discharge. See In re Bare, 284 B.R. 870, 873 (Bankr.N.D.Ill.2002) (discussing cases on both sides of issue).

B. Permissive Abstention under 28 U.S.C. § 1334(c)(1)

Even though abstention is not mandatory, the court has discretion to abstain under 28 U.S.C. § 1334(c)(1), which provides:

> Nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under Title 11 or arising in or related to a case under Title 11.

Federal courts consider a number of factors in determining whether permissive abstention is appropriate. These include: (1) the effect or lack thereof on the efficient administration of the estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of the applicable law; (4) the presence of a related proceeding commenced in state court or another non-bankruptcy court; (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted "core" proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden on the bankruptcy court's docket; (10) the likelihood that the commencement of proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; and (12) the presence in the proceeding of non-debtor parties. E.g., In re Kewanee Boiler Corp. 270 B.R. at 922-23, quoting Matter of Chicago, Milwaukee, St. Paul & Pacific R.R. Co., 6 F.3d 1184, 1189 (7th Cir.1993).

*4 However, when the court has core jurisdiction it should construe these factors narrowly and abstain only in unusual circumstances. Chicago, Milwaukee, 6 F.3d at 1194; Kewanee Boiler, 270 B.R. at 923. The court recognizes that state courts are also capable of interpreting the discharge injunction and bankruptcy court orders. E.g., In re McGhan, 288 F.3d 1172, 1180 (9th Cir.2002) (validity of bankruptcy court order cannot be attacked in state court, but state court has jurisdiction to construe bankruptcy orders and discharge). However, important bankruptcy issues within the court's core jurisdiction are at the center of this dispute. These issues include interpretation of the Stipulation, the confirmation order, the Plan, and the discharge injunction.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in B.R.                                                                                    Page 4
2004 WL 957958 (Bankr.N.D.Ill.)
**(Cite as: 2004 WL 957958 (Bankr.N.D.Ill.))**

This court should decide these issues unless there are compelling circumstances favoring a state court adjudication. Here, there are no such compelling circumstances. In addition, the court's familiarity with the complicated history of the underlying bankruptcy cases weighs in favor of exercising jurisdiction over this case. Although the dispute may also involve questions of contract interpretation under state law, the mere presence of state law issues is insufficient to warrant permissive abstention. *Matter of L & S Indus., Inc., 989 F.2d 929, 935 (7th Cir.1993)*; *Kewanee Boiler, 270 B.R. at 923*. The court therefore denies Hilbert's motion to abstain on a permissive basis.

III. Conclusion

For all of these reasons, the court denies Hilbert's motion to abstain and remand this action to state court.

2004 WL 957958 (Bankr.N.D.Ill.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

7

# ANNUAL REPORT OF
# THE ILLINOIS COURTS



# STATISTICAL
# SUMMARY
# 2003

# ANNUAL REPORT
# OF THE
# ILLINOIS COURTS

# STATISTICAL SUMMARY - 2003

Compiled and Published by the
Administrative Office of the Illinois Courts
840 South Spring Street
Springfield, Illinois 62704-2618
(217) 785-2125

# CONTENTS

Title Page .................................................................................................................................................................. i
Acknowledgments ...................................................................................................................................................... ii
Contents ..................................................................................................................................................................... iii

## CIRCUIT COURTS OF ILLINOIS

Map of Judicial Circuits of Illinois ........................................................................................................................... 3

Directory of Circuit Clerks of Illinois ....................................................................................................................... 4

Graphical Presentation of Five-Year Trends - - Total Caseload
    and Selected Case Categories ............................................................................................................................. 7
      Definition of Case Categories .......................................................................................................................... 8

Caseload and Statistical Records* ............................................................................................................................ 13
    Caseload Summaries by Circuit ......................................................................................................................... 14
    Case Filing Ratio: Judge/Population ................................................................................................................. 15
    Civil Caseload Statistics by County ................................................................................................................... 16
    Criminal, Traffic, Conservation and Ordinance Caseload Statistics by County ............................................... 30
    Juvenile Caseload Statistics by County ............................................................................................................. 44
    Age of Pending Cases by Case Category (Downstate Circuits) ......................................................................... 51
    Law Case Dispositions by Circuit ..................................................................................................................... 52
    Law Case Dispositions by County ..................................................................................................................... 53
    Time Lapse: Case Filing to Date of Verdict (Law Jury Verdicts Over $50,000) .............................................. 56
    Felony Dispositions and Sentences by County .................................................................................................. 57
    Disbursement by Circuit Clerks and Cost of Operating Circuit Clerks' Offices ............................................... 61
    Circuit Clerk Fees and Other Revenue by County ............................................................................................ 62
    Circuit Clerk Cost of Operating by County ....................................................................................................... 65
    Circuit Clerk Disbursement of Funds by County
        Fines, Penalties, Assessments, and Forfeitures ......................................................................................... 68
        Fees of Others ............................................................................................................................................ 80
        Miscellaneous Disbursements .................................................................................................................... 86

Graphical Presentation of Five-Year Trends - - Adult and Juvenile Probation ....................................................... 93
    Abbreviations ..................................................................................................................................................... 96

Adult and Juvenile Probation ................................................................................................................................... 97
    Active Adult Caseload ........................................................................................................................................ 98
    Adult Investigation Report ............................................................................................................................... 101
    Adult Probation - Programs Ordered ............................................................................................................... 104
    Active Juvenile Caseloads ................................................................................................................................ 107
    Juvenile Investigation Report ........................................................................................................................... 110
    Juvenile Court Activity
        Petitions Continued Under Supervision .................................................................................................... 113
        Adjudications ............................................................................................................................................ 116
        Placements ................................................................................................................................................ 119

\* Statistics for Kane County may be inaccurate due to inconsistent reporting to the Administrative Office of the Illinois Courts.

# APPELLATE COURT OF ILLINOIS

Map of Appellate and Supreme Court Judicial Districts and
    Directory of Appellate Clerks.................................................................................................................123

Graphical Presentation of Five-Year Trends - - Total Caseload and
    Caseload by District...............................................................................................................................125

Caseload and Statistical Records ................................................................................................................129
    Caseload Summary by District .........................................................................................................130
    Case Dispositions by District............................................................................................................131
    Method of Case Disposition..............................................................................................................132
    Time Lapse: Case Filing to Disposition..........................................................................................133
    Time Lapse: Brief Filing to Disposition .........................................................................................134
    Opinions and Rule 23 Orders...........................................................................................................135

# SUPREME COURT OF ILLINOIS

Caseload and Statistical Records - - Five-Year Trends and 2003 Data...............................................137
    Case Filings and Dispositions...........................................................................................................138
    Table 1:  Summary of Case Filings and Final Dispositions, 1999 - 2003......................................141
    Table 2:  Summary of Petitions for Leave to Appeal and/or Appeal as a Matter of Right
         Under Rules 315/317 - General Docket, 1999 - 2003....................................................142
    Table 3:  Mandatory Jurisdiction Appeals - General Docket, 1999 - 2003....................................143
    Table 4:  General Docket, People & Civil Cases, 1999 - 2003 ........................................................143
    Table 5:  Summary of the Call of the Docket, 1999 - 2003 .............................................................144
    Table 6:  Summary of Opinions, 1999 - 2003 ..................................................................................145
    Table 7:  Summary of Rehearings, 1999 - 2003 ...............................................................................145
    Table 8:  Attorney Disciplinary Cases, 2003 ...................................................................................146
    Figure 1:  Filings, 1999 - 2003 ............................................................................................................147
    Figure 2:  Petitions for Leave to Appeal Filed as a Percent of Appeals
         Decided by Appellate Court Opinion or Rule 23 Order, 1999 - 2003...........................147

**TIME LAPSE: CASE FILING TO DATE OF VERDICT**
**LAW JURY VERDICTS OVER $50,000**
**CIRCUIT COURTS OF ILLINOIS**
**CALENDAR YEAR 2003**

| COUNTY | LAW JURY VERDICTS OVER $50,000 | AVG. TIME LAPSE IN MONTHS BETWEEN DATE OF FILING AND DATE OF VERDICT | COUNTY | LAW JURY VERDICTS OVER $50,000 | AVG. TIME LAPSE IN MONTHS BETWEEN DATE OF FILING AND DATE OF VERDICT | COUNTY | LAW JURY VERDICTS OVER $50,000 | AVG. TIME LAPSE IN MONTHS BETWEEN DATE OF FILING AND DATE OF VERDICT |
|---|---|---|---|---|---|---|---|---|
| ADAMS | 1 | 13.8 | HARDIN | 1 | 89.0 | MORGAN | 3 | 35.4 |
| ALEXANDER | 0 | 0.0 | HENDERSON | 0 | 0.0 | MOULTRIE | 0 | 0.0 |
| BOND | 0 | 0.0 | HENRY | 3 | 35.0 | OGLE | 0 | 0.0 |
| BOONE | 0 | 0.0 | IROQUOIS | 2 | 40.0 | PEORIA | 18 | 41.6 |
| BROWN | 0 | 0.0 | JACKSON | 5 | 45.5 | PERRY | 3 | 50.2 |
| BUREAU | 3 | 9.4 | JASPER | 0 | 0.0 | PIATT | 0 | 0.0 |
| CALHOUN | 1 | 14.2 | JEFFERSON | 3 | 26.9 | PIKE | 0 | 0.0 |
| CARROLL | 0 | 0.0 | JERSEY | 0 | 0.0 | POPE | 1 | 55.6 |
| CASS | 0 | 0.0 | JO DAVIESS | 1 | 14.9 | PULASKI | 1 | 59.2 |
| CHAMPAIGN | 11 | 27.9 | JOHNSON | 0 | 0.0 | PUTNAM | 1 | 33.8 |
| CHRISTIAN | 4 | 19.4 | KANE | 23 | 28.4 | RANDOLPH | 2 | 25.9 |
| CLARK | 0 | 0.0 | KANKAKEE | 1 | 102.2 | RICHLAND | 0 | 0.0 |
| CLAY | 1 | 66.9 | KENDALL | 4 | 20.3 | ROCK ISLAND | 8 | 38.3 |
| CLINTON | 0 | 0.0 | KNOX | 1 | 58.2 | SALINE | 1 | 19.8 |
| COLES | 10 | 24.0 | LAKE | 19 | 37.6 | SANGAMON | 18 | 46.5 |
| COOK | 575 | 36.6 | LASALLE | 7 | 39.6 | SCHUYLER | 0 | 0.0 |
| CRAWFORD | 0 | 0.0 | LAWRENCE | 1 | 28.6 | SCOTT | 1 | 41.7 |
| CUMBERLAND | 0 | 0.0 | LEE | 4 | 34.5 | SHELBY | 1 | 20.6 |
| DEKALB | 2 | 43.4 | LIVINGSTON | 1 | 11.7 | ST. CLAIR | 10 | 29.0 |
| DEWITT | 0 | 0.0 | LOGAN | 4 | 23.9 | STARK | 1 | 17.6 |
| DOUGLAS | 0 | 0.0 | MACON | 7 | 24.9 | STEPHENSON | 3 | 29.1 |
| DUPAGE | 48 | 29.3 | MACOUPIN | 4 | 23.7 | TAZEWELL | 14 | 29.1 |
| EDGAR | 3 | 14.6 | MADISON | 23 | 30.6 | UNION | 0 | 0.0 |
| EDWARDS | 0 | 0.0 | MARION | 2 | 21.0 | VERMILION | 0 | 0.0 |
| EFFINGHAM | 3 | 28.4 | MARSHALL | 0 | 0.0 | WABASH | 0 | 0.0 |
| FAYETTE | 0 | 0.0 | MASON | 0 | 0.0 | WARREN | 0 | 0.0 |
| FORD | 1 | 18.1 | MASSAC | 6 | 30.4 | WASHINGTON | 1 | 27.0 |
| FRANKLIN | 11 | 39.1 | MCDONOUGH | 0 | 0.0 | WAYNE | 9 | 19.7 |
| FULTON | 0 | 0.0 | MCHENRY | 13 | 34.7 | WHITE | 0 | 0.0 |
| GALLATIN | 0 | 0.0 | MCLEAN | 12 | 30.3 | WHITESIDE | 1 | 78.1 |
| GREENE | 0 | 0.0 | MENARD | 0 | 0.0 | WILL | 29 | 35.9 |
| GRUNDY | 3 | 37.5 | MERCER | 0 | 0.0 | WILLIAMSON | 9 | 22.6 |
| HAMILTON | 0 | 0.0 | MONROE | 1 | 8.4 | WINNEBAGO | 9 | 42.4 |
| HANCOCK | 1 | 45.8 | MONTGOMERY | 2 | 23.3 | WOODFORD | 1 | 33.8 |