IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS

FEB 0 8 2005

KENNETH S. GARDNER, CLERK
PS REP. - AI

DOERGE CAPITAL COLLATERALIZED )
BRIDGE FUND L.P., an Illinois Limited )
Partnership, ARMANDO ALONSO, an )
Individual, FRANCISCO ALONSO, an )
Individual, ERNEST DAVIS, JR., an )
Individual, and THOMAS HALL, an )
Individual, )
                                       )      Case No. 04 A 04207
                Plaintiffs,            )
                                       )      Judge Bruce W. Black
        v.                             )
                                       )      Removed from Circuit Court of the
                                       )      Nineteenth Judicial Circuit
MARCUS LEMONIS, an Individual, and     )      (Lake County), Case No. 04 L 873
FREEDOMROADS LLC, a Limited Liability  )
Company,                               )
                                       )
                Defendants.            )

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION TO ABSTAIN AND REMAND

Defendants Marcus Lemonis and FreedomRoads LLC, by their attorneys, respectfully submit this Response in opposition to Plaintiffs' motion to abstain or remand. First, this Court should decide Defendants' motion to transfer before considering Plaintiffs' motion to remand or abstain. Second, because Plaintiffs' claims contain core proceedings, the bankruptcy court should exercise jurisdiction. Third, neither mandatory nor discretionary abstention is appropriate.

## ARGUMENT

**I.    The Court Should Decide Defendants' Motion to Transfer Before Considering Plaintiffs' Motion to Remand.**

As Defendants' pending motion to transfer explains in greater detail, this Court should transfer this case to the District of Delaware, where the Debtor's case is currently pending, before reaching the question of whether to remand or abstain. Plaintiffs' assertion that

142995_1.DOC

this Court must first decide whether it has jurisdiction is incorrect. If Plaintiffs' jurisdictional objection had merit, then no federal court could transfer a case in which a motion to remand had been filed; however, federal courts, including in particular the Judicial Panel on Multidistrict Litigation, routinely transfer cases, notwithstanding pending remand motions.

Indeed, the Judicial Panel on Multidistrict Litigation transfers cases, together with any motion to remand, precisely so that the transferee court may hear and decide the remand motion. *E.g., In re Western States Wholesale Natural Gas Antitrust Litig.*, 290 F. Supp. 2d 1376, 1378 (J.P.M.L. 2003) (any remand motions "can be presented to and decided by the transferee judge"); *In re Ford Motor Co. Crown Victoria Police Interceptor Prods. Liab. Litig.*, 229 F. Supp. 2d 1377, 1378 (J.P.M.L. 2002) ("[A]ny pending motions to remand [MDL-transferred actions] to their respective state courts can be presented to and decided by the transferee judge."); *In re Farmers Ins. Exchange Claims Representatives' Overtime Pay Litig.*, 196 F. Supp. 2d 1373, 1375 (J.P.M.L. 2002) (same); *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 368 F. Supp. 812, 813 (J.P.M.L. 1973) (same).

As the First Circuit recently explained, "[t]he fact that there were pending jurisdictional objections did not deprive the MDL panel of the ability to transfer the case." *Grispino v. New England Mut. Life Ins. Co.*, 358 F.3d 16, 19 n.3 (1st Cir. 2004) (citing *In re Ivy*, 901 F.2d 7, 9 (2d Cir. 1990)). Similarly, in *In re Ivy*, the Second Circuit held that "the MDL Panel has jurisdiction to transfer a case in which a jurisdictional objection is pending,...that objection to be resolved by the transferee court." 901 F.2d at 9 (citation omitted). By transferring disputes to a court that is familiar with the underlying issues, "[c]onsitency as well as economy is thus served." *Id.* "Once transferred, the jurisdictional objections can be resolved by a single court." *Id.*

2

As in MDL cases, judicial economy is equally served by transferring this case to the District of Delaware, which is already familiar with the underlying bankruptcy proceedings and which issued the orders central to this dispute.

## II.    Plaintiffs' Action Comprises Core Proceedings.

Plaintiffs' admissions *before* they became concerned about removal and remand speaks volumes. In the first sentence of their complaint, Plaintiffs conceded that:

> This action relates to an insolvent and now bankrupt corporation known as Holiday RV Superstores, Inc.

Compl. ¶ 1. They spend five more paragraphs of their complaint further describing the Debtor's bankruptcy, *id.* ¶¶ 8, 57-60, and complain that "the remaining assets of Holiday RV" were acquired "out of bankruptcy" and transferred to FreedomRoads LLC as part of an alleged conspiracy, *id.* ¶ 57. Plaintiffs' all too honest pleading of their complaint makes clear that their claims against FreedomRoads and Lemonis are core proceedings.

### A.    Plaintiffs' Claims Against FreedomRoads Are Core Proceedings That The Bankruptcy Court Should Decide.

Plaintiffs' successor liability claim against FreedomRoads constitutes a core proceeding. Plaintiffs base their sole theory of liability against FreedomRoads on the alleged transfer of the Debtor's equity or assets to FreedomRoads. *See* Compl. ¶¶ 10, 31, 46, 52; *id.* at Counts III, VI, IX, XII. In particular, they allege that FreedomRoads is the "successor to [the Debtor] Holiday RV Superstores, Inc." *Id.* ¶ 1. They do not assert any action that arises

independently of FreedomRoads' relationship with the Debtor or its assets. *See, e.g., id.* ¶¶ 10, 61-62, 88-89, 118-19, 148-49.[1]

Plaintiffs' attempt to impose successor liability on FreedomRoads for its alleged receipt of the Debtor's assets[2] implicates the Delaware Bankruptcy Court's order that the Debtor's assets be transferred "free and clear" of all claims and, thus, is an administrative matter under Title 11. *In re Korhumel Indus.*, 103 B.R. 917, 924 (Bankr. N.D. Ill. 1989) ("suit arose under Title 11" where plaintiff sought to impose successor liability on defendant who purchased assets "free and clear" from bankruptcy estate).

Moreover, the very filing of this case violates the Delaware Bankruptcy Court's permanent injunction, which prohibits Plaintiffs from pursuing "any encumbrance of any kind … against the property of the Debtor" and including "successors of the Debtor." *Findings of Fact, Conclusions of Law and Order*, No. 03-13221 (MFW) at 9, ¶ 19. (Bankr. D. Del. Aug. 27, 2004)

---

[1]    Having had their action removed, Plaintiffs now seek to distance themselves from their own complaint. For example, in their complaint, Plaintiffs allege that FreedomRoads allegedly "assumed ownership and control of … all or substantially all of [the Debtor's] assets," Compl. ¶ 88, but in their motion to remand, they now claim that "there was no transfer of assets to FreedomRoads," Mot. at 3. Likewise, in their complaint, Plaintiffs contend that "Lemonis and Adams [an alleged and unnamed co-conspirator] conspired together on a plan for Adams to acquire the remaining assets of [the Debtor] out of bankruptcy and to move those assets to … FreedomRoads LLC," Compl. ¶ 57, but now they offer the excuse that the references to the "bankruptcy are merely informational, not substantive," Mot. at 3. Nonetheless, not only do the allegations of their complaint constitute judicial admissions, *Help at Home, Inc. v. Med. Capital, LLC*, 260 F.3d 748, 753 (7th Cir. 2001), but also the propriety of removal is judged based upon Plaintiffs' allegations at the time of removal, which Plaintiffs cannot later manipulate to attempt to defeat removal. *See Gould v. Artisoft, Inc.*, 1 F.3d 544, 547 (7th Cir. 1993); *In re Shell Oil Co.*, 970 F.2d 355, 356 (7th Cir. 1992).

[2]    In their motion to remand, Plaintiffs now assert that an entity known as "FreedomRoads Minnesota" received ownership of the equity in the reorganized Debtor. The Plaintiffs are still in error. There is no legal entity called "FreedomRoads Minnesota." Rather, the confirmed bankruptcy plan transferred ownership of the reorganized Debtor to FreedomRoads Finance Company LLC (f/k/a Holiday Finance Company, LLC), which is referred to in the plan by the short-hand "FreedomRoads Minnesota." *See Second Am. Plan of Reorg. Of Holiday RV Supersores, Inc.* at Ex. A, p.4 thereto (Ex. 2 to Mot. to Trans.). Defendant FreedomRoads LLC owns FreedomRoads Finance Company.

(Ex. 1 to Mot. to Trans.)  The present case requires administration and enforcement of that order and, therefore, is a core proceeding under 28 U.S.C. § 157(b).

Indeed, the proof of claim that the lead plaintiff here, Doerge Capital, filed in the Debtor's bankruptcy proceedings shows that Plaintiffs' claims are core proceedings that belong in bankruptcy court.  Although Plaintiffs choose not to mention this fact, this case is actually the re-filing of an earlier action that Doerge Capital filed against the Debtor and Lemonis.[3]  A review of the original complaint (Ex. 1 hereto) reveals that Plaintiffs largely repeated the substance of the allegations from the original complaint in the current one.  Significantly, the proof of claim that Doerge Capital submitted in the Debtor's bankruptcy consisted of the original complaint that it filed against the Debtor and Lemonis.  *See Doerge Capital Proof of Claim* (Ex. 2 hereto).  The fact that Doerge Capital repeats nearly the same allegations in both its proof of claim and this action illustrates that its claims are core proceedings.

### B.  Plaintiffs' Claims Against Lemonis Are Derivative Claims, Which Constitute Core Proceedings That The Bankruptcy Court Should Decide.

In their motion to remand, Plaintiffs do not address their claims against Lemonis. These claims, however, are based upon Lemonis' relationship to the Debtor.  In particular, Plaintiffs bring claims for breach of fiduciary duty purportedly owed to them as creditors of the Debtor.  *See* Compl. at Counts II, V, VIII, & XI.  In Plaintiffs' words, "Lemonis as Chief Executive Officer and Chairman of the Board of Directors owed a fiduciary duty to the creditors of [the Debtor] Holiday RV in addition to all of its shareholders...."  *Id.* ¶ 80.

---

[3]    When they re-filed this action, Plaintiffs admitted that the current case is a re-filing of the previous action against the Debtor and Lemonis.  *See* Oct. 27, 2004 *Cert. of Attorney* (Ex. 4 hereto) ("There has been a previous voluntary or involuntary dismissal of the subject matter of this litigation and at the time of the dismissal Case No. 02 L 889 was assigned to The Honorable Raymond J. McKoski.").

Even assuming that Plaintiffs were creditors of the Debtor and that Lemonis owed a fiduciary duty to them as creditors, any claim they might assert for breach of fiduciary duty is derivative, rather than direct. *Production Res. Group, LLC v. NCT Group, Inc.*, No. C.A. 114-N, 2004 WL 2647593, at *13-14 (Del. Ch. Nov. 17, 2004) (Ex. 3 hereto).[4] As the *Production Resources* court explained:

> [R]egardless of whether they are brought by creditors when a company is insolvent, these claims [for breach of fiduciary duty] remain derivative, with either shareholders or creditors suing to recover for a harm done to the corporation as an economic entity and any recovery logically flows to the corporation and benefits the derivative plaintiffs indirectly to the extent of their claim on the firm's assets....

> Whether a firm is solvent or insolvent, it – and not a constituency such as its stockholders or its creditors – owns a claim that a director has, by failing to exercise sufficient care, mismanaged the firm and caused a diminution to its economic value.

*Id.* at *13-14.

A reading of Plaintiffs' complaint confirms that the claims Plaintiffs assert against Lemonis for breach of fiduciary duty are derivative. For example, they complain that Lemonis allegedly spent "outlandish sums of company funds" for improper expenses "in violation of Holiday RV's expense reimbursement policies." Compl. ¶ 33. Plaintiffs likewise allege that "[u]sing Holiday RV funds, Lemonis acquired a 2003 Range Rover for his personal use." *Id.* ¶ 34. They complain that Lemonis improperly paid himself a $40,000 bonus. *Id.* ¶¶ 39-40. They further assert that Lemonis supposedly engaged in a series of secret side deals, self-dealing, and/or conspiracies to the detriment of the Debtor. *Id.* ¶¶ 30, 36, 45-46, 50, 56-57, 81, 111, 141, 163.

---

[4]    Because the Debtor is a Delaware corporation, Delaware law governs the duties of its officers and directors.

Under Delaware jurisprudence, such claims are derivative, rather than direct. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) (rejecting "special injury" concept to distinction between direct and derivative claims). As the Delaware Supreme Court recently held, the analysis of whether the complaint alleges a direct or derivative claim "must turn solely on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Id.* at 1033. Here, the Debtor both suffered the alleged injury and would receive the benefit of any recovery. *See, e.g., VGS, Inc. v. Castiel*, No. C.A. 17995, 2003 WL 723285, at *10-11 (Del. Ch. Feb. 28, 2003) (Ex. 5 hereto) (breach of fiduciary claims of waste and self-dealing are derivative). Thus, Plaintiffs' breach of fiduciary claims are derivative.[5]

Moreover, the Debtor's confirmed plan permanently enjoined Plaintiffs from pursing "any encumbrance of any kind ... against the property ... of the Debtor," including against successors of the Debtor. *See Findings of Fact, Conclusions of Law and Order* at 9-10, ¶ 19. The only limitation upon that injunction is that Plaintiffs were permitted to pursue *non-derivative* claims. *See Second Am. Plan of Reorg.*, at 10, ¶ 12.5 ("[N]othing in the Plan or any order confirming the Plan shall release, enjoin or impact in any way any *non-derivative* Claim held by a Person or Entity against a current or former officer, director or Lender of the Debtor or Reorganized Debtor, or any non-Debtor.") (emphasis added).

Thus, at a minimum, any court that considers Plaintiffs' claims against Lemonis will need to decide whether the claims are derivative and are barred by the confirmed plan and permanent injunction. Therefore, the claims against Lemonis comprise core proceedings that the

---

[5]     Tellingly, Plaintiffs tacitly admitted that any cause of action for Lemonis' alleged misuse of corporate resources belongs to the Debtor when they alleged that the Debtor had previously sued Lemonis for this very conduct. Compl. ¶ 42.

bankruptcy court should adjudicate. *In re Conseco, Inc.*, 02 B 49672, 03 A 04283, 2004 WL 957958, *3 (Bankr. N.D. Ill. Jan. 28, 2004) (Ex. 6 hereto) (action was core proceeding because a court must first determine "whether the confirmed plan and discharge injunction bar [the plaintiff] from proceeding…" before deciding merits of case).

**C.      Plaintiffs' Lead Case Teaches That The Bankruptcy Court Should Exercise Its Jurisdiction.**

Ironically, Plaintiffs rely heavily upon *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159 (7th Cir. 1994). *Zerand*, however, explains that the bankruptcy court should hear this action. There, strangers to the bankruptcy, Ronald Cox and his wife, filed a personal injury suit more than four years after confirmation, seeking damages for an injury that occurred two years after confirmation. *Id.* at 161.

Here, in contrast, Plaintiffs' claims did not arise post-confirmation. Indeed, Plaintiffs admit that their "allegations primarily relate to pre-petition misrepresentations and fraudulent statements" and seek damages for pre-petition events. Mot. at 2.

Moreover, these Plaintiffs are not strangers to the bankruptcy. Not only did each plaintiff have notice of the bankruptcy proceedings, but three of the Plaintiffs actually appeared in the bankruptcy proceedings to assert claims. Plaintiff Doerge Capital even served on the unsecured creditors committee and was entitled to vote on the plan.

As the Seventh Circuit stated in *Zerand*, "[h]ad the Coxes been parties to the bankruptcy proceeding, they would have had no possible basis for suit against Zerand," which purchased the debtor's assets. 23 F.3d at 163. Here, the Plaintiffs were parties to the bankruptcy proceeding. The bankruptcy court, thus, should hear this case.

8

### III.    Abstention Is Inappropriate.

Even if Plaintiffs' action were merely "related to" Title 11 – which is not the case – mandatory abstention is not appropriate. Similarly, the facts of this situation do not support the "narrow exception" of permissive abstention.

### A.    Plaintiffs Have Not And Cannot Carry The Burden For Mandatory Abstention.

For mandatory abstention, the *movant* must establish: (1) it filed a timely motion; (2) the proceeding is based on solely state law issues; (3) the case does not arise under Title 11 or arise under a case under Title 11; (4) there is no independent basis for federal jurisdiction for the claim, other than the bankruptcy proceeding; (5) an action has been commenced in a state forum; *and* (6) the case could be timely adjudicated in state court. *In re Emerald Acquisition Corp.*, 170 B.R. 632, 646 (N.D. Ill. 1994). The failure to establish any one of these elements defeats mandatory abstention. *Id.* Because Plaintiffs have not made and cannot make a showing on the third, fourth, and sixth elements, their motion should be denied.

*First*, as explained above, the current case will require interpretation of the Delaware Bankruptcy Court's confirmation order, with regard to both whether it bars Plaintiffs' successor liability claims against FreedomRoads and whether it released the derivative fiduciary duty claims against Lemonis. Thus, the matter is a core proceeding and must be decided by the bankruptcy court. *In re Emerald*, 170 B.R. at 646 (where claims "are core matters, mandatory abstention is not appropriate");[6] *In re Conseco*, 2004 WL 957958, *3 ("It is beyond dispute that a

---

[6]    Significantly, the only case that Plaintiffs cite for mandatory abstention, *In re Emerald*, 170 B.R. at 646, shows that abstention is inappropriate here. There, the plaintiffs brought "Valuation Claims" against former directors of the debtor challenging, *inter alia*, the directors' pre-petition conduct, including the decision to put the debtor into bankruptcy. The Court recognized that such allegations were a collateral attack on the bankruptcy process and, thus, were core proceedings under both Section 157(b)(2)(A), covering "matters concerning the administration of the estate," and under Section 157(b)(2)(O), the catchall. *Id.*

bankruptcy court has core jurisdiction to determine whether a plan or the discharge injunction bars claims against a debtor" and abstention is not appropriate where the defendant argues that the bankruptcy court's order bars the claims); *see In re Kewanee Boiler Corp.*, 270 B.R. 912, 917 (Bankr. N.D. Ill. 2002) (bankruptcy courts have core jurisdiction to interpret and enforce their orders); *In re Forty-Eight Insulations, Inc.*, 212 B.R. 938, 941 (Bankr. N.D. Ill. 1997) ("Bankruptcy courts have inherent authority to interpret their own confirmation orders.") (*citing In re Weber,* 25 F.3d 413, 416 (7th Cir. 1994) (bankruptcy court's interpretation of own order entitled to deference)); *see also In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 6 F.3d 1184, 1189 (7th Cir. 1993) (participation in state action for 19 months and existence of open state law questions are insufficient to "to deprive defendant of a federal forum" for core claims). Thus, mandatory abstention is not appropriate for this reason alone.

      *Second*, by failing to properly address whether diversity jurisdiction exists, Plaintiffs did not carry their burden as the movant. In their motion to remand, Plaintiffs incorrectly claim that Plaintiff Doerge Capital is an Illinois limited partnership. First, as a factual matter, Plaintiffs' motion contradicts both the allegations of their own complaint, Compl. ¶ 2, and the records of the Delaware Secretary of State (Ex. 7 to Mot. to Trans.), which show that Doerge Capital is actually a Delaware limited partnership. Second, as a legal matter, Plaintiffs completely misunderstand the test for Doerge Capital's citizenship. For the purposes of diversity jurisdiction, the citizenship of the individual partners determines the citizenship of a limited partnership, *not* the state in which it was formed or where it claims to have its principle place of business. *See Grupo Dataflux v. Atlas Global Group*, 541 U.S. 567, ___, 124 S. Ct. 1920, 1923 (2004). Plaintiffs have been entirely silent as to the partners' identities and citizenship. For this additional reason, Plaintiffs failed to meet their burden for abstention.

*Third*, Plaintiffs have not even attempted to prove that this action can be timely adjudicated in state court. *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 74 B.R. 651, 654 (N.D. Ill. 1987) ("the party motioning for mandatory abstention under § 1334(c)(2) carries the burden of proving the action can be timely adjudicated in the state forum."). Merely arguing that a proceeding can be timely adjudicated in state court is insufficient; Plaintiffs must present evidence. *In re Georgou*, 157 B.R. 847, 851 (Bankr. N.D. Ill. 1993). Plaintiffs' failure to offer evidence is fatal to their argument. *Id.*

There is good reason that Plaintiffs have failed to carry their burden. The timely adjudication element of mandatory abstention considers: (1) the backlog of the state court's calendar; (2) the status of the bankruptcy proceeding; (3) the complexity of state law issues; and (4) whether the state court proceeding would prolong the administration or liquidation of the estate. *J.D. Marshall*, 74 B.R. at 654-55; *In re Georgou*, 157 B.R. at 851. These factors illustrate that this case could not be timely adjudicated in state court. First, the most recent Annual Report of the Illinois Courts shows that jury cases of more than $50,000 pending in Lake County Circuit Court take an average of *more than three years to reach a verdict. See* Ann. Rep. of Ill. Cts. (Ex. 7 hereto.) Second, given that a plan of reorganization already has been confirmed, the bankruptcy case is hardly in its infancy. Third, although this case may involve complex legal issues, these are not issues of Illinois state law, so that the Illinois courts have no compelling reason to decide them. Rather, the issues involve federal bankruptcy law arising from the scope and meaning of the Delaware Bankruptcy Court's confirmation order and *Delaware* law arising from the fiduciary duty claims Plaintiffs purport to assert.[7] Finally, abstention could delay wrapping up the bankruptcy proceedings because the Defendants may

---

[7]     Indeed, based upon its location and docket, the Delaware Bankruptcy Court is in a better position than either the Lake County Circuit Court or this Court to decide any complex issues of Delaware law.

11

have causes of action against the Debtor created by Plaintiffs' current claims. Hence, the factors for assessing the timeliness of the state court adjudication establish that that this action cannot be timely adjudicated in state court.

Because Plaintiffs failed to make the necessary showing for at least three of the elements necessary for mandatory abstention, this Court should not abstain under Section 1334(c)(2).

B.    **Discretionary Abstention Is Also Inapplicable.**

1.    **This Case Does Not Present The Rare Circumstances In Which Abstention Could Be Appropriate.**

Nor is discretionary abstention under Section 1334(c)(1) appropriate here. "Courts should generally exercise their jurisdiction if properly conferred and abstention is the exception rather than the rule." *In re Chicago, Milwaukee*, 6 F.3d at 1189; *accord In re Kewanee Boiler Corp.*, 270 B.R. at 918 & 923 ("Because of [the] paramountcy of policies set by Congress in the bankruptcy system, permissive abstention is rarely appropriate in bankruptcy cases."). Moreover, where the resolution of a case will require interpretation of a bankruptcy court order, the bankruptcy court should not abstain, even if the claims raise questions of state law. *In re Conseco*, 2004 WL 957958 *4; *In re Kewanee Boiler*, 270 B.R. at 918 & 923 (refusing to abstain because "a bankruptcy court is the best forum to deal with cases involving violations of the statutory injunction"); *see In re Forty-Eight Insulations*, 212 B.R. at 941 ("Bankruptcy courts have inherent authority to interpret their own confirmation orders.").

As the Seventh Circuit explained:

> Abstention is but a narrow exception to the exercise of federal jurisdiction, and the reorganization court should not abstain from interpreting its own consummation order absent extraordinary circumstances. The reorganization court is clearly in the best position [] to interpret the consummation order....

*In re Chicago, Milwaukee,* 6 F.3d at 1194 (citation omitted). In fact, in *In re Chicago,*

*Milwaukee* – the only case Plaintiffs cite for discretionary abstention -- the Seventh Circuit

reversed the lower court's decision to abstain under Section 1334(c)(1) as an abuse of discretion

because the defendant, a successor to the debtor's assets, had argued that the bankruptcy court's

confirmation order barred the plaintiff's claims. *Id.* at 1188. Similarly, the Defendants here

have argued that Plaintiffs' claims are barred by the Delaware Bankruptcy Court's confirmation

order. *See* disc., *supra,* at 4-7; Defs' Mot. to Dismiss at 2-6.

### 2.    The *Chicago, Milwaukee* Factors Disfavor Abstention.

Even the multi-factor test for discretionary abstention that Plaintiffs suggest

would require the bankruptcy court to exercise its jurisdiction:

- The efficient administration of the estate will not be aided by sending this case to Lake County. In fact, it may be hindered if the state court is forced to interpret the meaning of the bankruptcy plan, confirmation order, and permanent injunction. It will also be hindered if this case causes the Defendants to file an action against the Debtor for indemnification or for recovery of the funds paid to the bankruptcy estate in exchange for, *inter alia,* release from the Debtor's pre-petition liability.[8]

- This case does not involve issues of *Illinois* state law, complex or otherwise. Rather, federal bankruptcy issues predominate in the case, with some issues of *Delaware* corporate law also arising. Hence, no reason exists to defer to an Illinois state court for decision. Moreover, Plaintiffs concede that they bring "run of the mill state law claims," Mot. ¶ 23, tipping the question of the difficulty or unsettled nature of the applicable law towards the more relevant bankruptcy issues.

- As noted above, Plaintiffs miscomprehend the appropriate test for diversity jurisdiction and have failed to make any showing on this factor.

- Key issues in this case require a determination of whether Plaintiffs even have standing to pursue the purported causes of action in the face of the bankruptcy plan, confirmation order, and permanent injunction. The question of standing implicates almost every factor they cite for discretionary abstention. For example, the court hearing this case must decide whether Plaintiffs can plead around the confirmation order to impose successor liability on the alleged new owner of the Debtor's assets. That court must also decide whether creditors may

---

[8]      The fact that the bankruptcy reorganization has reached confirmation and the state case is not in discovery – nor even "at issue" – strongly weighs against abstention. *See In re Ascher,* 128 B.R. 639, 646 (Bankr. N.D. Ill. 1991) ("Considerations of judicial economy strongly suggest that the ... proceeding ... that is much further down the road to resolution ... takes precedence....") (ellipses in original) (citation omitted).

individually bring suits against a debtor's officers for breach of fiduciary duty or whether such claims are derivative and held by the bankruptcy estate for all creditors or the debtor's successor. These are issues for the bankruptcy court, not the Illinois state court. "Where there is a conflict between a bankruptcy court administering a complex reorganization and other court proceedings, equity favors the unfettered authority of the bankruptcy court to proceed expeditiously and without the time-consuming and costly distraction of other litigation." *In re Ascher*, 128 B.R. at 646 (citation omitted).

In short, abstention threatens the integrity of the bankruptcy proceeding, whereas the exercise of federal jurisdiction does not implicate the comity concerns that underlie the abstention doctrine.

## CONCLUSION

For the reasons stated above, this Court should deny Plaintiffs' motion to abstain and remand.

Dated:  February 3, 2005

Respectfully submitted,

One of the Attorneys for Defendants
Marcus Lemonis and FreedomRoads LLC

Arthur J. Howe (ARDC # 6190109)
Ian H. Fisher (ARDC # 6224920)
Schopf & Weiss LLP
312 W. Randolph Street, Suite 300
Chicago, Illinois  60606
(312) 701-9300

## CERTIFICATE OF SERVICE

I, Ian H. Fisher, an attorney, hereby certify that I caused a copy of the attached

**Defendants' Opposition to Plaintiffs' Motion to Abstain and Remand** to be served via email

and by U.S. Mail, on February 3, 2005, upon the following:

> Robert A. Carson
> Christopher J. Horvay
> Christina B. Conlin
> Gould & Ratner
> 222 North LaSalle Street, Eighth Floor
> Chicago, IL 60601
> RCarson@gouldratner.com

Ian H. Fisher

15

**1**

IN THE EIGHTEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

| | |
|---|---|
| DOERGE CAPITAL COLLATERALIZED BRIDGE FUND, L.P., an Illinois Limited Partnership,<br><br>Plaintiff,<br><br>v.<br><br>HOLIDAY R.V. SUPERSTORES, INC., a Florida Corporation, and MARCUS LEMONIS, an individual.<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>No. |

## VERIFIED COMPLAINT AT LAW

Doerge Capital Collateralized Bridge Fund, L.P., ("Doerge") by its attorneys, complains of Holiday R.V. Superstores, Inc. ("Holiday") and Marcus Lemonis ("Lemonis") as follows:

### The Parties

1. Doerge is an Illinois limited partnership with its principal place of business in Chicago, Illinois, whose principal member is DCM Bridge, L.L.C.

2. Holiday is a Delaware corporation with its principal place of business located in Lincolnshire, Illinois.

3. Lemonis is an individual residing in Cook County, Illinois, who served as Holiday's Chief Executive Officer.

### COUNT I
### (Breach of Agreement - Holiday)

4. In or around December, 2001, Doerge and Holiday negotiated an agreement whereby Doerge would loan funds to Holiday in exchange for an equity investment in Holiday, comprising the future issuance of Holiday stock.

5.    On or about January 8, 2002, Doerge and Holiday executed a Term Sheet which detailed the initial parameters and terms of their agreement, in advance of the parties' execution of a finalized agreement, referred to in the Term Sheet as "definitive documentation." (A true and correct copy of the Term Sheet is attached as Exhibit A).

6.    From December 2001 to February 2002, Doerge, relying in good faith on its agreement with Holiday, as memorialized in the Term Sheet, loaned Holiday a total of $500,000.00, in two payments of $250,000.00 each (the "loaned funds").

7.    Doerge advanced its first $250,000.00 loan to Holiday in December, 2001. Holiday acknowledges receipt of this payment on page two of the Term Sheet ("The Company acknowledges timely receipt of the payment of the first tranche.").

8.    After Doerge's first payment, the parties ratified the Term Sheet and began exchanging draft versions of the definitive documentation.

9.    On February 20, 2002, Doerge loaned Holiday an additional $250,000.00. (Holiday's signed acknowledgement of the wire transfer of this payment is attached as Exhibit B).

10.    After Doerge provided its second loan payment to Holiday, it became clear that the parties could not reach agreement on the language of the definitive documentation.

11.    Because no agreement could be reached, Doerge wrote to Holiday on April 18, 2002, demanding return of the loaned funds.

12.    Holiday did not return the loaned funds.

13.    Subsequently, Doerge again sent a demand letter to Holiday, demanding return of the loaned funds.

14.    Again, Holiday did not return the loaned funds.

15.    Holiday, after accepting the loaned funds, breached the parties' agreement by twice failing to return the loaned funds to Doerge upon proper demand.

16.    Holiday further breached the parties' agreement by failing to produce the definitive documentation required by the Term Sheet.

17.    Doerge has performed all its obligations under the Agreement.

WHEREFORE, Doerge requests entry of a judgment in its favor and against Holiday, for $500,000.00, plus interest, its costs in filing this action, attorney's fees, and such other relief in its favor and against Holiday as the Court deems appropriate.

## COUNT II
### (Breach of Agreement - Holiday)

18.    Doerge repeats and reasserts the allegations of paragraphs 1 through 17, inclusive, as paragraph 18.

19.    In the Term Sheet, Holiday agreed that, should the parties fail to reach agreement on definitive documentation, Holiday would file a Certificate of Designation setting forth the terms of the Term Sheet with respect to the first payment of the loaned funds.

20.    The parties failed to reach agreement on definitive documentation.

21.    Holiday has not filed a Certificate of Designation as required by the Term Sheet.

22.    Holiday breached the parties' agreement, upon failure to reach an agreement on definitive documentation, by failing to file a Certificate of Designation setting forth the terms established in the Term Sheet with respect to Doerge's initial payment.

23.    Doerge has performed all its obligations under the Agreement.

WHEREFORE, Doerge requests entry of a judgment in its favor and against Holiday, for $500,000.00, plus its costs in filing this action, and such other relief in its favor and against Holiday as the Court deems appropriate.

## Count Three –Fraudulent Inducement - Holiday

24. Doerge repeats and reasserts the allegations of paragraphs 1 through 23, inclusive, as paragraph 24.

25. During negotiations prior to the parties' execution of the Term Sheet, representatives of Doerge had numerous conversations with Marcus Lemonis, Chief Executive Officer of Holiday, about the future ownership of Holiday.

26. Doerge represented to Lemonis that they did not wish to enter into an agreement with Holiday if there was any chance that the ownership structure of Holiday would change after entering the agreement.

27. Doerge informed Lemonis that they were aware that an individual named Steve Adams was interested in obtaining ownership control of Holiday, and told Lemonis that Doerge would not enter any agreement with Holiday, and would invest its capital elsewhere, unless Doerge could be assured that Adams would not take ownership control of Holiday.

28. Lemonis, in conversations with Doerge's representatives, repeatedly stated that ownership control of Holiday would remain unchanged, and stated specifically that Adams would not assume ownership control of Holiday.

29. Lemonis made these statements knowing that they were not true.

30. Doerge, relying on Lemonis' statements, executed the Term Sheet and advanced Holiday the loaned funds.

31. Subsequently, on or about April 4, 2002, Doerge learned, via a "13D" form filed with the Securities and Exchange Commission, that Adams, through a stock purchase, would assume ownership control of Holiday.

32. Lemonis, as CEO of Holiday, fraudulently misrepresented Holiday's plans for ownership control to Doerge, knowing that Doerge would not loan funds to Holiday if it knew any ownership change would take place.

33. Doerge, in reliance on Lemonis's misrepresentation of Holiday's ownership, executed the Term Sheet, and advanced the loaned funds to Holiday.

34. Thus, Holiday fraudulently induced Doerge to advance the loaned funds, which Doerge loaned to Holiday in good-faith reliance on Lemonis' misrepresentations, and improperly denied Doerge the ability to control the loaned funds and invest those funds elsewhere.

WHEREFORE, Doerge respectfully requests that this court enter an order awarding Doerge damages in the amount of $500,000.00, plus costs in bringing this action, punitive damages, attorney's fees, and such other and further relief in Doerge's favor and against Holiday as this court deems just.

### Count Four – Fraud (Lemonis)

35. Doerge repeats and reasserts the allegations of paragraphs 1 through 35, inclusive, as paragraph 36.

36. Lemonis stated to representatives of Doerge that ownership control of Holiday would not change hands.

37. Lemonis made this statement knowing it to be false.

38. Doerge relied on Lemonis' false statement in deciding to enter its agreement with Holiday.

39. Absent Lemonis' untrue statement that ownership would not change, Doerge would not have entered an agreement with Holiday.

40. Ownership of Holiday changed soon after Doerge entered its agreement with Holiday, when Steve Adams assumed ownership control.

41. Holiday's change of ownership denied Doerge the benefit of its agreement with Holiday, and further denied Doerge the use and benefit of the loaned funds.

WHEREFORE, Doerge respectfully requests that this court enter an order awarding Doerge damages in the amount of $500,000.00, plus costs in bringing this action, punitive damages, attorney's fees, and such other and further relief in Doerge's favor and against Marcus Lemonis as this court deems just.

**DOERGE CAPITAL
COLLATERALIZED
BRIDGE FUND, L.P.**

By: _____
One of its attorneys

Gould & Ratner
Louis D. Bernstein
Andrew N. Fiske
222 North LaSalle Street
Suite 800
Chicago, IL 60601
(312) 236-3003

## VERIFICATION

I, David Doerge, under penalty of perjury, state that I am an agent of Plaintiff, Doerge

Capital Collateralized Bridge Fund L.P., and am authorized to execute this Verification on its

behalf. I have read the foregoing Verified Complaint. The allegations contained in the

Verification are true and correct to the best of my knowledge.

> Under penalties as provided by law pursuant to Section
> 1-109 of the Code of Civil Procedure, the undersigned
> certifies that the statements set forth in this instrument
> are true and correct.

David Doerge

**2**

| United States Bankruptcy Court<br>For the District of Delaware | PROOF OF CLAIM | Proceedings in<br>Chapter 11 |
|---|---|---|

Name of Debtor: Holiday RV Superstores, Inc.

Case Number:  03-13221 (MFW)

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property): Doerge Capital Collateralized Bridge Fund, L.P.

Name and address where notices should be sent:

Christopher J. Horvay, Esq.
Mark E. Abraham
Gould & Ratner
222 N LaSalle Suite 800
Chicago, IL 60601
(312) 236-3003
(312) 236-3241 (fax)

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

THIS SPACE IS FOR COURT USE ONLY

Account or other number by which creditor identifies debtor:

Case No. 02 L 889 filed against Holiday R.V. Superstores, Inc., et al. in the Nineteenth Judicial Circuit of Lake County, Illinois

Check here if this claim ☐ replaces
☐ amends a previously filed claim, dated:

**1.  Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- XX Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- XX Other [Breach of Contract for non-payment of demand loan]

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Your social security number.
  Unpaid compensation for services performed
  from _____ to _____ (date)

**2.  Date debt was incurred:** December 2001 to February 2002

**3.  If court judgment, date obtained:**

**4.  Total Amount of Claim at Time Case Filed:**    $500,000 plus interest [See Motion for Partial Summary Judgment, attached as Group Exhibit 1 and incorporated herein].

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5.  Secured Claim**
- ☐ Check this box if your claim is secured by collateral (including a right of setoff).
  Brief Description of Collateral:
  - ☐ Real Estate  ☐ Motor Vehicle
  - ☐ Other _____
  Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6.  Unsecured Priority Claim**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $
Specify the priority of the claim:
- ☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days
  before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. §507(a)(4).
- ☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. §507(a)(6).
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(_____).
  * Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7.  Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8.  Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9.  Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

DELAWARE
CLAIMS AGENCY LLC

APR 22 2004

Claim # 67
Initials MSH

Date
April 20, 2004

Sign and print name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)

By: Christopher J. Horvay, Attorney For Claimant
By its authorized agent

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§152 and 3571.

/240766.v 1

FILED

IN THE NINETEENTH JUDICIAL CIRCUIT    AUG 1 1 2003
LAKE COUNTY, ILLINOIS

*ca, .C. Loffett*
CIRCUIT CLERK

DOERGE CAPITAL COLLATERALIZED        )
BRIDGE FUND L.P., an Illinois        )
Limited Partnership,                 )
                         Plaintiff,  )
                                     )    No.    02 L 889
              v.                     )
                                     )
HOLIDAY R.V. SUPERSTORES, INC.,      )
a Florida Corporation, and MARCUS    )
LEMONIS, an individual.              )
                         Defendants. )

## MOTION FOR PARTIAL SUMMARY JUDGMENT

Doerge Capital Collateralized Bridge Fund L.P., ("Doerge") by its attorneys, pursuant to

735 ILCS 5/2-1005, moves for summary judgment on Counts I and II, against Holiday R.V.

Superstores, Inc. In support, Doerge states as follows:

## I. BACKGROUND

Doerge is an Illinois limited partnership with its principal place of business in Chicago,

Illinois. Holiday is a Delaware corporation located in Lincolnshire, Illinois. Marcus Lemonis is

an individual residing in Lake County, Illinois, who served as Holiday's Chief Executive Officer.

Doerge filed a four-count Verified Amended Complaint against Holiday and Lemonis, alleging

actions under breach of agreement, fraudulent inducement and fraud. A copy of the Amended

Verified Complaint is attached as Exhibit 1.

In December, 2001, Doerge and Holiday negotiated an agreement whereby Doerge would

loan funds to Holiday in exchange for an equity investment in Holiday, comprising the future

issuance of Holiday stock. *See Verified Amended Complaint, ¶ 4.* On January 8, 2002, Doerge

and Holiday executed a Term Sheet that detailed the initial parameters and terms of their

/204874.v 1

agreement, in advance of the parties' execution of a finalized agreement, referred to in the Term Sheet as "definitive documentation." *See Term Sheet, attached as Exhibit A to the Verified Amended Complaint.*

From December 2001 to February 2002, Doerge, relying in good faith on its agreement with Holiday, as memorialized in the Term Sheet, loaned Holiday a total of $500,000.00, in two payments of $250,000.00 each (the "loaned funds"). *See Term Sheet; See also Verified Amended Complaint,* ¶5-6. On December 21, 2001, Doerge advanced its first $250,000.00 loan to Holiday. *See Wire Payment Confirmation, attached hereto as Exhibit 2; See also Verified Amended Complaint,* ¶ 7. The loaned funds were wired to an account designated by Holiday. *See December 21, 2001 Designation Sheet signed by Marcus Lemonis on behalf of Holiday, attached hereto as Exhibit 3.* Holiday acknowledged receipt of this payment on page two of the Term Sheet ("The Company acknowledges timely receipt of the payment of the first tranche.").

After Doerge's first payment, the parties ratified the Term Sheet and began exchanging draft versions of the definitive documentation. On February 20, 2002, Doerge loaned Holiday an additional $250,000.00. *See Holiday's Acknowledgement of the wire transfer of this payment, attached as Exhibit B to the Verified Amended Complaint; See also, Wire Payment Confirmation, attached hereto as Exhibit 4.* Once again, Doerge wired the loaned funds to an account designated by Holiday. *See February 20, 2002 Correspondence directing payment, signed by Marcus Lemonis, attached hereto as Exhibit 5.*

After Doerge provided its second loan payment to Holiday, it became clear that the parties could not reach agreement on the language of the definitive documentation. Because no agreement could be reached, Doerge wrote to Holiday on April 18, 2002, demanding return of the loaned funds. *A copy of the April 18, 2002 letter is attached as Group Exhibit 6.*

/204874.v 3

Holiday did not return the loaned funds. Subsequently, Doerge again sent a demand letter to Holiday, demanding return of the loaned funds. *See Group Exhibit 6.* Again, Holiday did not return the loaned funds.

In the Term Sheet, Holiday agreed that, should the parties fail to reach agreement on definitive documentation, Holiday would file a Certificate of Designation setting forth the terms of the Term Sheet with respect to the first payment of the loaned funds. *See Term Sheet, p 7, attached as Exhibit A to the Verified Amended Complaint; See also, Verified Amended Complaint, ¶ 19.* The parties failed to reach agreement on definitive documentation. *See Verified Amended Complaint, ¶ 20.* Holiday has not filed a Certificate of Designation as required by the Term Sheet. *See Verified Amended Complaint, ¶ 21.*

## II. ARGUMENT

Summary judgment should be granted if the pleadings, depositions, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *735 ILCS 5/2-1005(c).* The purpose of summary judgment is not to try issues, but to determine whether any triable issues exist. *Vessey v. Chicago Housing Authority*, 145 Ill. 2d 404, 416 (Ill. 1991). The trial court's decision to grant or deny a motion for summary judgment is not discretionary. *Basu v. Stelle*, 237 Ill. App. 3d 113 (2nd Dist. 1992). If there is no dispute as to material facts and the undisputed facts only support one inference, the only question is the legal effect of the facts. *Frost v. Robave, Inc.*, 296 Ill. App. 3d 528 (1st Dist. 1998). Where facts are not in dispute, the interpretation of a written contract is a question of law and summary judgment is appropriate. *Ford v. Dovenmuehle Mortgage, Inc.*, 273 Ill. App. 3d 240, 244 (1st Dist. 1995); *See also Giannetti v. Angiuli*, 273 Ill.

App. 3d 305 (2nd Dist. 1994) ("*summary judgment is a proper procedure where only the construction of language and the validity of a contract are at issue.*").

This is a very simple case. Doerge loaned Holiday $500,000.00. Holiday did not perform its obligations pursuant to the parties' agreement and did not provide any consideration to Doerge for the $500,000.00. Holiday now refuses to return the $500,000.00 without any basis to do so.

In sum, Holiday, after accepting the loaned funds, breached the parties' agreement by twice failing to return the loaned funds to Doerge upon proper demand. Holiday further breached the parties' agreement by failing to file a Certificate of Designation setting forth the terms established in the Term Sheet with respect to Doerge's initial payment. Holiday has not, and cannot, plead or set forth any affirmative defenses. There is no genuine issue of material fact and summary judgment is proper.

WHEREFORE, Doerge Capital Collateralized Bridge Fund L.P., requests entry of summary judgment in its favor and against Holiday on Counts I and II of the Verified Amended Complaint, for $500,000.00, plus interest and costs in filing this action, and such other relief in its favor and against Holiday R.V. Superstores, Inc., as the Court deems appropriate.

> **DOERGE CAPITAL**
> **COLLATERALIZED**
> **BRIDGE FUND L.P.**
>
> By: _____
> One of its attorneys

Gould & Ratner
Louis D. Bernstein
Christina B. Conlin
222 North LaSalle Street
Suite 800
Chicago, IL 60601
(312) 236-3003

/204874.v 3

## VERIFICATION

I, David Doerge, under penalty of perjury, state that I am an agent of Plaintiff, Doerge

Capital Collateralized Bridge Fund L.P., and am authorized to execute this Verification on its

behalf.  I have read the foregoing Motion for Summary Judgment.  The allegations contained in

the document are true and correct to the best of my knowledge.

> Under penalties as provided by law pursuant to Section
> 1-109 of the Code of Civil Procedure, the undersigned
> certifies that the statements set forth in this instrument
> are true and correct.
>
> David J. Doerge

5

1

IN THE EIGHTEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

**FILED**

JUL 2 - 2003

*x̄uly ṁ ɡjett*

**CIRCUIT CLERK**

THE DOERGE CAPITAL                )
COLLATERALIZED BRIDGE FUND         )
L.P., a Delaware Limited Partnership,  )
                      Plaintiff,  )
                              )      No.  02 L 889
                              )
          v.                 )
                              )
HOLIDAY R.V. SUPERSTORES, INC.,    )
a Delaware Corporation, and MARCUS )
LEMONIS, an individual.            )
                    Defendants.  )

## VERIFIED AMENDED COMPLAINT AT LAW

The Doerge Capital Collateralized Bridge Fund L.P., ("Doerge") by its attorneys,

complains of Holiday R.V. Superstores, Inc. ("Holiday") and Marcus Lemonis ("Lemonis") as

follows:

### The Parties

1.     Doerge is a Delaware limited partnership with its principal place of business in

Chicago, Illinois, whose general partner is DCM Bridge, LLC.

2.     Holiday is a Delaware corporation, that at all relevant times had its principal place

of business located in Lincolnshire, Illinois.

3.     Lemonis is an individual residing in Lake County, Illinois, who served as

Holiday's Chief Executive Officer.



11.    Because no agreement could be reached, Doerge wrote to Holiday on April 18, 2002, demanding return of the loaned funds.

12.    Holiday did not return the loaned funds.

13.    Subsequently, Doerge again sent a demand letter to Holiday, demanding return of the loaned funds.

14.    Again, Holiday did not return the loaned funds.

15.    Holiday, after accepting the loaned funds, breached the parties' agreement by twice failing to return the loaned funds to Doerge upon proper demand.

16.    Holiday further breached the parties' agreement by failing to produce the definitive documentation required by the Term Sheet.

17.    Doerge has performed all its obligations under the Agreement.

WHEREFORE, The Doerge Capital Collateralized Bridge Fund L.P. requests entry of a judgment in its favor and against Holiday, for $500,000.00, plus interest, its costs in filing this action, attorney's fees, and such other relief in its favor and against Holiday as the Court deems appropriate.

## COUNT II
### (Breach of Agreement - Holiday)

18.    Doerge repeats and reasserts the allegations of paragraphs 1 through 17, inclusive, as paragraph 18.

19.    In the Term Sheet, Holiday agreed that, should the parties fail to reach agreement on definitive documentation, Holiday would file a Certificate of Designation setting forth the terms of the Term Sheet with respect to the first payment of the loaned funds.

20.    The parties failed to reach agreement on definitive documentation.

21.    Holiday has not filed a Certificate of Designation as required by the Term Sheet.

3

22.    Holiday breached the parties' agreement, upon failure to reach an agreement on definitive documentation, by failing to file a Certificate of Designation setting forth the terms established in the Term Sheet with respect to Doerge's initial payment.

23.    Doerge has performed all its obligations under the Agreement.

WHEREFORE, The Doerge Capital Collateralized Bridge Fund L.P. requests entry of a judgment in its favor and against Holiday, for $500,000.00, plus its costs in filing this action, and such other relief in its favor and against Holiday as the Court deems appropriate.

## Count Three – Fraudulent Inducement - Holiday

24. The Doerge Capital Collateralized Bridge Fund L.P., repeats and reasserts the allegations of paragraphs 1 through 23, inclusive, as paragraph 24.

25. David Doerge is the managing member of DCM Bridge LLC, the general partner in The Doerge Capital Collateralized Bridge Fund L.P.

26. During negotiations prior to the parties' execution of the Term Sheet, David Doerge and other representatives of The Doerge Capital Collateralized Bridge Fund L.P. had numerous conversations with Marcus Lemonis, Chief Executive Officer of Holiday, about the future ownership of Holiday.

27. The Doerge Capital Collateralized Bridge Fund L.P. represented to Lemonis that they did not wish to enter into an agreement with Holiday if there was any chance that the ownership structure of Holiday would change after entering the agreement.

28. The Doerge Capital Collateralized Bridge Fund L.P. informed Lemonis that they were aware that an individual named Stephen Adams ("Adams") was interested in obtaining ownership control of Holiday, and told Lemonis that The Doerge Capital Collateralized Bridge Fund L.P. would not enter any agreement with Holiday, and would invest its capital elsewhere,

4

unless The Doerge Capital Collateralized Bridge Fund L.P. could be assured that Adams would not take ownership control of Holiday.

29. Lemonis, in conversations with David Doerge and other representatives of Plaintiff, repeatedly stated that ownership control of Holiday would remain unchanged, and stated specifically that Adams would not assume ownership control of Holiday.

30. Lemonis made these statements knowing that they were not true.

31. The Doerge Capital Collateralized Bridge Fund L.P., relying on Lemonis' statements, executed the Term Sheet and advanced Holiday the loaned funds.

32. Subsequently, on or about April 4, 2002, The Doerge Capital Collateralized Bridge Fund L.P. learned, via a "13D" form filed with the Securities and Exchange Commission, that Adams, through a stock purchase, would assume ownership control of Holiday.

33. Lemonis, as CEO of Holiday, fraudulently misrepresented Holiday's plans for ownership control to David Doerge and other representative of The Doerge Capital Collateralized Bridge Fund L.P., knowing that The Doerge Capital Collateralized Bridge Fund L.P. would not loan funds to Holiday if it knew any ownership change would take place.

34. The Doerge Capital Collateralized Bridge Fund L.P., in reliance on Lemonis's misrepresentation of Holiday's ownership, executed the Term Sheet, and advanced the loaned funds to Holiday.

35. Thus, Holiday fraudulently induced The Doerge Capital Collateralized Bridge Fund L.P. to advance the loaned funds, which The Doerge Capital Collateralized Bridge Fund L.P. loaned to Holiday in good-faith reliance on Lemonis' misrepresentations, and improperly denied The Doerge Capital Collateralized Bridge Fund L.P. the ability to control the loaned funds and invest those funds elsewhere.

5

WHEREFORE, The Doerge Capital Collateralized Bridge Fund L.P. respectfully requests that this court enter an order awarding The Doerge Capital Collateralized Bridge Fund L.P. damages in the amount of $500,000.00, plus costs in bringing this action, punitive damages, attorney's fees, and such other and further relief in The Doerge Capital Collateralized Bridge Fund L.P.'s favor and against Holiday as this court deems just.

## Count Four – Fraud (Lemonis)

36. The Doerge Capital Collateralized Bridge Fund L.P. repeats and reasserts the allegations of paragraphs 1 through 35, inclusive, as paragraph 36.

37. Lemonis stated to David Doerge, and other representatives of Plaintiff, that ownership control of Holiday would not change hands.

38. Lemonis made this statement knowing it to be false.

39. The Doerge Capital Collateralized Bridge Fund L.P. relied on Lemonis' false statement in deciding to enter its agreement with Holiday.

40. Absent Lemonis' untrue statement that ownership would not change, The Doerge Capital Collateralized Bridge Fund L.P. would not have entered an agreement with Holiday.

41. Ownership of Holiday changed soon after The Doerge Capital Collateralized Bridge Fund L.P. entered its agreement with Holiday, when Steve Adams assumed ownership control.

42. Holiday's change of ownership denied The Doerge Capital Collateralized Bridge Fund L.P. the benefit of its agreement with Holiday, and further denied The Doerge Capital Collateralized Bridge Fund L.P. the use and benefit of the loaned funds.

WHEREFORE, The Doerge Capital Collateralized Bridge Fund L.P. respectfully requests that this court enter an order awarding The Doerge Capital Collateralized Bridge Fund L.P. damages in the amount of $500,000.00, plus costs in bringing this action, punitive damages,

attorney's fees, and such other and further relief in The Doerge Capital Collateralized Bridge

Fund L.P.'s favor and against Marcus Lemonis as this court deems just.

THE DOERGE CAPITAL
COLLATERALIZED
BRIDGE FUND L.P.

By: _____
        One of its attorneys

Gould & Ratner
Louis D. Bernstein
Christina B. Conlin
222 North LaSalle Street
Suite 800
Chicago, IL 60601
(312) 236-3003
Atty. No.: 105960

## **VERIFICATION**

I, David Doerge, under penalty of perjury, state that I am an agent of Plaintiff, Doerge

Capital Collateralized Bridge Fund L.P., and am authorized to execute this Verification on its

behalf. I have read the foregoing Verified Amended Complaint. The allegations contained in

the Verification are true and correct to the best of my knowledge.

> Under penalties as provided by law pursuant to Section
> 1-109 of the Code of Civil Procedure, the undersigned
> certifies that the statements set forth in this instrument
> are true and correct.

David Doerge

8



EXHIBIT A



January 8, 2002

**SUMMARY TERMS**

| | |
|---|---|
| Issuer: | Holiday RV Superstores, Inc. (the "Company") |
| Securities Offered: | ~~20,833.34~~ 12,500 shares of Series B Non-Voting Participating Preferred Stock ("Participating Preferred") to be issued by the Company and warrants to purchase Common Stock of the Company at a rate of 25% of the shares issuable upon conversion of the Participating Preferred. Except as set forth below, the terms of the Participating Preferred will be identical *mutatis mutandis* to the terms of the Series A Preferred Stock (Sub-Series A-2) issued to The Steven Adams Living Trust UTA dated September 15, 1997 (the "Adams Terms"), which are not subject to further change. The Company has provided to Doerge a copy of the Certificate of Designation relating to the Series A Preferred Stock which has been filed with the Delaware Secretary of State. |
| Offering Price: | The shares will be offered at ~~$60.00~~ $100.00 per share. |

Settlement and Issuance Dates:

| Purchase Date | Total Price | Shares |
|---|---|---|
| December 31, 2001 | $250,000 | ~~4,166.67~~ 2,500 |
| February 20, 2002 | 250,000 | ~~4,166.67~~ 2,500 |
| April 15, 2002 | 750,000 | ~~12,500.00~~ 7,500 |
| | $1,250,000 | ~~20,833.34~~ 12,500 |

The Company acknowledges timely receipt of the payment of the first tranche.

| | |
|---|---|
| Liquidation Preference: | In the event of a liquidation or winding up of the Company, the holders of the Participating Preferred shares shall be entitled to receive, after payment of all debts of the Company, in preference to the holders of the Common Stock and all other classes of preferred stock other than the Series A Preferred Stock, a sum equal to (a) the purchase price per share multiplied by the number of shares owned by the holders of the |

*With questions, please contact Casey Gunnell, President, at (954) 522-9903*


EXHIBIT



January 8, 2002

Participating Preferred shares plus (b) all accrued and unpaid dividends plus (c) the Participation Feature. <u>The Series A Preferred Stock shall be senior in right of liquidation to the Participating Preferred.</u> The "Participation Feature" shall be equal to the amount which the holder of the Participating Preferred shares would have been entitled to in the event that (x) all other preferred stock had been repaid or converted to Common Stock and (y) the Participating Preferred shares had been convertible (which they are not) into shares of Common Stock of the Company at a rate of 100 shares of Common Stock for each Participating Preferred share, and such shares indeed had been convertible into Common Stock, and such remaining assets of the Company was distributed ratably to the holders of the Common Stock on an as-if-converted basis. The term "liquidation or winding up" shall ~~include a sale of all or substantially all of the assets of the Company or a merger, consolidation or other similar organic change in the Company.~~ <u>be as defined in the A-1 Certificate of Designation.</u>

**Dividends:**

Dividends, if any, on the Participating Preferred shares shall be at the annual rate of 15% compounded semi-annually (the "Coupon"). The dividends shall be paid in cash, unless consented to by the Holder, in which case they shall be paid in additional Participating Preferred shares (at the rate of ~~$60.00~~ <u>$100.00</u> per share) or any agreed combination of cash and additional Participating Preferred shares. From and after the Optional Redemption Date (as defined below), the Coupon <u>on the Participating Preferred</u> will increase by 50 basis points on such date and each and every October 1, January 1, April 1 and July 1 thereafter until the Participating Preferred shares and all accrued interest thereon are paid in full.

**Redemption Rights:**

*At the Option of the Holders.* At any time on 10 days written notice from and after the Optional Redemption Date, the Holders of the Participating Preferred Shares may elect to require the Company to redeem (the "Redemption") all or any portion of the Participating Preferred Shares for a price per share equal to the greater of (a) ~~$60.00~~ <u>$100.00</u> or (b) ~~100~~ <u>169</u> times the average of the closing bid and asked price on the



January 8, 2002

principal exchange on which the Company's shares are listed for the 10 trading days ending on the date preceding said written notice; provided in any event that prior to such redemption the Series A Preferred Stock shall have been converted or redeemed in whole. The Redemption shall occur in cash within 30 days of said notice(s). The "Optional Redemption Date" shall be June 30, 2002 if prior to such date the Company shall not have redeemed the Participating Preferred shares through the issuance of Convertible Preferred shares (as defined below) or earlier if (a) the termination (by any means) of full-time employment with the Company of Marcus Lemonis or a material change in his job responsibilities or (b) the stockholders Company shall have rejected the authorization of the creation of the Convertible Preferred (as defined below).

*At the Option of the Company [*Provided that no notice of redemption has been made by the Holder of the Participating Preferred shares, the Company may redeem the Participating Preferred shares by issuance of a like number of Series C Convertible Preferred shares (the "Convertible Preferred") with an initial liquidation preference equal to the liquidation preference of the Participating Preferred shares plus any accrued and unpaid dividends. The terms of the Convertible Preferred shares shall otherwise be identical to the Company's Sub-Series A-1 Preferred Stock *mutatis mutandis* except that the Convertible Preferred will be Junior Securities as defined in the Certificate of Designation for the Sub-Series A-1 Preferred Stock (the A-1 Certificate of Designation") and the conversion price of the Convertible Preferred shall be $0.60 per share of Common Stock.

Voting Rights:

Except as otherwise required by applicable law, the Participating Preferred shall have no voting rights, except that the holders of two-thirds in value of the Participating Preferred shares would be required prior to the Company (a) incurring any debt (except for normal trade and floor planning debt in the ordinary course of business) or issuing additional series of Preferred Stock, which, when added together with the existing Participating Preferred A and B series would



January 8, 2002

equal or exceed a face amount of $6 million, (b) pledging a lien on any asset of the Company (except for floor planning in the ordinary course of business or normal equipment lease financing) and (c) selling any asset of the Company except in the ordinary course of business, causing the Company to be merged or liquidated or recommending the voting of stock or tender of Common Stock in any merger involving the Company except for the presently contemplated sale-leaseback transaction between the Company and the purchasers of the Series A Preferred Stock.

**Anti-Dilution Protection:**

In the event that the Company issues additional shares of Common Stock or preferred stock or instruments convertible into Common Stock at a price per share less than $0.60 $0.52, then the Holders of the Participating Preferred shares would be entitled to receive additional Participating Preferred shares using a narrow-based weighted average basis for determining appropriate anti-dilution adjustments subject to the exclusions set forth in the A-1 Certificate of Designation. The Participating Preferred shares will have proportional anti-dilution protection for stock splits, stock dividends, and the like.

**Purpose:**

The purpose of the proceeds shall be to repay a lender's loan in the principal amount not to exceed $1,000,000 plus other general working capital purposes.

**Information and Observer Rights:**

A representative of the Holders of the Participating Preferred (selected by the Holders of a majority in liquidation preference) shall be entitled to (a) attend all Board meetings (and receive information packets provided to directors) subject to appropriate confidentiality protections in favor of the Company and (b) receive financial information and information regarding Company budgets, operating plans and material developments on a periodic basis.

**Future Working Capital Investment:**

For a period of ninety (90) days from and after the closing of the transaction contemplated by the Adams Terms, and subject to the rights of the holders of the Series A Preferred Stock and to due authorization of



January 8, 2002

additional shares of Common Stock. Doerge shall have the right, but not the obligation, to purchase up to an additional $2 million in liquidation preference of preferred stock of the Company convertible into 3 million shares of Common Stock and otherwise on mutually agreed terms (the "Additional Investment"). Any share purchases would be in increments of no less than $50,000 and each closing would occur on no more than 5 days notice.

Fees and Expenses:

At Closing of the final tranche, the Company shall pay to Doerge Capital Management ("DCM") or an assignee or designee thereof a fee of $50,000 for structuring this transaction and for expenses incurred in conducting its due diligence examination. The Company shall also pay reasonable counsel fees for the Holder not to exceed $15,000 payable in equal one-third increments at the closing of each tranche and all counsel expenses at the closing of the final tranche. For the Additional Investment DCM shall be entitled to a fee of $100,000 per $1 million invested, up to one-half of which may, at the election of DCM, be issued in shares of common stock at the initial conversion price of the preferred stock. The Company shall also pay reasonable counsel fees for the Holder not to exceed $15,000 per $1 million funded, payable at each respective closing.



January 8, 2002

This term sheet is non-binding and only represents the parties' current understanding with respect to the subject matter hereof and supersedes any prior agreement or understanding with respect to such subject matter. Closing is conditioned upon negotiation and completion of final definitive documentation reasonably acceptable to both parties and satisfactory due diligence by the investors in their sole discretion. The payment of the subscription price for the first tranche prior to the execution of definitive documentation shall create no inference of this Term Sheet being a binding agreement provided that this Term Sheet is binding with respect to the first tranche which is intended to be funded, at the request of the Company for the convenience of the Company, prior to the drafting or execution of definitive documentation or the filing of any Certificate of Designation (the "CD"). In the event that the parties cannot reach agreement on the definitive documentation, the Company shall file a CD giving rise to the provisions of the preceding sentence and effect an obligation of the parties Holders of the Participating Preferred to purchase the first tranche prior to filing a CD and the provisions of the preceding sentence may be enforced through the remedy of specific performance, it being recognized that the Participating Preferred is unique and there is no adequate legal remedy. This Term Sheet shall be governed by and construed in accordance with the internal laws of the State of Illinois irrespective of conflict of laws principles. Any interpretation of or disputes arising under this Term Sheet shall be resolved in the exclusive forum of the federal courts located in Chicago, Illinois.

**HOLIDAY RV SUPERSTORES, INC.**

NAME: _____

TITLE: _____


**INVESTOR**

BY: *David Doerge*

NAME: *David J. Doerge*

TITLE: *Manager / Member*

----------- COMPARISON OF HEADERS -----------

HEADER DISCONTINUED

-HEADER 2-
JANUARY 8, 2002

-HEADER 3-
HEADER DISCONTINUED

-HEADER 4-
DECEMBER 21, 2001


----------- COMPARISON OF FOOTERS -----------

-FOOTER 1-

WITH QUESTIONS, PLEASE CONTACT CASEY GUNNELL, PRESIDENT, AT (954) 522-9903
PAGE 5 2 OF 7 6



December 21, 2001

RECREATION USA, 200 E. BROWARD
BLVD., SUITE 920, FT. LAUDERDALE,
FL        33301        954-522-9903,
WWW.RECUSA.COM

S

-FOOTER 2-
80003057-3.DOC 80003057 5.DOC
WITH QUESTIONS, PLEASE CONTACT CASEY
GUNNELL, PRESIDENT, AT (954) 522-9903
PAGE 4 2 OF 5 6
RECREATION USA, 200 E. BROWARD
BLVD., SUITE 920, FT. LAUDERDALE,
FL        33301        954-522-9903,
WWW.RECUSA.COM

H

80003057_5.DOC
*With questions, please contact Casey Gunnell, President, at (954) 522-9903*
Page 2 of 6
RECREATION USA, 200 E. BROWARD BLVD., SUITE 920, FT. LAUDERDALE, FL 33301 954-522-9903, www.RECUSA.COM

TOTAL P.09



EXHIBIT B

# DOERGE CAPITAL MANAGEMENT
### THE CHICAGO MERCANTILE EXCHANGE CENTER
### 30 SOUTH WACKER DRIVE, SUITE 2111
### CHICAGO, ILLINOIS 60606

February 20, 2002

Marcus Lemonis
Chairman and CEO
Recreation USA
200 E. Broward Blvd
Suite 920
Ft. Lauderdale, FL 33301

Dear Marcus:

Regarding the February 20, 2002 payout pursuant to the purchase of Holiday RV Superstores, Inc. Series C Convertible Preferred by The Doerge Capital Collateralized Bridge Fund, L.P. (the "Bridge Fund"), by signing below you agree to and acknowledge the following:

1) Holiday RV Superstores, Inc. authorized The Bridge Fund to distribute $250,000, on its behalf, to the wire instructions below:

>      City National Bank
>      ABA
>      Account name:
>      Account number:

*as modified by counsel to Holiday RV Superstores, Inc.*

2) Holiday RV Superstores, Inc. further agrees to accept all changes and additional documentation, including a Registration Rights Agreement and ~~various escrow agreements~~, proposed by Fred Tannenbaum, attorney for The Bridge Fund in his email message dated February 16, 2002.

Thank you for your attention to this matter.

The Doerge Capital Collateralized Bridge Fund, L.P.
By DCM Bridge, LLC, General Partner

By David J. Doerge, Managing Member

ACKNOWLEDGED AND AGREED BY

By:

Its:

**REDACTED**



2