1 Bank One Plaza
Mail Suite IL1-0936
Chicago, Illinois 60670-0936



**American National Bank**
and Trust Company of Chicago • Chicago, Illinois 60690

A *BANK ONE* Company

DOERGE CATITAL COLLATERALIZED
BRIDGE FUND LP
30 S WACKER SUITE 2112
CHICAGO IL 60606-7488

Account #:

Please call 1-312-661-5520 for inquiries

## WIRE PAYMENT ADVICE

### WE DEBIT YOUR ACCOUNT

REDACTED

| | |
|---|---|
| **AMOUNT:** | |
| **DEBIT ACCOUNT #:** | |
| **CREDIT ACCOUNT #:** | |
| **BENEFICIARY NAME:** | |
| **DATE:** | 12/21/01 |
| **BANK ONE REF #:** | |
| **ORIGINATOR-TO-BENEFICIARY INFORMATION:** | |



### WE DEBIT YOUR ACCOUNT

| | | | |
|---|---|---|---|
| **AMOUNT:** | $250,000.00 | **SENDER BANK:** | |
| **ACCOUNT #:** | | **SENDER BANK REF #:** | |
| **BENEFICIARY NAME:** | | **RECEIVER BANK:** | |
| **DATE:** | 12/21/01 | | |
| **BANK ONE REF #:** | | **ORIGINATOR NAME:** | DOERGE CAPITAL COLLATERALIZED |
| **SWIFT/FED REF #:** | | **ORIGINATOR ADDRESS:** | DOERGE CAPITAL MANAGEMENT 30 S WACKER SUITE 2112 CHICAGO IL    USA606067488 |
| **TIME STAMP:** | SENT 12/21 AT 16:00 | | |
| **ORIGINATOR-TO-BENEFICIARY INFORMATION:** | LOAN REPPAYMENT FOR RV SUPERSTORES | | |

PRIVILEGED ATTORNEY WORK-PRODUCT

EXHIBIT

2

**3**

21 01 03:30p    Ila Penfold          847-948-5881          p.1
                                     3129868563    P.02/02
DEC-21-2001 11:57    JERGE CAPITAL MANAGEMENT

*Recreation USA*
"Where America Shops for RVs & Boats"

December 21, 2001

The Doerge Capital Colleteralized Bridge Fund, L.P.
30 South Wacker Drive
Suite 2112                                    C O P Y
Chicago, IL 60606

Dear Gentleman:

Regarding the initial payout pursuant to the purchase of Holiday RV, Superstores, Inc. Series
C Convertible Preferred by The Doerge Capital Collateralized Bridge Fund, L.P. (the
"Bridge Fund"), I hereby authorize The Bridge Fund to distribute $250,000 on my behalf
Holiday RV Superstores, Inc. directly according to the wire instructions below.

Bank name: _City National BANK_

Bank city & state: _Ohio_            **REDACTED**

Bank ABA #: _____

Account name: _____

Account number: _____

Thank you for your attention to this matter.

Holiday RV Superstores, Inc.

SIGNED BY: _____

NAME: _Marcus Lemonis_

TITLE: _Chairman & CEO_

*PRIVILEGED ATTORNEY WORK-PRODUCT*

---

TOTAL P.02


EXHIBIT
3

**4**

Page 1 of 1

1 Bank One Plaza
Mail Suite IL1-0936
Chicago, Illinois 60670-0936

**American National Bank**
and Trust Company of Chicago · Chicago, Illinois 60690

A *BANK ONE* Company

COPY



‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖  1
DOERGE CATITAL COLLATERALIZED
BRIDGE FUND LP
30 S WACKER SUITE 2112
CHICAGO IL 60606-7488

Account #:

Please call 1-312-661-5520 for inquiries

# REDACTED

## WIRE PAYMENT ADVICE

WE DEBIT YOUR ACCOUNT

| | | |
|---|---|---|
| **AMOUNT:** | $250,000.00 | **SENDER BANK:** |
| **ACCOUNT #:** | | **SENDER BANK REF #:** |
| **BENEFICIARY NAME:** | | **RECEIVER BANK:** |
| **DATE:** | 02/20/02 | **ORIGINATOR NAME:** DOERGE CAPITAL COLLATERALIZED |
| **BANK ONE REF #:** | | **ORIGINATOR ADDRESS:** DOERGE CAPITAL MANAGEMENT |
| **SWIFT/FED REF #:** | | 30 S WACKER SUITE 2112 |
| | | CHICAGO ILL USA606067488 |
| **TIME STAMP:** | SENT 02/20 AT 15:50 | |
| **ORIGINATOR-TO-BENEFICIARY INFORMATION:** | RVEE LOAN | |

PRIVILEGED ATTORNEY WORK-PRODUCT

EXHIBIT
4

5

DOERGE CAPITAL MANAGEMENT

THE CHICAGO MERCANTILE EXCHANGE CENTER
30 SOUTH WACKER DRIVE, SUITE 2112
CHICAGO, ILLINOIS 60606

February 20, 2002

Marcus Lemonis
Chairman and CEO
Recreation USA
200 E. Broward Blvd
Suite 920
Ft. Lauderdale, FL 33301

**REDACTED**

Dear Marcus:

Regarding the February 20, 2002 payout pursuant to the purchase of Holiday RV
Superstores, Inc. Series C Convertible Preferred by The Doerge Capital Collateralized
Bridge Fund, L.P. (the "Bridge Fund"), by signing below you agree to and acknowledge
the following:

1) Holiday RV Superstores, Inc. authorized The Bridge Fund to distribute $250,000,
   on its behalf, to the wire instructions below:

   City National Bank
   ABA
   Account name:
   Account number:

   *as modified by
   counsel to Holiday RV
   Superstores, Inc.*

2) Holiday RV Superstores, Inc. further agrees to accept all changes and additional
   documentation, including a Registration Rights Agreement and ~~certain service~~
   ~~documents~~, proposed by Fred Tannenbaum, attorney for The Bridge Fund in his
   email message dated February 16, 2002.

Thank you for your attention to this matter.

The Doerge Capital Collateralized Bridge Fund, L.P.
By DCM Bridge, LLC, General Partner

By David S. Doerge, Managing Member

ACKNOWLEDGED AND AGREED BY

By:

Its:

**EXHIBIT**
**5**

**6**

**The Doerge Capital Collateralized Bridge Fund, LP**
30 South Wacker Drive
Suite 2112
Chicago, IL 60606
Phone (312) 906-9600
Facsimile: (312) 906-8563

April 18, 2002

Marcus Lemonis
CEO

Casey Gunnell
CFO

Holiday RV Superstores, Inc.
200 E Broward Blvd
Fort Lauderdale, FL 33301

*Sent via facsimile and mail*

Gentlemen:

As you know, the Doerge Capital Collateralized Bridge Fund, LP (the "Bridge Fund")
advanced funds to Holiday RV Superstores, Inc. (the "Company") with an initial advance
of $250,000 on December 21, 2001 and an additional advance of $250,000 on February
20, 2002.  These advances were made in contemplation of a possible equity investment
which was outlined in a non-binding Term Sheet in December 2001. The advances were
also made upon many representations made by you and the Company regarding your
relationship with and the future role of Steve Adams as well as the Company's operating
performance. In fact, we trusted and relied on your personal and Company assurances so
much that we extended these funds prior to receipt of any binding documents.

A number of provisions of that Term Sheet, however, were not found in the draft
definitive documents which were belatedly furnished to the Bridge Fund. Binding
documentation as you know therefore does not exist between the Bridge Fund and the
Company.  Perhaps more fundamentally, numerous material misrepresentations were
made to the Bridge Fund by Company to induce the Bridge Fund to execute the Term
Sheet and make its advances.

In the absence of definitive documentation and given numerous misrepresentations
throughout the negotiation process by the Company, the advances to date may only be
characterized as demand loans, and not equity investments. This letter is a formal demand
for an immediate repayment of the principal amount of $500,000 of those loans plus all



EXHIBIT
Group
6

accrued interest, as well as reimbursement of all legal and administrative expenses incurred by the Bridge Fund.

As I made clear to the Company many times during the negotiation process, the sole purpose of our loan was to remedy an earlier loan by the Bridge Fund to Recreational Holdings, Inc. (Rec Holdings). I also informed you of my sincere belief that this goal would be impossible in the event of a change in control of Holiday RV. The Term Sheet, in fact, envisioned that the Bridge Fund would have the right to approve any changes in control. Marcus Lemonis furthermore repeatedly assured me, and I relied on these assurances, that there would be no change of control. More specifically, Marcus represented that he would not allow Steve Adams to gain a controlling interest in the Company. An amended 13D filed with the Securities and Exchange Commission on or about April 4, 2002 by Mr. Adams clearly identifies that he now owns a controlling interest and that the upcoming shareholder approval is a mere formality. Even for the pure sake of argument that the Bridge Fund's advances were somehow to be considered equity, which they are not, the draft definitive documents contemplated that the holder of such equity would have the right to require the Company to immediately redeem its investment upon a change of control.

Additionally, Mr. Lemonis repeatedly assured me, and I relied on these assurances, that (i) operations continue to improve and (ii) the Company's floor planning line of credit had been resolved. The information presented in the most recently filed 10Q contradicts Mr. Lemonis' representations. The Bridge Fund therefore hereby demands immediate repayment and asks that the Company contact my office immediately to discuss repayment. If such payment is not made in full by April 30, 2002, the Bridge Fund will, without any further notice to the Company or to you personally, take any and all action necessary to collect these sums.

Sincerely,


Jeffrey Catuara
COO
Doerge Capital Management
A Division of Balis, Lewittes and Coleman, Inc

**The Doerge Capital Collateralized Bridge Fund, LP**
30 South Wacker Drive
Suite 2112
Chicago, IL 60606
Phone (312) 906-9600
Facsimile: (312) 906-8563

October 15, 2002

Marcus Lemonis
CEO
Holiday RV Superstores, Inc.
100 Tri-State International Drive
Suite 115
Lincolnshire, IL 60069

*Sent via facsimile (847) 948-1687 and mail*

Dear Marcus:

As you know, the Doerge Capital Collateralized Bridge Fund, LP (the "Bridge Fund") advanced funds to Holiday RV Superstores, Inc. (the "Company") with an initial advance of $250,000 on December 21, 2001 and an additional advance of $250,000 on February 20, 2002. These advances were made in contemplation of a possible equity investment that was outlined in a non-binding Term Sheet in December 2001. The advances were also made upon many representations made by you and the Company regarding your relationship with and the future role of Steve Adams as well as the Company's operating performance. In fact, we trusted and relied on your personal and Company assurances so much that we extended these funds prior to receipt of any binding documents.

A number of provisions of that Term Sheet, however, were not found in the draft definitive documents which were belatedly furnished to the Bridge Fund. Binding documentation as you know therefore does not exist between the Bridge Fund and the Company. Perhaps more fundamentally, numerous material misrepresentations were made to the Bridge Fund by Company to induce the Bridge Fund to execute the Term Sheet and make its advances.

In the absence of definitive documentation and given numerous misrepresentations throughout the negotiation process by the Company, the advances to date may only be characterized as demand loans, and not equity investments. This letter is a formal demand for an immediate repayment of the principal amount of $500,000 of those loans plus all accrued interest, as well as reimbursement of all legal and administrative expenses incurred by the Bridge Fund.

An amended 13D filed with the Securities and Exchange Commission on or about September 23, 2002 by Mr. Adams clearly identifies that he now owns a controlling interest. Even for the pure sake of argument that the Bridge Fund's advances were somehow to be considered equity, which they are not, the draft definitive documents contemplated that the holder of such equity would have the right to require the Company to immediately redeem its investment upon a change of control.

The Bridge Fund therefore hereby demands immediate repayment and asks that the Company contact my office immediately to discuss repayment. If such payment is not made in full by October 30, 2002, the Bridge Fund will, without any further notice to the Company or to you personally, take any and all action necessary to collect these sums.

Sincerely,
The Doerge Capital Collateralized Bridge Fund, LP
By: DCM Bridge, LLC
Its: General Partner




By: David J. Doerge
Its: Managing Member


cc:    Anthony Borzillo, CFO
       Holiday RV Superstores, Inc.

       Stephen Adams
       2575 Visa del Mar Drive
       Ventura, CA 93001

# GOULD & RATNER

MARK E. ABRAHAM
312/899-1601
mabraham@gouldratner.com

April 20, 2004

***Via Federal Express***

Delaware Claims Agency LLC
Attn: Holiday RV Claims Department
103 West 7th Street
Wilmington, Delaware 19801

      Re:     <u>In re Holiday RV Superstores, Inc.</u>
                 Case No. 03-13221 (MFW)

To Whom It May Concern:

      Enclosed is an original and two copies of a Proof of Claim (with exhibits) on behalf of Doerge Capital Collateralized Bridge Fund, L.P. for filing. Please return a file-stamped copy of the Proof of Claim to my attention in the enclosed Federal Express package.

      Please contact the undersigned if you have any questions.

                 Very truly yours,

                 GOULD & RATNER

                 Mark E. Abraham

CJH:mc

Enclosures

cc: Christopher J. Horvay

/240830.v 2



222 North LaSalle Street, Eighth Floor, Chicago, Illinois 60601
Telephone 312/236-3003 Facsimile 312/236-3241 www.gouldratner.com

**3**

Westlaw.

2004 WL 2647593                                                                    Page 1
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 2004 WL 2647593 (Del.Ch.))**

c

Court of Chancery of Delaware,
New Castle County.

PRODUCTION RESOURCES GROUP, L.L.C., a Delaware
limited liability company,
Plaintiff,
v.
NCT GROUP, INC., a Delaware corporation, Distributed
Media Corporation, a
Delaware corporation, and Michael J. Parrella, John J.
McCloy, II, Samuel A.
Oolie, Irene Lebovics, and CY E. Hammond, Defendants.

C.A. No. 114-N.

Submitted: Sept. 20, 2004.
Decided: Nov. 17, 2004.

**Background:** Judgment creditor brought claims of breach of fiduciary duty against corporate debtor, its directors, including its chief executive officer (CEO) and president, and its chief financial officer (CFO), and sought appointment of receiver for corporation. Defendants brought motion to dismiss for failure to state a claim.

**Holdings:** The Court of Chancery, Strine, Vice Chancellor, held that:
(1) creditor sufficiently pled that corporation was insolvent;
(2) exculpatory provision of corporate charter applied to due care claims against directors; and
(3) exculpatory provision of corporate charter did not protect directors from fiduciary duty claims.
Motion granted in part and denied in part.

**[1] Pretrial Procedure ⟨key⟩624**
307Ak624 Most Cited Cases
To grant a motion to dismiss for failure to state a claim, it must appear with reasonable certainty that plaintiff would not be entitled to the relief sought under any set of facts which could be proven to support the action. Chancery Court Rule 12(b)(6).

**[2] Pretrial Procedure ⟨key⟩679**
307Ak679 Most Cited Cases
On a motion to dismiss for failure to state a claim, well-pled facts alleged in the complaint are viewed in the light most favorable to plaintiff, but conclusory allegations are not accepted as true without specific factual allegations to support them. Chancery Court Rule 12(b)(6).

**[3] Corporations ⟨key⟩553(3)**
101k553(3) Most Cited Cases
Creditor sufficiently pled that corporation was insolvent, as required to state a claim for appointment of receiver; creditor alleged that corporation's liabilities were nearly five times its assets, that it had racked up huge annual operating losses for the last five years, that it had staved off collapse by pledging billions of unauthorized and unregistered shares of its penny stock to creditors, and that corporation was not able to pay its debts to at least two significant creditors as they became due. 8 Del.C. § 291.

**[4] Corporations ⟨key⟩557(2)**
101k557(2) Most Cited Cases
A complaint can state a claim for appointment of a receiver for a corporation by alleging facts that, if true, demonstrate the corporation's insolvency; it is not necessary, at the pleading stage, for the plaintiff to prove by clear and convincing evidence that the corporation is insolvent. 8 Del.C. § 291.

**[5] Corporations ⟨key⟩553(3)**
101k553(3) Most Cited Cases
To meet the burden to plead insolvency, as required to state a claim for appointment of a receiver for a corporation, plaintiff must plead facts that show that the corporation has either: (1) a deficiency of assets below liabilities, with no reasonable prospect that the business can be successfully continued in the face thereof, or (2) an inability to meet maturing obligations as they fall due in the ordinary course of business. 8 Del.C. § 291.

**[6] Corporations ⟨key⟩325**
101k325 Most Cited Cases
Typically, creditors may not allege fiduciary duty claims against directors of solvent corporations; it is presumed that creditors are capable of protecting themselves through the contractual agreements that govern their relationships with corporations, and the law of fraudulent conveyance, as well as federal bankruptcy law, exist to protect creditors.

**[7] Corporations ⟨key⟩349**
101k349 Most Cited Cases
When a corporation has reached the point of insolvency,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2004 WL 2647593                                                                                    Page 2
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 2004 WL 2647593 (Del.Ch.))**

under Delaware law, the corporation's directors owe fiduciary duties to the corporation's creditors.

**[8] Corporations** ☜320(4)
101k320(4) Most Cited Cases
**[8] Corporations** ☜547(1)
101k547(1) Most Cited Cases
When a director of an insolvent corporation, through a breach of fiduciary duty, injures the corporation itself, the claim against the director for breach of fiduciary duty belongs to the corporation, but the class of persons who may press the fiduciary claim derivately expands, to include creditors of the corporation.

**[9] Corporations** ☜349
101k349 Most Cited Cases
Statute authorizing corporate charter provisions that insulate directors from personal liability to the corporation for breaches of the duty of care applies to creditors' derivative claims against directors of an insolvent corporation alleging the directors mismanaged the corporation and caused a diminution to its economic value. 8 Del.C. § 102(b)(7).

**[10] Corporations** ☜349
101k349 Most Cited Cases
To the extent that directors of an insolvent corporation have engaged in conscious wrongdoing or in unfair self-dealing, an exculpatory corporate charter provision does not insulate them from fiduciary duty claims asserted derivatively on the corporation's behalf by creditors. 8 Del.C. § 102(b)(7).

**[11] Trusts** ☜173
390k173 Most Cited Cases
While the trust law duty of impartiality does not necessarily require equal treatment of beneficiaries, it does prohibit a trustee from disadvantaging particular beneficiaries for invidious reasons.

**[12] Corporations** ☜310(1)
101k310(1) Most Cited Cases
Allegation of creditor of insolvent corporation, that corporation's chief executive officer (CEO) and president had received excessive compensation, constituted a due care claim against directors, for which directors were protected by exculpatory provision of corporation's certificate of incorporation. 8 Del.C. § 102(b)(7).

**[13] Corporations** ☜310(1)
101k310(1) Most Cited Cases
Informed decisions regarding employee compensation by

independent boards are usually entitled to business judgment rule protection.

**[14] Corporations** ☜349
101k349 Most Cited Cases
**[14] Corporations** ☜548(2)
101k548(2) Most Cited Cases
Creditor of insolvent corporation stated direct and derivative claims that directors breached their fiduciary duty, as exception to protection of directors under exculpatory clause of corporation's certificate of incorporation; creditor alleged that corporation had been suffering extreme financial distress for several years, yet directors issued or pledged billions of shares more than were authorized by charter, permitted wife of former director to obtain liens on corporation's assets, retained no less than eight companies affiliated with wife under substantial consulting contracts while refusing to cause corporation to pay its debt to creditor, placed funds received from wife into corporate subsidiary so as to avoid collection efforts by creditor, and paid excessive compensation to corporation's chief executive officer (CEO) and president. 8 Del.C. § 102(b)(7).

**[15] Equity** ☜43
150k43 Most Cited Cases
In general, equity is reluctant to create remedies when adequate legal remedies already exist.

**[16] Pretrial Procedure** ☜375
307Ak375 Most Cited Cases
Creditor was entitled to discovery of financial information regarding corporation's solvency, in action against corporate debtor and its directors and officers for breach of fiduciary duty and appointment of receiver, though corporation's publicly filed documents contained information about corporation's finances; discovery would allow creditor to examine accuracy of documents' descriptions of corporation's current arrangements and examine corporation's future prospects. 8 Del.C. § 291.

**[17] Pretrial Procedure** ☜32
307Ak32 Most Cited Cases
In evaluating a motion to compel discovery, the standard of relevance that the court must apply is whether the discovery sought is reasonably calculated to lead to admissible evidence. Chancery Court Rule 26(b)(1).

**[18] Pretrial Procedure** ☜27.1
307Ak27.1 Most Cited Cases

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2004 WL 2647593                                                                                                          Page 3
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 2004 WL 2647593 (Del.Ch.))**

**[18] Pretrial Procedure 41**
307Ak41 Most Cited Cases
The scope of permissible discovery is broad, and thus, objections to discovery requests, in general, will not be allowed unless there have been clear abuses of the process which would result in great and needless expense and time consumption.

**[19] Pretrial Procedure 41**
307Ak41 Most Cited Cases
The burden is on the party objecting to discovery to show why the requested information is improperly requested.

Vernon R. Proctor, Esquire, Patricia L. Enerio, Esquire, The Bayard Firm, Wilmington, Delaware, Attorneys for Plaintiff.

Scott D. Cousins, Esquire, Paul D. Brown, Esquire, Greenberg Traurig, LLP, Wilmington, Delaware, and Adam D. Cole, Esquire, Karen Y. Bitar, Esquire, Greenberg Traurig, LLP, New York, New York, Attorneys for Defendants.

OPINION

STRINE, Vice Chancellor.

**\*1** Plaintiff Production Resources Group, L.L.C. ("PRG") has been trying to collect a debt from defendant NCT Group, Inc. since 1999. PRG sought and obtained a judgment against NCT for approximately $2,000,000, plus interest, in the Connecticut court system. But PRG has been unsuccessful in collecting on the judgment, despite continuing legal proceedings in Connecticut to compel payment.

In the meantime, however, NCT continues to operate. The means by which it does so are unusual. NCT's primary creditor, Carole Salkind, is the wife of a former NCT director and purportedly continues to put in new capital to permit the company to pay some of its bills (and its payroll). The source of funding is odd in several respects, including that: 1) Salkind allegedly has no means of her own to support investments of the level she has putatively made; 2) no fewer than eight companies controlled by her family allegedly act as paid consultants to NCT; 3) her latest cash financing has been placed into a company subsidiary to avoid the claims of creditors including PRG; and 4) Salkind

has personally been issued preferred debt and warrants convertible into nearly a billion shares--a number far in excess of that authorized by the NCT charter. Perhaps most important, Salkind has allegedly been permitted to secure her status as a creditor by obtaining liens on NCT's assets and therefore to stake out a claim superior to PRG and other NCT creditors. Given the massive number of shares pledged to her and her right to foreclose to collect the defaulted debt NCT owes her, Salkind is fairly regarded as the company's de facto controlling stockholder.

These facts, if true, are even more problematic because NCT's own public filings reveal that it is balance-sheet insolvent and that it has been unable to pay several debts that came due. To compromise some of these debts, NCT has pledged or issued billions of shares of its stock--which trades in pennies-- shares far in excess of what is authorized by its charter. At the same time, NCT has failed to hold an annual meeting since 2001 because, it says, the company cannot afford the cost. Perhaps for these reasons, NCT has been unable to secure approval from the SEC for its request to register certain shares it has pledged to PRG and others; NCT's registration statement is on its ninth edition and has not yet received approval.

By this action, PRG is attempting to protect its interests (and it says, the interests of other creditors) by seeking the appointment of a receiver for NCT under 8 Del. C. § 291. According to PRG, NCT long ago became insolvent. Additionally, PRG alleges that NCT's board and a top non-director officer have committed various breaches of fiduciary duty. Because NCT is insolvent, PRG argues that it may press these claims as direct claims that are not subject to the heightened pleading standard of Rule 23.1 and without overcoming the exculpatory charter provision that protects NCT directors from due care claims.

**\*2** The defendants--NCT, its directors (who include its Chief Executive Officer as well as its President) and one of its officers, the company's Chief Financial Officer--have responded with a motion to dismiss. For reasons that are not immediately apparent, the defendants did not move to stay this action under the McWane [FN1] doctrine. Instead, the defendants moved to dismiss the complaint for failure to state a claim upon which relief can be granted.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2004 WL 2647593                                                                    Page 4
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
(Cite as: 2004 WL 2647593 (Del.Ch.))

The defendants argue that PRG's complaint fails to state a claim under § 291 or for breach of fiduciary duty. As to the § 291 claim, the defendants contend that PRG has failed to allege that NCT is insolvent and, alternatively, that even if NCT is insolvent, PRG has failed to allege additional facts that, if true, would invoke this court's statutory discretion to appoint a receiver. All this case is, say the defendants, is a debt collection action, and the fact that a single creditor is unhappy does not, without more, provide grounds for the appointment of a receiver under § 291.

The defendants similarly argue that PRG has failed to plead facts that state a fiduciary duty claim. They say the complaint's allegations of breach of duty, at most, plead a duty of care claim that is exculpated by a provision (authorized by 8 Del. C. § 102(b)(7)) within NCT's certificate of incorporation. Even if NCT must be deemed insolvent for pleading purposes, the defendants argue that the fiduciary duty claims remain claims belonging to the corporation and within the scope of the exculpatory charter clause. Alternatively, the defendants argue that the complaint's allegations of fiduciary breaches are entirely conclusory and fail even lenient notice pleading standards.

In this opinion, I largely deny the defendants' motion to dismiss.

The § 291 claim is sustained because PRG has pled facts that, if true, show that NCT is insolvent, both in the sense that its liabilities far exceed its assets and that it has been unable to pay its debts when they have come due. [FN2] Indeed, NCT's pleading-stage arguments to the contrary come dangerously close to causing the court to invoke Rule 11 [FN3] on its own motion as the company's own public filings are, in themselves, sufficient to create a pleading-stage inference of insolvency.

Furthermore, the complaint sufficiently states a basis for the possible discretionary appointment of a receiver. The facts as pled suggest that PRG and its de facto controlling stockholder Salkind are engaging in bad faith conduct designed to advantage Salkind to the detriment of PRG and other NCT creditors. The allegations, when read in the plaintiff-friendly manner required by Rule 12, support an inference of self-dealing and deceptive conduct rather than a

good-faith attempt to deal in an even-handed manner with all company creditors. Given the well-pled facts supporting an inference of insolvency, one evident purpose of § 291--to protect creditors of insolvent corporations--is fairly implicated by the complaint. Therefore, the count in the complaint seeking a receiver is sustained.

*3 The fiduciary duty count's sustainability is a bit more problematic. PRG is not a stockholder. PRG has standing to raise fiduciary duty claims, however, because it has pled that NCT is insolvent. PRG believes that the insolvency of a corporation fundamentally transforms the liability threat that directors face. According to PRG, once a company becomes insolvent, the directors may not look to the protections of an exculpatory charter clause to insulate them from fiduciary duty claims brought by creditors even if the claims are predicated on an injury to the firm and would therefore be classified as derivative. [FN4] PRG says this result flows from the text of § 102(b)(7) which does not mention claims by creditors as being within the statute's reach. Therefore, PRG asserts that it is free to press claims for breach of the duty of care against NCT's directors.

In this opinion, I reject PRG's reasoning on this point. Some of PRG's fiduciary duty claims rest largely on generalized and conclusory assertions that NCT's board and officers have mismanaged the firm. Claims of this type are classically derivative, in the sense that they involve an injury to the corporation as an entity and any harm to the stockholders and creditors is purely derivative of the direct financial harm to the corporation itself. [FN5] The fact that the corporation has become insolvent does not turn such claims into direct creditor claims, it simply provides creditors with standing to assert those claims. At all times, claims of this kind belong to the corporation itself because even if the improper acts occur when the firm is insolvent, they operate to injure the firm in the first instance by reducing its value, injuring creditors only indirectly by diminishing the value of the firm and therefore the assets from which the creditors may satisfy their claims. By the plain terms of § 102(b)(7), an exculpatory charter provision may, as NCT's charter does, insulate directors from due care claims brought by the corporation itself, including derivative claims.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2004 WL 2647593                                                          Page 5
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
(Cite as: 2004 WL 2647593 (Del.Ch.))

To sustain PRG's contrary argument would undermine the protections authorized by § 102(b)(7). One of the primary purposes of § 102(b)(7) is to encourage directors to undertake risky, but potentially value-maximizing, business strategies, so long as they do so in good faith. To expose directors to liability for breach of the duty of care for derivative claims of mismanagement asserted by creditors guts this purpose by denying directors the protection of § 102(b)(7) when they arguably need it most. That is, when, despite the directors' good intentions, the business plan of the firm did not generate financial success and the firm has become insolvent, the possibility of hindsight bias about the directors' prior ability to foresee that their business plans would not pan out is at its zenith and when the exculpatory charter provision is most useful.

Furthermore, it is odd to think that creditors would be afforded greater leeway to press derivative claims than stockholders. Creditors are typically better positioned than stockholders to protect themselves by the simple tool of contracting. And a body of statutory law called the law of fraudulent conveyance exists specifically to protect creditors. The reality that creditors become the residual claimants of a corporation when the equity of the corporation has no value does not justify expanding the types of claims that the corporation itself has against its directors. It simply justifies enabling creditors to exercise standing to ensure that any valuable claims the corporation possesses against its directors are prosecuted.

**\*4** Here, this reasoning results in the dismissal of some of PRG's breach of fiduciary duty claims. The complaint's allegations of generalized mismanagement are pled in a cursory manner and fail to state a claim. Moreover, they are at best pled as due care claims. In this regard, the complaint fails to plead non-exculpated conduct as to the defendant-directors. By contrast, however, the complaint does plead other non-exculpated fiduciary duty claims with particularity. The claim that the board has engaged in conscious wrongdoing through its transactions with Salkind is pled sufficiently to survive dismissal. The combination of 1) Salkind's status as de facto controlling stockholder, 2) the payments made to her family's companies as consultants, 3) the payment of hefty salaries to insiders from a company

that is insolvent and says it cannot afford to hold annual meetings, 4) the continued subordination of other creditors to Salkind, 5) the issuance of many more shares than authorized in the certificate, and 6) the use of a company subsidiary to avoid the legitimate claims of a creditor, taken together, creates an inference of faithless behavior. Therefore, these aspects of PRG's fiduciary duty claims survive the motion to dismiss.

### I. Factual Background

PRG's second amended verified complaint ("the complaint") is the relevant pleading under attack. The complaint incorporates and relies heavily upon NCT's Pre-Effective Amendment No. 9 to Securities and Exchange Commission Form S-1 ("Amended S-1"). The following description of the facts is therefore drawn from these documents as required by Rule 12(b)(6).

In 1999, PRG installed expensive computer controlled audio systems for NCT and has been trying to collect payment ever since. PRG brought suit in Connecticut state court for breach of contract, eventually accepting a $2,000,000 confessed judgment from NCT and its wholly owned subsidiary, Distributed Media Corporation ("DMC"), on December 20, 2001. Judgment for the $2,000,000, plus interest and costs, was entered on January 17, 2002. PRG's efforts to collect the debt have been largely unsuccessful and it is still owed over 90% of its original principal judgment. [FN6] PRG continues to pursue enforcement of the judgment through ongoing litigation in the Connecticut state courts. Before confessing judgment for $2 million on December 20, 2001, NCT and PRG had entered into a "resolution agreement" earlier in 2001 in which NCT agreed that it owed PRG $1,906,221. In that agreement, NCT also promised to register 6.7 million shares of NCT stock for the benefit of PRG. That promise to register shares also remains unfulfilled. NCT has had no success in registering any shares and its Amended S-1 is currently in its ninth iteration.

The remaining facts in the complaint are perhaps best addressed in two parts, those dealing with the alleged insolvency of NCT and those relating to purported misconduct by the defendants who are members of NCT's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2004 WL 2647593                                                                    Page 6
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
(Cite as: 2004 WL 2647593 (Del.Ch.))

board and management. This rough division corresponds to some extent with the two claims for relief in the complaint, the claim for a receiver under § 291 and the claim for breach of fiduciary duty. As discussed later in the opinion, however, the facts underlying the fiduciary duty claims also bear on the viability of the § 291 claim.

### A. NCT's Financial Condition

**\*5** NCT Group, Inc., formerly NCT Audio, Inc., is a publicly traded Delaware corporation with a principal place of business in Westport, Connecticut. NCT is a technology and communications company that has yet to achieve profitability, having operated at a deficit since at least 1998. Although the defendants claim that NCT is a start-up, the company has existed since April, 1986. According to the Amended S-1, NCT's primary business is to "design products and develop and license technologies based upon its portfolio of patents and other rights." [FN7] To say that NCT is publicly traded is perhaps misleading. NCT does file regular financial statements with the SEC but its common stock trades on the pink sheets. Pennies, not dimes, are the currency used to purchase NCT shares.

The complaint sets forth several facts, reported in NCT's public filings, that support a rational inference that NCT has been insolvent for several years. Initially, PRG alleges that NCT's liabilities far exceed its assets. As of September 30, 2003, NCT's working capital deficit was $57.1 million. [FN8] NCT had negative net tangible assets of $53.7 million as of December 31, 2002. [FN9] Thus, from the perspective of its balance sheet, NCT is clearly insolvent.

Second, the complaint pleads that NCT has little cash and that its ability to raise cash is questionable at best. In the Amended S-1, NCT management acknowledged that the cash and cash equivalents on hand, $500,000 as of September 30, 2003, would not be sufficient to sustain the company through June 2004 and noted that the company's auditors had concluded that there was "substantial doubt about [NCT's] ability to continue as a going concern." [FN10]

Third, the Complaint pleads disturbing facts regarding NCT's capital structure that buttress PRG's contention that

NCT is insolvent. NCT has issued nearly all the shares of stock that it is authorized to issue, 642 million out of 645 million, [FN11] and does not intend to ask the shareholders to increase the authorized shares unless and until the Amended S-1 becomes effective, a prospect that, I must infer, is dubious given NCT's financial condition and the fact that the Amended S-1 attached to the complaint is the ninth version. Even more importantly, NCT has issued shares and pledged additional shares that are beyond the level authorized in the certificate in order to settle pending legal claims and pay for goods and services such as rent, inventory and temporary help. These issuances of stock have not been in small numbers--they are alleged to involve nearly 160 million shares. This is a business strategy of dubious legality and is suggestive of desperation, rather than solvency.

According to the complaint, the issuance of new shares has been accelerating rapidly. Simply to meet its obligations to certain parties who have been granted convertible securities or other contractual rights, NCT needs from *2.9 billion* to *5.6 billion* shares, a level 4.5 to 8.6 times that authorized in the company's charter. [FN12] Allegedly, that is not even the "all in" number that would take into account all claims to NCT common stock. A rational inference is that these facts make it very improbable that the SEC would ever register additional NCT shares, especially when its authorized shares trade in pennies and its financial condition, as pled, suggests that its shares are likely worthless.

**\*6** Fourth and perhaps most importantly, NCT acknowledges in SEC filings that it has been unable to repay its indebtedness as it comes due on numerous occasions. In fact, NCT "has established a history of defaulting on the repayment of obligations" [FN13] to its primary creditor, Salkind. NCT's Amended S-1 reports a default on $10.6 million of corporate debt owed almost exclusively to Salkind. [FN14] Failure to pay its debts in due course, including the debt it has confessed it owes to PRG, supports the inference that NCT is insolvent. In this regard, it is notable that NCT's failure to pay PRG before collection proceedings evidences a prior inability to meet its obligations to trade creditors, as does its pledge of billions



of (unauthorized and unregistered) shares to Salkind and trade creditors other than PRG in order to stave off a bankruptcy filing.

Finally, the Amended S-1 contains one of the more unusual excuses one can imagine for a public company's failure to hold an annual meeting since 2001. That document plainly states that NCT has not held an annual meeting because the company cannot afford the costs of holding one:

We did not hold a shareholder meeting in 2002 or 2003 and our next meeting date is contingent upon effectiveness of this registration statement because we are not in a financial position to incur duplicate printing and mailing costs of our annual report to our shareholders in the event that changes are required. [FN15]

When a company cannot afford to accord its stockholders the fundamental opportunity to elect directors each year, it is in an odd position to argue that a complaint should be dismissed for failure to allege insolvency with sufficiency.

### B. The Facts Supporting PRG's Fiduciary Duty Claims

The complaint attempts to plead viable claims for breach of fiduciary duty against NCT's board and certain of its officers. In this regard, the complaint is less than ideal. In a cursory manner, the complaint alleges that the defendant-directors and officers breached their fiduciary duties by grossly mismanaging the company's finances. The complaint further alleges that the "exorbitant salaries" [FN16] that NCT pays its officers, including its CEO, defendant Michael Parrella, and its President, defendant Irene Lebovics also evidence a breach of fiduciary duty. The mismanagement and excessive salaries, the complaint states, caused the company to become insolvent.

Far less conclusory, however, are the allegations of the complaint addressing the relationship between NCT and its primary creditor, Carole Salkind. Salkind is not a typical insider; she is not an officer or director of NCT (though she allegedly is married to one-time NCT director Morton Salkind). According to the complaint, public documents describe Salkind as a legal secretary, a position that PRG (rationally) suggests does not generate an income sufficient to account for the millions of dollars in capital she has

allegedly provided to NCT in order to become its primary creditor and de facto controlling stockholder. But, for at least the period from 2001 to the present, Salkind has putatively been the primary financial backer for NCT. As of October 31, 2003 NCT owed Salkind more than $28 million. NCT has defaulted on at least 13 convertible notes owed to her, worth more than $9 million in principle alone, and refinanced them on more unfavorable terms for NCT. [FN17] Salkind is allegedly now a secured creditor, holding liens on most of NCT's tangible assets, including the stock of NCT's subsidiaries. She would be allocated a substantial amount of any cash that NCT might generate in an initial public offering by any NCT subsidiary.

*7 Additionally, no fewer than eight companies that are affiliated with Salkind's husband and son act as paid consultants to NCT. [FN18] Payments on these contracts are allegedly $240,000 per year plus additional warrants and options for the rapidly-diluting NCT stock. According to a December 2003 Schedule 13-d filing she made, Salkind or her affiliates owned over 1.2 billion shares of NCT stock on a fully converted basis. [FN19] This means that Salkind alone--and apart from other NCT stockholders--supposedly beneficially owns shares, on a fully converted basis, far exceeding the 645 million shares authorized by the company's corporate charter.

To be clear, Salkind is not technically NCT's controlling stockholder. Nonetheless, she is undisputedly the primary creditor of the company. The company has a history of defaulting on her loans, paying penalties and refinancing them, and her loans have been procured in exchange for convertible notes and warrants that, if exercised, would give her more shares of NCT than are currently outstanding. Furthermore, Salkind allegedly has liens on all the assets of NCT, including the stock of its subsidiaries. In short, it is fairly inferable that Salkind, at her will, can assume practical control over NCT by either exercising her foreclosure rights in default or by converting and becoming a controlling shareholder. In essence, PRG fairly alleges that Salkind is NCT's de facto controlling shareholder and that her interests are being inequitably favored over PRG's and other creditor's interests by a complicit board.

At the pleading stage, one must also assume that NCT's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



four-member board--two members of which, defendants Parrella and Lebovics, earn substantial salaries as managers--knows that Salkind has practical control over the company. Notably, the complaint alleges that Parrella and Lebovics have received and continue to receive substantial salaries and bonuses during a period when NCT's financial performance and health have been dismal and when NCT has dishonored its debt to PRG. Such alleged behavior raises the possibility that, along with the payments to Salkind's family companies, there is a pattern of improper self-enrichment by those in control. That inference is reinforced by another fact. In sworn testimony that has come to light since the complaint was filed, Cy Hammond, NCT's CFO, has admitted that Salkind's capital infusions have often been put into the coffers of NCT subsidiaries precisely to frustrate the ability of PRG to collect on debts due it from NCT. [FN20] Nonetheless, the consideration for these putative infusions has allegedly been additional convertible notes of NCT itself. [FN21]

These additional components add bitter flavor to a bisque already full of off-putting ingredients. At the pleading stage, their combination generates an aroma of fiduciary infidelity.

## II. *Legal Analysis*
### A. *Procedural Standard*

[1][2] The applicable standard that must be applied to decide a motion to dismiss for failure to state a viable claim are well settled. [FN22] To grant the motion here, it must appear with reasonable certainty that PRG would not be entitled to the relief sought under any set of facts which could be proven to support the action. [FN23] Well-pled facts alleged in the complaint are viewed in the light most favorable to PRG, but conclusory allegations are not accepted as true without specific factual allegations to support them. [FN24]

### B. *PRG's Claim For A Receiver Under 8 Del. C. § 291*

**\*8** PRG seeks the appointment of a receiver under 8 *Del. C.* § 291 to manage the assets of NCT. Section 291 states, in pertinent part, that "[w]henever a corporation shall be insolvent, the Court of Chancery, on the application of any creditor or stockholder thereof, may, at any time, appoint 1

or more persons to be receivers of and for the corporation.... The powers of the receivers shall be such and shall continue so long as the Court shall deem necessary." [FN25] NCT argues that the complaint fails to state a claim under § 291 for several reasons, which I now address in turn.

### 1. *Has PRG Sufficiently Alleged Insolvency?*

[3] NCT's first argument is that PRG has not alleged facts supporting an inference that PRG is insolvent. NCT premises this argument on the notion that PRG must--in its complaint!--prove by clear and convincing evidence that NCT is insolvent.

[4] That premise, however, is erroneous. In order for a receiver to be actually appointed by this court under § 291, precedent of this court does hold that the fact of the corporation's insolvency must be proven by clear and convincing evidence. [FN26] That case law, however, does not address the pleading burden under § 291 and no case law undercuts what a plain reading of the statute implies, which is that a complaint can state a claim under § 291 by alleging facts that, if true, demonstrate the corporation's insolvency. The cases NCT cites were not decided on the pleadings but after the development of a full record. [FN27]

[5] To meet the burden to plead insolvency, PRG must plead facts that show that NCT has either: 1) "a deficiency of assets below liabilities with no reasonable prospect that the business can be successfully continued in the face thereof," or 2) "an inability to meet maturing obligations as they fall due in the ordinary course of business." [FN28] Here, PRG has pled facts meeting both tests.

As to the first, NCT concedes that its liabilities exceed its assets. But it maintains that PRG has failed to allege facts that support a finding that it has "no reasonable prospects" of continuing. In support of this reading, NCT points to several decisions of this court for the proposition that a company that has liabilities in excess of assets but borrows money to pay debts is not necessarily insolvent. [FN29] In other words, this case law suggests that if a company can raise money to pay bills through credit in a commercially sensible manner, then the company is not insolvent. [FN30] By pointing to this case law, NCT seeks to establish that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



mere fact that its liabilities exceed its assets does not end the inquiry. [FN31]

Even if the court accepts this uncontroversial premise, PRG has still alleged sufficient facts to support a reasonable inference of insolvency. In the first place, it is significant that NCT's liabilities are nearly five times its assets. NCT had negative net tangible assets of $53.7 million and a working capital deficit of $57.1 million as of December 31, 2002. [FN32] Both of these figures exceed NCT's aggregate revenue of $41.2 million for the *five* years ending December 31, 2002, *combined;* not its net revenue, its total aggregate revenue! [FN33] During the same period, NCT consistently racked up huge annual operating losses. The imposing size of the still-growing deficits NCT confronts is sufficient--at the pleading stage--to support an inference that the company has no prospects of successfully continuing. That NCT has staved off collapse by pledging billions of unauthorized and unregistered shares (of its penny stock), fails to negate the inference that the company has no reasonable prospect to salvage its finances and continue as a viable going concern that meets its legal obligations. NCT's drastic circumstances differ materially from cases where the relevant corporation's assets and liabilities were approximately equal and where, with traditional financing, there appeared a prospect for viability. [FN34]

*9 Second, NCT's contention that it is simply replacing old debt with new and that it has the capacity to meet its obligations responsibly through additional borrowing is unpersuasive. NCT fails to acknowledge that the complaint creates a rational inference that funding NCT's business through borrowing or credit is unsustainable. NCT does not have the credit necessary to borrow at commercially reasonable rates that will enable it to meet its obligations going forward. NCT has issued approximately 642 million shares of 645 million authorized shares. [FN35] It has committed to issue many more; Salkind and her affiliates, for example, beneficially own over 1.2 billion shares on a fully converted basis. [FN36] NCT claims that it will seek to increase the number of authorized shares at its next shareholder meeting, but such a vote will not occur, according to NCT, until after its Amended S-1 filing is effective--an eventuality that seems quite unlikely to come to pass.

Even more importantly, NCT fails to acknowledge that it has already been unable to pay its debts by raising new capital or through new borrowing. The reality is that it is not meeting its obligations to creditors and therefore, even if Salkind is putting in new money, at the pleading stage, the clear inference remains that NCT has no reasonable prospect for overcoming its balance sheet insolvency. In other words, the fact that it is raising money to fund some operational needs and pay some obligations might be relevant, but not in the confidence-inspiring sense that NCT wishes, as these infusions do not suggest that NCT is able to operate viably.

For similar reasons, the complaint quite obviously sets forth facts meeting the second test for insolvency. As to at least two significant debtors, PRG and Salkind, NCT was unable to meet its debts as they came due. NCT is limping along but only through an unusual arrangement with Salkind and only by taking steps to avoid meeting its obligations to PRG as a judgment creditor. Given these pleading stage facts, NCT's claim that the complaint is deficient for failing to allege insolvency is, to put it mildly, without any reasonable basis. Furthermore, that NCT has satisfied debts to trade creditors with (actual or pledged) shares of its penny stock, some or most of which were unregistered and unauthorized shares, is indicative of an inability to pay debts as they come due.

### 2. *Does PRG Plead Facts That, If True, Suggest That The Later Appointment Of A Receiver Might Be Appropriate?*

NCT's next attack on PRG's § 291 claim is based on dictum in prior cases suggesting that this court "normally" should not appoint a receiver under § 291 where the sole purpose of the petitioner seeking the receivership is to collect a corporate debt, [FN37] especially when another forum exists in which the petitioner can obtain payment of the debt. In *Keystone Fuel Oil v. Del-Way Petroleum, Co.,* [FN38] Vice Chancellor Brown wrote:

> The generally accepted principle [is] that a receiver will never be appointed except under special circumstances of great exigency and when some real beneficial purpose

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2004 WL 2647593                                                                    Page 10
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
(Cite as: 2004 WL 2647593 (Del.Ch.))

will be served thereby. Moreover, a receiver is normally a remedy of an auxiliary nature incidental to primary relief bottomed upon fraud or inequitable conduct under the given circumstances, and the appointment of a receiver should not be the sole object of a suit. *Drob v. National Memorial Park*, Del. Ch., 41 A.2d 589 (1945); *Lichens Co. v. Standard Commercial Tobacco Co.*, Del. Ch., 40 A.2d 447 (1945[1944]). [FN39]

**\*10** The dictum in *Keystone Oil* does not support NCT's motion for dismissal for several reasons.

Initially, it is worth noting that *Keystone Oil* cited to two cases in which a petitioner sought the appointment of a receiver pendente lite for a solvent company and invoked this court's general equitable authority, not the statutory authority granted by § 291. [FN40] When a company is solvent, § 291 is by its plain terms not even implicated and, of course, it makes sense for this court to be extremely cautious about using its inherent equitable powers to appoint a receiver in those circumstances. If a company is solvent and can pay its debts, presumably a creditor can protect its rights in the normal course by pursuing an action for breach of contract or other remedies. In other words, solvency removes the core justification for appointing a receiver under § 291. [FN41] Thus, the authority upon which *Keystone Oil* relies addresses situations in which this court is not exercising statutory authority as to an insolvent company and therefore when it sensibly would proceed with greater caution because it is addressing a request to displace a sitting board of directors of a solvent company. [FN42]

Furthermore, in *Keystone Oil* itself, this court found that the company for which a receiver was sought was solvent, thereby making the appointment of a receiver under § 291 statutorily inappropriate. [FN43] For all these reasons, I do not read *Keystone Oil* as setting forth a binding rule that a § 291 claim must be auxiliary to another claim. Such a reading of the dictum in *Keystone Oil* would cabin the discretion afforded to this court under the plain terms of § 291 [FN44] by reading a requirement into the statute that the General Assembly did not spell out.

More importantly, even under the reasoning of *Keystone Oil*, it would be inappropriate to dismiss PRG's § 291 claim. If one gives a more measured reading to its words than does

NCT, *Keystone Oil* simply emphasizes the discretionary nature of the § 291 remedy and the reality that this court should not lightly undertake to substitute a statutory receiver for the board of directors of an insolvent company. That is a perfectly sensible and unremarkable articulation of the prudent manner in which this court should decide whether to exercise its statutory appointment powers. [FN45] If, for example, the record before the court convinces the court that the board of an insolvent company is dealing even-handedly and diligently with creditor claims and is doing its best to maximize the value of the corporate entity for all creditors, then the court would have little justification for appointing a receiver.

NCT strains the sensible dictum in *Keystone Oil* regarding what "normally" delimits this court's exercise of discretion and tries to convert it into a pleading-stage barrier to the procession of PRG's claim. For reasons that the reader can already discern, PRG has pled facts that rationally support the inference that NCT's board, facing a situation in which its primary duty is to maximize the value of assets available to satisfy its creditors, is, instead, operating in concert with the company's de facto controlling stockholder to avoid payment of debts to a large creditor, to advantage that controlling stockholder (and her family's companies) and NCT's top managers to the detriment of outside creditors of the firm.

**\*11** This is not to say that a board of an insolvent company may not negotiate in good faith with creditors for the benefit of the firm. Rather, it is to emphasize that here there are facts pled that in days past would be deemed to have raised a claim for "constructive fraud." NCT is permitting Salkind to repeatedly expand her position as a fully secured creditor, to the detriment of PRG and other creditors in the event of liquidation. At the same time, Salkind's family members continue to receive lucrative payments as consultants of the company, money that could be used to pay the debt owed to PRG. Meanwhile, defendants Parrella and Lebovics, two members of the four member NCT board, who Salkind likely has the practical power to displace, continue to draw substantial salaries. And Salkind's new capital infusions are being placed into a subsidiary in order to avoid PRG's collection efforts.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2004 WL 2647593
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
(Cite as: 2004 WL 2647593 (Del.Ch.))

At the pleading stage, these unusual facts are sufficient to enable PRG to proceed with discovery on its § 291 claim, as they support the rational inference that a receiver is necessary to protect NCT's creditors. Although what seems to be troubling now may later prove to have a wholly benign character, PRG is entitled to have rational inferences drawn in its favor and it would be error to deny it the opportunity to convince the court, on a full record, that a receiver should be appointed. The motion to dismiss the claim seeking a receiver under 8 Del. C. § 291 is therefore denied.

### C. Does The Complaint State A Claim For Breach Of Fiduciary Duty?

The second count in the complaint alleges that the NCT board and one of its officers, NCT's Chief Financial Officer Cy Hammond, breached their fiduciary duties. NCT claims that this count raises derivative claims that are not pled in accordance with Rule 23.1 and, perhaps more importantly, are barred, as to the directors, by the corporation's exculpatory charter provision. PRG's answer to that argument depends heavily on its contention that NCT is insolvent. PRG argues that, as a creditor of an insolvent company, its claims for breach of fiduciary duty are necessarily direct and that, consequentially, the exculpatory charter provision does not bar those claims. Alternatively, it argues that it has pled sufficient facts to state a claim for non-exculpated conduct by the director-defendants.

The resolution of which party is correct largely depends on a proper understanding of the nature of claims that belong to corporations and the reasons why creditors are accorded the protection of fiduciary duties when companies become insolvent. Once this context is understood, it is easier to determine whether, and to what extent, PRG's claims for fiduciary duty survive.

### 1. The Nature Of The Claims Raised By PRG--Are They Derivative or Direct?

[6] Typically, creditors may not allege fiduciary duty claims against corporate directors. [FN46] It is presumed that creditors are capable of protecting themselves through the contractual agreements that govern their relationships with firms. Furthermore, a specific body of law--the law of

fraudulent conveyance--exists precisely to protect creditors. And, of course, important elements of federal bankruptcy law also protect creditors. Given that these legal tools exist to protect creditors, our corporate law (and that of most of our nation) expects that the directors of a solvent firm will cause the firm to undertake economic activities that maximize the value of the firm's cash flows primarily for the benefit of the residual risk-bearers, the owners of the firm's equity capital. [FN47] So long as the directors honor the legal obligations they owe to the company's creditors in good faith, as fiduciaries they may pursue the course of action that they believe is best for the firm and its stockholders. Indeed, in general, creditors must look to the firm itself for payment, rather than its directors or stockholders, except in instances of fraud or when other grounds exist to disregard the corporate form.

*12 These realities, of course, do not mean that the directors are required to put aside any consideration of other constituencies, including creditors, when deciding how to manage the firm. But it does mean that the directors--as fiduciaries in equity--are primarily focused on generating economic returns that will exceed what is required to pay bills in order to deliver a return to the company's stockholders who provided equity capital and agreed to bear the residual risk associated with the firm's operations. [FN48] Somewhat oddly, a decision of this court that attempted to emphasize that directors have discretion to temper the risk that they take on behalf of the equity holders when the firm is in the "zone of insolvency" has been read by some as creating a new body of creditor's rights law. The *Credit Lyonnais* [FN49] decision's holding and spirit clearly emphasized that directors would be protected by the business judgment rule if they, in good faith, pursued a less risky business strategy precisely because they feared that a more risky strategy might render the firm unable to meet its legal obligations to creditors and other constituencies.

The obligation of directors in that context of high risk and uncertainty, said Chancellor Allen, was not "merely [to be] the agent of the residue risk bearers" but rather to remember their fiduciary duties to "the corporate enterprise" itself, in the sense that the directors have an obligation "to the community of interest that sustained the corporation ...." and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2004 WL 2647593
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
(Cite as: 2004 WL 2647593 (Del.Ch.))

to preserve and, if prudently possible, to maximize the corporation's value to best satisfy the legitimate claims of all its constituents, and not simply to pursue the course of action that stockholders might favor as best for them. [FN50] In other words, *Credit Lyonnais* provided a shield to directors from stockholders who claimed that the directors had a duty to undertake extreme risk so long as the company would not technically breach any legal obligations. [FN51] By providing directors with this shield, creditors would derive a clear benefit because directors, it can be presumed, generally take seriously the company's duty to pay its bills as a first priority. [FN52]

Creative language in a famous footnote in *Credit Lyonnais* [FN53] was read more expansively by some, not to create a shield for directors from stockholder claims, but to expose directors to a new set of fiduciary duty claims, this time by creditors. To the extent that a firm is in the zone of insolvency, some read *Credit Lyonnais* as authorizing creditors to challenge directors' business judgments as breaches of a fiduciary duty owed to them. [FN54] Some cases in the courts of other jurisdictions have embraced this reading. [FN55]

This view of the common law of corporations is not unproblematic. [FN56] Arguably, it involves using the law of fiduciary duty to fill gaps that do not exist. Creditors are often protected by strong covenants, liens on assets, and other negotiated contractual protections. The implied covenant of good faith and fair dealing also protects creditors. So does the law of fraudulent conveyance. With these protections, when creditors are unable to prove that a corporation or its directors breached any of the specific legal duties owed to them, one would think that the conceptual room for concluding that the creditors were somehow, nevertheless, injured by inequitable conduct would be extremely small, if extant. Having complied with all legal obligations owed to the firm's creditors, the board would, in that scenario, ordinarily be free to take economic risk for the benefit of the firm's equity owners, so long as the directors comply with their fiduciary duties to the firm by selecting and pursuing with fidelity and prudence a plausible strategy to maximize the firm's value. [FN57]

**\*13** Fortunately, this case does not require me to explore the

metaphysical boundaries of the zone of insolvency. Instead, it requires me to apply a more well-settled line of authority, albeit a line of authority that is perhaps less well understood.

[7] When a firm has reached the point of insolvency, it is settled that under Delaware law, the firm's directors are said to owe fiduciary duties to the company's creditors. [FN58] This is an uncontroversial proposition and does not completely turn on its head the equitable obligations of the directors to the firm itself. [FN59] The directors continue to have the task of attempting to maximize the economic value of the firm. [FN60] That much of their job does not change. But the fact of insolvency does necessarily affect the constituency on whose behalf the directors are pursuing that end. By definition, the fact of insolvency places the creditors in the shoes normally occupied by the shareholders--that of residual risk-bearers. Where the assets of the company are insufficient to pay its debts, and the remaining equity is underwater, whatever remains of the company's assets will be used to pay creditors, usually either by seniority of debt or on a pro rata basis among debtors of equal priority.

In insolvency, creditors, as residual claimants to a definitionally-inadequate pool of assets, become exposed to substantial risk as the entity goes forward; poor decisions by management may erode the value of the remaining assets, leaving the corporation with even less capital to satisfy its debts in an ultimate dissolution. The elimination of the stockholders' interest in the firm and the increased risk to creditors is said to justify imposing fiduciary obligations towards the company's creditors on the directors. A strand of authority (by no means universally praised) therefore describes an insolvent corporation as becoming akin to a trust for the benefit of the creditors. This line of thinking has been termed the "trust fund doctrine." [FN61] Under a trust fund approach, the directors become trustees tasked with preserving capital for the benefit of creditors who are deemed to have an equity-like interest in the firm's assets.

Several questions arise when directors assume a fiduciary duty towards creditors. For example, as will be touched upon later, the fact that creditors become the residual risk-bearers does little to shape the fiduciary duties directors

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



2004 WL 2647593                                                                          Page 13
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 2004 WL 2647593 (Del.Ch.))**

owe to particular creditors. For example, a venerable decision of this court, *Asmussen v. Quaker City Corp.,* holds that the mere fact that directors of an insolvent firm favor certain creditors over others of similar priority does not constitute a breach of fiduciary duty, absent self-dealing. [FN62]

[8] More to the current point, the transformation of a creditor into a residual owner does not change the nature of the harm in a typical claim for breach of fiduciary duty by corporate directors. Two examples will illustrate this. Assume that a corporation, say an airline, is already insolvent but that it has ongoing operations. A well-pled claim is made by one of the company's many creditors that the directors have engaged in self-dealing. Is this claim a direct claim belonging to the corporation's creditors as a class, or the specific complaining creditor, such that any monetary recovery would go directly to them, or it? I would think that it is not. Instead, because of the firm's insolvency, creditors would have standing to assert that the self-dealing directors had breached their fiduciary duties by improperly harming the economic value of the firm, to the detriment of the creditors who had legitimate claims on its assets. No particular creditor would have the right to the recovery; rather, all creditors would benefit when the firm was made whole and the firm's value was increased, enabling it to satisfy more creditor claims in order of their legal claim on the firm's assets. In other words, even in the case of an insolvent firm, poor decisions by directors that lead to a loss of corporate assets and are alleged to be a breaches of equitable fiduciary duties remain harms to the corporate entity itself. [FN63] Thus, regardless of whether they are brought by creditors when a company is insolvent, these claims remain derivative, with either shareholders or creditors suing to recover for a harm done to the corporation as an economic entity and any recovery logically flows to the corporation and benefits the derivative plaintiffs indirectly to the extent of their claim on the firm's assets. [FN64] The reason for this bears repeating--the fact of insolvency does not change the primary object of the director's duties, which is the firm itself. The firm's insolvency simply makes the creditors the principal constituency injured by any fiduciary breaches that diminish the firm's value and logically gives them standing to pursue

these claims to rectify that injury. Put simply, when a director of an insolvent corporation, through a breach of fiduciary duty, injures the firm itself, the claim against the director is still one belonging to the corporation.

*14 Likewise, the fact that a firm has become insolvent *after* the acts that are alleged to have been fiduciarily improper does not convert a claim belonging to the corporation into one belonging to creditors, allowing them to proceed directly against the directors. Assume as a second example that a creditor alleges that the firm has become insolvent because of directorial mismanagement. The creditor's claim clearly alleges that because of director misconduct the firm itself has become less valuable. The later fact of insolvency does not transform the nature of the claim; it simply changes the class of those eligible to press the claim derivatively, by expanding it to include creditors. [FN65]

### 2. *The Implications Of Section 102(b)(7) For Derivative Creditor Claims*

Clarity about the nature of claims of this kind is important. Section 102(b)(7) authorizes corporate charter provisions that insulate directors from personal liability to the corporation for breaches of the duty of care. This is an important public policy statement by the General Assembly, which has the intended purpose of encouraging capable persons to serve as directors of corporations by providing them with the freedom to make risky, good faith business decisions without fear of personal liability.

[9] Whether a firm is solvent or insolvent, it--and not a constituency such as its stockholders or its creditors--owns a claim that a director has, by failing to exercise sufficient care, mismanaged the firm and caused a diminution to its economic value. Although § 102(b)(7) itself does not mention creditors specifically, [FN66] its plain terms apply to all claims belonging to the corporation itself, regardless of whether those claims are asserted derivatively by stockholders or by creditors.

This reading of the statute is also necessary in order for the statute's evident purpose to be implemented. Assume again the example of a claim that directors, at a time when the


firm was solvent, engaged in acts of mismanagement that injured the firm and caused the firm to become insolvent. Assume further that the mismanagement allegedly resulted from gross negligence. Because the firm has become insolvent, the claim is asserted by creditors (or has been assigned to creditors in a bankruptcy). In such a scenario, the statutorily-authorized defense is most valuable to directors because there is the real danger that a fact-finder, in view of hindsight bias and its knowledge of the fact that the directors' business strategy did not pan out, will conclude that the directors have acted with less than due care, even if they did not. If the mere fact that creditors have standing to pursue an insolvent corporation's claim against the directors or that the corporation's claim has been assigned as an asset to creditors somehow transforms the claim into one not belonging to the corporation, § 102(b)(7) protection might be withdrawn simply because a business strategy failed, hollowing § 102(b)(7) of much of its intended utility.

**\*15** There appears to be no persuasive normative justification for such a carving. It would be puzzling if, in insolvency, the equitable law of corporations *expands* the rights of firms to recover against their directors so to better protect creditors, who, unlike shareholders, typically have the opportunity to bargain and contract for additional protections to secure their positions. [FN67] The kind of claims that an insolvent firm could press against its directors would, one would think, be at most coextensive with, and certainly not superior to, the claims that a solvent firm itself could bring against its directors. Such claims should not be expanded to enable the firm to hold directors liable for lack of due care simply because the firm is or, even worse, has become insolvent.

Notably, there is no injury to the legitimate expectations of creditors by such an interpretation of § 102(b)(7). Only claims of the corporation asserted derivatively by creditors fall within the charter defense. The argument that § 102(b)(7) clauses should not bind third parties lacks force because the clauses only restrict third parties to the extent that they seek to enforce rights on behalf of the corporation itself. Any claims that creditors possessed themselves against the firm or its directors--such as claims for breach of

contract or for common law or statutory torts like misrepresentation and fraudulent conveyance--would not be barred by the exculpatory charter provision because those claims do not belong to the corporation or its stockholders. [FN68]

[10] Moreover, by the statute's own terms, an exculpatory charter provision does not insulate directors from liability for various acts of disloyalty towards the firm. [FN69] Thus, to the extent that directors have engaged in conscious wrongdoing or in unfair self-dealing, the exculpatory charter provision does not insulate them from fiduciary duty claims asserted on the firm's behalf by creditors. As a result, the argument that an exculpatory charter provision works some unfairness on creditors is rendered even more slight. By what equitable notion should creditors who retain the right to prove that a director is liable for fraudulent conveyance, misrepresentation, tortious interference with contract or breach of other legal duties to them, or for a non-exculpated breach of fiduciary duty towards the corporation, be granted a care-based claim that the corporation itself had contractually relinquished and that may never be pressed by the stockholders of a solvent firm? That is, what right or efficient theory of commercial law would permit creditors, through a bankruptcy trustee or other mechanism, to inherit not only claims belonging to the corporation as an entity but also claims that the corporation has contractually promised it would not bring against its directors?! The creditors would end up as transferees from the corporation of a broader class of claims than the corporation ever possessed.

### 3. *What Pleading Standard Applies To A Derivative Claim Asserted By A Creditor Of An Insolvent Firm?*

**\*16** In their briefs, the parties spent very little time on a few other subtle aspects of this area of the law. For example, assuming that a claim that creditors are asserting is one belonging to the firm, does that mean that creditors must plead demand excusal under Rule 23.1? The parties have not burdened me with input on this precise question. An independent review of Delaware precedent reveals nothing on point and I am cautious to make a pronouncement about the question without better contributions from the parties. The reason that there is no Delaware law precisely on point

Westlaw.

2004 WL 2647593                                                          Page 15
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
(Cite as: 2004 WL 2647593 (Del.Ch.))

no doubt has something to do with the fact that in most situations involving insolvent public companies, the firm is placed in bankruptcy, and the procession of claims belonging to the firm is addressed through the Bankruptcy Court process. [FN70]

For reasons I discuss later, I need not address what, if any, effect the pled fact of insolvency has on the demand excusal inquiry, which is typically guided by the teaching of *Aronson v. Lewis.* [FN71] One can argue that it should have no effect, except insofar as the fact of insolvency might bear on the first prong of the *Aronson* inquiry--the independence of the directors and their ability to consider a demand for suit with the requisite impartiality. [FN72] Given the built-in safety valve of *Aronson's* second prong--the ability to proceed with a derivative claim if it meets particularized pleading standards [FN73]--the demand excusal inquiry articulated by that case arguably provides a sound framework even in the context of an insolvent firm.

On the other hand, that directors are elected by stockholders and not creditors, the absence of any right by creditors to seek books and records, and the concern that directors might be extremely resistant to granting a demand when the corporation's financial condition has weakened its ability to provide indemnification and insurance might be argued as factors justifying a different approach to pleading demand excusal. In so writing, I ponder a question that the parties have not. It is therefore fortunate that I can decide the pending motion without resolving this question; that is, the outcome of the motion will not be hinged on whether or not a notice or particularized pleading standard applies.

4. *What Does The Direct And Derivative Distinction Mean When A Firm Is Insolvent?*

Another question the parties do not confront is what the direct/derivative claim distinction means when a firm is insolvent. PRG assumes that all fiduciary duty claims become direct when a firm is insolvent. The defendants' arguments are less clear but they come close to asserting the opposite; namely, that all fiduciary duty claims must be derivative.

To my mind, the question has no stark answer. When a firm is solvent, there can be situations when a board's fiduciary misconduct is not injurious to the firm as a whole but is injurious to particular stockholders. Assume, for example, that the board controlled 80% of the stock and consistently shorted the remaining stockholders on dividend distributions, took the excess and gave it to themselves, and lied to the minority about the material facts. In those circumstances, it seems likely that the injured minority stockholders could assert direct duty of loyalty claims even though there was no injury to the firm.

*17 When a firm is insolvent, the directors are said to owe fiduciary duties to the creditors, much like the directors of solvent firms owe such duties to the stockholders. The important unanswered question is precisely what the contents of those duties are. As Justice Frankfurter famously stated:

> But to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as fiduciary? In what respects has he failed to discharge these obligations? And what are the consequences of his deviation from duty? [FN74]

These questions are very important in this context for obvious reasons. For example, the directors of an insolvent corporation must retain the right to negotiate in good faith with creditors and to strike fair bargains for the firm. To what extent should the "fiduciary" status of the directors impinge on such negotiations? Would it, for example, expose the directors to liability under principles of common law fraud for material omissions of fact to creditors in negotiations, and not simply for affirmative misrepresentations? And in precisely what circumstances would creditors be able to look directly to the directors for recompense as opposed to the firm?

Here, as we shall see, there is one allegation in the complaint that arguably takes on the flavor of a direct claim that the NCT directors breached their fiduciary duties to PRG, as a particular creditor. That particular allegation can be analogized to a more general example. Suppose that the directors of an insolvent firm do not undertake conduct that lowers the value of the firm overall, or of creditors in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

2004 WL 2647593                                                                    Page 16
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
(Cite as: 2004 WL 2647593 (Del.Ch.))

general, but instead take action that frustrates the ability of a particular creditor to recover, to the benefit of the remainder of the corporation's creditors and of its employees. Could this conceivably be a breach of the directors' fiduciary duties to the particular injured creditor and, if so, under what circumstances? Would that creditor have to show that the directors did not rationally believe that their actions (e.g., in trying to maintain the operations of the firm) would eventually result in the creation of value that would enable payment of the particular creditor's claim? To at least my mind, there are a myriad of policy considerations that would arise by the indulgence or non-indulgence of a fiduciary duty claim of this type and I am reluctant to ponder their viability without better help from briefing by adversarial parties. There is older authority, such as the *Asmussen* case adverted to previously, that holds that directors of insolvent firms may appropriately prefer particular creditors over others of equal priority. [FN75] But that line of authority also indicates that if that discrimination is motivated by self-interest, then a breach of fiduciary duty may be found. [FN76] The question that arises is whether pure self-dealing is the only fiduciarily-invidious reason that might justify a direct claim by a disadvantaged creditor.

**\*18** [11] For reasons I will explain, I can resolve the motion without making any broad pronouncements that would have large policy implications. Rather, I will resolve the motion on the established principle that when a firm is insolvent, the directors take on a fiduciary relationship to the company's creditors, combining that principle with the conservative assumption that there might, possibly exist circumstances in which the directors display such a marked degree of animus towards a particular creditor with a proven entitlement to payment that they expose themselves to a direct fiduciary duty claim by that creditor. [FN77]

*5. The Implications Of These Considerations For The Viability Of PRG's Fiduciary Duty Claims*

I now resolve the motion to dismiss PRG's fiduciary duty claims, bearing in mind the prior considerations.

I begin by noting that PRG makes one cursory claim whose viability is undercut by NCT's exculpatory charter

provision. The complaint alleges in a conclusory manner that the individual defendants "totally failed to exercise appropriate oversight over NCT and its management and are directly responsible for the deplorable financial condition of" the company. [FN78] This failure is alleged to be "gross negligence or worse." [FN79] Insofar as the complaint explicitly attempts to state a due care claim against the defendant-directors for mismanagement and inadequate oversight, the exculpatory charter provision bars it. [FN80] As important, the mismanagement and inadequate oversight allegations in the complaint are wholly conclusory and fail to meet even notice pleading requirements. [FN81] As a result, the complaint fails to state a claim for breach of fiduciary duty in this respect.

[12][13] The complaint also alleges that NCT's CEO, Parrella, and President, Lebovics, received excessive compensation, to the tune of payments of nearly $1.6 million since 2000 in Parrella's case and around $700,000 since 2001 in Lebovics' case. By the precise words of the complaint, this claim is framed as a due care claim. Considered on its own merits and in isolation from other allegations in the complaint, the excessive compensation claim could not stand. For one thing, the § 102(b)(7) clause clearly protects the directors other than Parrella and Lebovics. [FN82] For another, the excessive compensation claim is pled in a conclusory manner. Informed decisions regarding employee compensation by independent boards are usually entitled to business judgment rule protection. [FN83] The complaint alleges that Parrella and Lebovics received excessive compensation due to the "gross neglect" of the board. But that is an assertion that is unsupported by any pled facts regarding the nature of the supposed gross neglect. NCT has a compensation committee comprised of two directors, John McCloy and Samuel Oolie, whose independence is not challenged in the complaint. And the fact that Parrella and Lebovics received substantial salaries during a period when NCT was performing poorly would not, without more, ordinarily sustain a claim.

**\*19** [14] The extent of the compensation received by Parrella and Lebovics, however, does help PRG sustain a non-exculpated breach of fiduciary duty claim, when considered in context with the other troubling facts pled in



the complaint. The unusual and particularized facts surrounding the funding of NCT through continued dealings with NCT's de facto controlling stockholder, Salkind, raise a sufficient inference of scienter to fall outside the reach of the exculpatory charter provision especially given the extreme financial distress NCT has been suffering for several years. [FN84] To wit, the complaint alleges that the NCT board has: 1) not convened an annual stockholder meeting for several years; 2) caused NCT to issue or pledge billions of shares more than are authorized by its charter; 3) permitted Salkind to obtain liens on the assets of the corporation; 4) retained no less than 8 companies affiliated with Salkind under substantial consulting contracts while refusing to cause the company to pay its debt to PRG; 5) placed funds from Salkind into a company subsidiary, rather than NCT itself, in order to avoid collection efforts by PRG; and 6) paid substantial salaries and bonuses to Parrella and Lebovics while refusing to cause the company to pay its debt to PRG. This strange method of proceeding is suggestive of self-interest on the part of Salkind, Parrella, and Lebovics and of bad faith on the part of the NCT board members who are putatively independent. It is a permissible (and, at this stage, therefore required) inference that rational persons acting in good faith as the directors of an insolvent firm would not proceed in this manner. [FN85]

Because of this unusual set of particularized facts, the complaint states a cognizable claim for breach of fiduciary duty, even if a particularized pleading standard is applicable. And, as pled, the unusual pattern of conduct is suggestive of injury to NCT as a firm, in the sense that there is the potential that the economic value of NCT otherwise available to all creditors has been diminished by improper transfer to insiders and to the de facto controlling stockholder.

In addition, the complaint pleads that NCT's board has taken particular steps to disadvantage PRG as a creditor and to frustrate its efforts at collection. In view of the odd facts pled and the flavor of self-dealing they generate, I am not prepared to rule out the possibility that PRG can prove that the NCT board has engaged in conduct towards PRG that might support a direct claim for breach of fiduciary duty by it as a particular creditor. In this regard, the complaint alleges that NCT breached specific promises made to PRG and has taken steps to accept new capital in a manner that was intentionally designed to hinder PRG's effort to obtain payment.

In indulging the possibility that PRG might prevail on either a derivative or individual claim, I want to make clear what this opinion does not conclude. I do not rest my decision in any manner on the proposition that it is a breach of fiduciary duty for the board of an insolvent company to engage in vigorous, good-faith negotiations with a judgment creditor. That, in fact, might be the *duty* of a board, which necessarily has to balance the interests of all those with a claim to the firm's inadequate assets. What is pled here, however, is a suspicious pattern of dealing that raises the legitimate concern that the NCT board is not pursuing the best interests of NCT's creditors as a class with claims on a pool of insufficient assets, but engaging in preferential treatment of the company's primary creditor and de facto controlling stockholder (and perhaps of its top officers, who are also directors) without any legitimate basis for the favoritism. [FN86] On a motion to dismiss, it would therefore be improvident to conclude that there is no possibility of a recovery against the defendants.

*20 [15] As the case proceeds, however, the opportunity will arise to revisit some of these questions with better input from the parties. In particular, it will be important to better understand the precise justification for equity's role in cases like this, an understanding that needs to be informed by the scope of the legal rights that PRG possesses as a creditor against NCT and its directors and officers. Evaluating a creditor's claim that directors have breached fiduciary duties owed to the firm involves no novel inquiry, as the court can draw deeply on the principles that apply in typical derivative cases. The extent of the fiduciary obligations directors and officers owe in their dealings with specific creditors of insolvent firms is a far less settled matter. In general, equity is reluctant to create remedies when adequate legal remedies already exist. [FN87] It may well be, for example, that upon close examination, existing principles of tort or contract law are sufficient when applied with the understanding that directors bear a fiduciary relation to creditors when a firm is insolvent. [FN88]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



### D. *PRG's Motion to Compel*

[16] Because the complaint survives NCT's motion to dismiss, PRG's motion to compel the answers to certain discovery requests must also be resolved. PRG objects to three blanket objections that are repeated throughout the defendants' responses to discovery: 1) that NCT's public documents contain all the relevant information that PRG needs; 2) that PRG's requests therefore seek information that is irrelevant; and 3) that PRG should have sought discovery in the Connecticut action. The defendants did not file a motion to stay the ongoing discovery; indeed, they agreed not to seek a stay as part of an agreement to extend a discovery deadline that the defendants had missed. [FN89]

[17][18][19] Regrettably, the defendants' resistance to the requested discovery is wholly unjustified. In evaluating a motion to compel discovery, the standard of relevance that the court must apply is whether the discovery sought is reasonably calculated to lead to admissible evidence. [FN90] The scope of permissible discovery is broad, [FN91] therefore "objections to discovery requests, in general, will not be allowed unless there have been clear abuses of the process which would result in great and needless expense and time consumption." [FN92] The burden is on the objecting party to show why the requested information is improperly requested. [FN93]

I do not intend to address PRG's discovery requests individually, but I will touch on several by way of example to show how inexcusable the defendants' failure to produce has been. Most of PRG's outstanding requests seek financial information and therefore information that is relevant, if not essential, to the central question of NCT's solvency. Yet, the defendants make the ludicrous claim that NCT's public filings are wholly sufficient to meet PRG's needs to prove insolvency.

But in arguing the motion to dismiss, NCT has taken the position that the facts that its financial statements show that its liabilities grossly exceed its assets and that its auditors doubt the firm's viability as a going concern are not determinative of its solvency. NCT also slights the multiple other facts in the public filings that are indicative of insolvency, arguing that NCT's ability to procure additional funding from Salkind (future funding that public documents admit is not guaranteed), [FN94] for example, demonstrates its financial viability. Having made these arguments, it is foolishly inconsistent, and not indicative of a large mind, for NCT to block discovery of its documents and other information that are not contained in the public filings. For example, that discovery could shed light on what potential funding NCT's backers, particularly Salkind, have actually brought to the table and why. By its own arguments, NCT has claimed that the nature of third party transactions may be, at a later stage, dispositive on the issue of solvency. While public records may describe the current state of the arrangements, PRG is entitled to test the accuracy of those descriptions, to get the actual transactional documents, and to discover evidence regarding the current financial condition of NCT and its future prospects. [FN95] Similarly, NCT has claimed that it has viability as a going concern. PRG is entitled to explore for itself whether NCT actually possesses the vitality it claims by examining documents bearing on the firm's business plan and prospects.

*21 Without dilating on further examples, it suffices to say that the defendants' refusal to produce the requested documents was unjustified and that prompt and complete responses to each request for production shall be forthcoming.

The defendants' refusal to answer requests for admission was equally unjustified. They claim that they cannot answer because they do not understand what PRG means by terms like "assets" and "liabilities" because those terms vary in meaning by context. It is best to be understated about this response and simply to call it obviously inadequate. In answering the requests for admission, the defendants can obviously define "assets" and "liabilities" the way NCT does when it makes public filings. One would assume that usage would conform to Generally Accepted Accounting Principles. If NCT, as a publicly traded company, and its directors and officers wish to assert that they apply different, non-traditional definitions of these terms, they can define their alternative meanings, answer the questions applying those definitions, and indicate how the application of those definitions differs from the application of standard

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

accounting definitions. Put simply, the defendants should have answered the requests for admission long ago.

Lastly, the defendants allege that discovery here duplicates discovery in ongoing proceedings in Connecticut as to certain issues, or should have been conducted there. Although I believe it would be advisable to coordinate discovery in the two actions to avoid waste, the defendants had no basis to resist production on this ground given their express agreement not to seek a general stay of discovery. To the extent that requested information has already been provided to PRG in Connecticut, the defendants may refer PRG to the Bates numbers of the relevant documents. More generally, the parties shall negotiate a stipulation coordinating discovery in the two actions.

Because the defendants had no reasonable basis to resist the requested discovery, PRG is entitled to reasonable attorneys' fees and costs. [FN96] PRG shall submit an affidavit specifying that amount to the defendants and submit, after notice, a conforming order requiring payment.

### III. *Conclusion*

For the foregoing reasons, 1) the motion to dismiss PRG's claim under 8 *Del. C.* § 291 is denied; 2) the motion to dismiss the claim for breach of fiduciary duty is granted to the limited extent specified herein, and otherwise denied; and 3) PRG's motion to compel is granted.

**IT IS SO ORDERED.**

> FN1. *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Engineering Co.,* 263 A.2d 281 (Del.1970).
>
> FN2. *Siple v. S & K Plumbing and Heating, Inc.,* 1982 WL 8789, at * 2 (Del.Ch. Apr. 13, 1982); *see also* Rodman Ward, Jr., Edward P. Welch & Andrew J. Turezyn, *Folk on the Delaware General Corporation Law: A Commentary and Analysis,* § 291.2 at GLC-XI-4 (4th ed.2004); Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 8-11[d], 8-214 (Release No. 5, February 2004).

> FN3. *See* Del. Ct. Ch. R. 11(b)(2), (4).
>
> FN4. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1039 (Del.2004).
>
> FN5. *Id.*
>
> FN6. According to PRG, as of December 10, 2003, only about $130,000 had been collected on the Connecticut judgment.
>
> FN7. Amended S-1 at 1.
>
> FN8. Amended S-1 at 60.
>
> FN9. Amended S-1 at 13.
>
> FN10. Amended S-1 at 3.
>
> FN11. Complaint at ¶ 18; *see also* Amended S-1 at 1.
>
> FN12. Complaint at ¶ 18; Amended S-1 at 9-10.
>
> FN13. Amended S-1 at 2.
>
> FN14. Amended S-1 at 3, 62, 72-73.
>
> FN15. Amended S-1 at 9.
>
> FN16. Complaint at ¶ 33.
>
> FN17. Complaint at ¶ 12, 14.
>
> FN18. PRG alleges no fewer then eight companies affiliated with Ms. Salkind's son, Steven Salkind, or her husband, Morton Salkind, have "consulting agreements" with NCT with the services provided by Ms. Salkind's family members. Complaint at ¶ 13.
>
> FN19. Warrants, options, and convertible notes have been issued to Salkind, her family members, and companies controlled by her. Amended S-1 at 87-88. Including all of these shares, Salkind has beneficial control, for filing purposes under federal securities laws, of over 1.2 billion shares on a fully converted basis. She disclaims control over the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

portion of these shares controlled by her family members. *Id.*

FN20. *See* Hammond testimony excerpts, Exhibit D to Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint. I consider this sworn testimony in the interest of efficiency because it could obviously form the basis for an amended complaint by PRG.

FN21. *Id.*

FN22. *See, e.g., In re Tri-Star Pictures, Inc. Litig.,* 634 A.2d 319, 326 (Del.1993) (articulating the Rule 12(b)(6) standard).

FN23. *Rabkin v. Philip A. Hunt Chemical Corp.,* 498 A.2d 1099, 1104 (Del.1985).

FN24. *Tri-Star,* 634 A.2d at 326.

FN25. 8 *Del. C.* § 291.

FN26. *Kenny v. Allerton Corp.,* 151 A. 257, 257 (Del.Ch.1930); *Manning v. Middle States Oil Corp.,* 137 A. 79, 80 (Del.Ch.1927); *see also* Rodman Ward, Jr., Edward P. Welch & Andrew J. Turezyn, *Folk on the Delaware General Corporation Law: A Commentary and Analysis,* § 291.2 at GLC-XI-4 (4th ed.2004); *Wolfe* at § 8-11[d], 8-214.

FN27. *See, e.g., Francotyp-Postalia AG & Co. v. On Target Tech., Inc.,* 1998 WL 928382 (Del.Ch. Dec. 24, 1998) (decided after trial); *Banks v. Cristina Copper Mines, Inc.,* 99 A.2d 504 (Del.Ch.1953) (decided on summary judgment record); *Shaten v. Volco Cement Corp.,* 2 A.2d 152 (Del.Ch.1938) (decided on motion after presentation of plaintiff's case at trial).

FN28. *Siple v. S & K Plumbing and Heating, Inc.,* 1982 WL 8789, at *2 (Del.Ch. Apr.13, 1982); *see also* Rodman Ward, Jr., Edward P. Welch & Andrew J. Turezyn, *Folk on the Delaware General*

*Corporation Law: A Commentary and Analysis,* § 291.2 at GLC-XI-4 (4th ed.2004); *Wolfe* at § 8-11 [d], 8-214.

FN29. *See, e.g., Francotyp-Postalia AG & Co. v. On Target Tech., Inc.,* 1998 WL 928382, at *5 (Del.Ch. Dec. 24, 1998); *Banks v. Cristina Copper Mines, Inc.,* 99 A.2d 504 (Del.Ch.1953).

FN30. *Shaten v. Volco Cement Corp.,* 2 A.2d 152 (Del.Ch.1938).

FN31. The cases that NCT cites where the defendant companies had the ability to generate capital in a more traditional manner are inapposite here. In *Banks,* the defendant company was allegedly taking loans from officers and directors and paying debt by issuing stock to creditors; this was not found sufficient to sustain a claim of insolvency. *Banks v. Cristina Copper Mines, Inc.,* 99 A.2d 504, 507 (Del.Ch.1953). But, in that case the defendant company's balance sheet showed assets over a million dollars more than its indebtedness. Moreover, some of its debts were in dispute and the defendant represented that it stood ready to pay immediately any debt found as a result of the claim at trial. *Id.* That case was also decided only after discovery on a summary judgment record.

NCT's reliance on *Shaten v. Volco Cement Corp.* is also misplaced. *Shaten v. Volco Cement Corp.,* 2 A.2d 152, 153 (Del.Ch.1938). Having sufficient "credit" to raise the money needed to pay debts, as contemplated in *Shaten,* includes having assets that could support a potential loan. *Id.* ("[D]efendant appears to have ample assets to enable it to raise funds in case the necessity arises to satisfy the bank's demand for payment, if demand for payment should be pressed, and to pay the complainant also if his claim is established."). In contrast, here the complaint suggests that NCT is not creditworthy and that, even with Salkind's putative infusions of new capital, NCT is still unable to pay debts, a fact exemplified by NCT's acceptance of new capital into its subsidiaries' accounts precisely to avoid



creditor claims. Finally, it bears emphasis that in stark contrast to the uncertain debts at issue in *Banks* and *Shaten*, here a trial has already occurred establishing the debt owed to PRG, PRG has repeatedly and aggressively pressed its demand for payment, and NCT has allegedly actively avoided payment of that debt. *See Gibralt Capital Corp. v. Smith,* 2001 WL 647837, at *8 (Del.Ch. May 9, 2001) (denying the defendant's motion to dismiss where plaintiff alleged that: 1) the defendant was insolvent; 2) the individual defendants caused the insolvency through their actions; and 3) a receiver was the only way to oust the controlling defendants).

FN32. Amended S-1 at 13, 60.

FN33. Complaint at ¶ 21; Amended S-1 at 4.

FN34. *See, e.g., Keystone Fuel Oil v. Del-Way Petroleum, Co.,* 1977 WL 2572 (Del.Ch. Jun. 16, 1977).

FN35. Amended S-1 at 1.

FN36. Amended S-1 at 87.

FN37. *See Keystone Fuel Oil v. Del-Way Petroleum, Co.,* 1977 WL 2572 (Del.Ch. Jun. 16, 1977).

FN38. *Id.*

FN39. *Id.* at *2.

FN40. *See Drob v. Nat'l Mem'l Park, Inc.,* 41 A.2d 589 (Del.Ch.1945); *Lichens Co. v. Standard Commercial Tobacco Co.,* 40 A.2d 447 (Del.Ch.1944).

FN41. *Jones v. Maxwell Motor Co.,* 115 A. 312, 314 (Del.Ch.1921)* ( "The purpose of the statute is to protect the rights of stockholders and creditors *in cases of insolvency.")* (emphasis added); *see also* R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business*

*Organizations,* § 11.4 (3d ed. Supp.2003) ("*Section 291* is concerned solely with protecting the stockholders and creditors of an insolvent corporation.").

FN42. A leading commentator has noted this distinction, and has suggested that the requirement of an auxiliary claim applies in the equitable-solvent context, not in a statutory *§ 291* context. *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 8-11[d], 8-216 (Release No. 5, February 2004) (citing *Drob* and *Lichens Co.* in a discussion of receivers pendente lite).

FN43. *Keystone Fuel Oil v. Del-Way Petroleum, Co.,* 1977 WL 2572, at *2 (Del.Ch. Jun. 16, 1977). In *Keystone Oil,* the similar sense of caution that the court applied when considering a receiver pendente lite in *Drob* and *Lichens Co.* was warranted because the defendant's insolvency was realistically disputed--part of its assets were real estate holdings of debatable value and a significant portion of its liability was contested in litigation. *Id.* These facts left it unclear as to whether the court's statutory or equitable power was being invoked. Ultimately, the *Keystone Oil* court implied that Keystone had not met the burden of demonstrating defendant's insolvency (thus implicating *Drob* and *Lichens Co.'s* cautions regarding receivers for *solvent* companies) and denied the application for a receiver; however, it supported this decision by observing that even in the event insolvency existed, the court retained discretion in deciding whether to appoint a receiver (presumably under *§ 291). Id.*

FN44. *See Kenny v. Allerton Corp.,* 151 A. 257 (Del.Ch.1930).

FN45. *See* R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations,* § 11.2 (3d ed. Supp.2003) ("The appointment of a receiver is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

always a question that rests in the sound discretion of the Court, which will not be exercised lightly."); Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 8-11[d], 8-215 (Release No. 5, February 2004) ("Even if a corporation is shown to be insolvent, a receiver will not be appointed as a matter of course. Rather, whether a receiver should be appointed in the particular circumstances is a matter within the discretion of the Court of Chancery.") (citations omitted).

FN46. *Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 787 (Del.Ch.1992) ("[T]he general rule is that directors do not owe creditors duties beyond the relevant contractual terms.").

FN47. For a lucid articulation of the rationale for this approach, see Mark J. Roe, *The Shareholder Wealth Maximization Norm and Industrial Organization,* 149 U. Pa. L.Rev.2063, 2065 (2001).

FN48. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 176 (Del.1986) (indicating that board can consider interests of other constituencies if they are rationally related to furthering the interests of stockholders).

FN49. *Credit Lyonnais Bank Nederland, N.V., v. Pathe Communications Corp.,* 1991 WL 277613 (Del.Ch. Dec. 30, 1991).

FN50. *Id.* at *34 & n. 55.

FN51. For an example of a decision that arguably reflects a very different perspective than *Credit Lyonnais* regarding the consideration that directors should give to the interests of creditors of an insolvent (or nearly insolvent) corporation, see the majority decision in *Omnicare, Inc. v. NCS Healthcare, Inc.,* 818 A.2d 914 (Del.2003) (holding that directors breached their fiduciary duty by, after a search for market alternatives, securing a transaction that provided full repayment

to creditors and a substantial payment to the stockholders, in a situation when the enterprise value of the firm was largely comprised of debt and when the failure to secure the transaction might have resulted in less than full payment to the creditors and no payment to the equity).

FN52. I assume that, at all times, directors have an obligation to consider the legal duties of the firm and to avoid consciously placing the firm in a position when it will be unable to discharge those duties. Our statutory law reflects this aspect of director responsibility. *See, e.g.,* 8 Del. C. § 102(b)(7)(ii) (conduct that involves knowing violations of law cannot be exculpated). If this is accepted as a proposition, it seems to me even less plausible that directors' duties somehow change profoundly as the firm approaches insolvency. As the proportion of the firm's enterprise value that is comprised of debt increases, directors must obviously bear that in mind as a material consideration in determining what business decisions to make. I doubt, however, that there is a magic dividing line that should signal the end to some, most, or all risk-taking on behalf of stockholders or even on behalf of creditors, who are not homogenous and whose interests may not be served by a board that refuses to undertake any further business activities that involve risk. As a result, the business judgment rule remains important and provides directors with the ability to make a range of good faith, prudent judgments about the risks they should undertake on behalf of troubled firms. *See Angelo, Gordon & Co. v. Allied Riser Comm. Corp.,* 805 A.2d 221, 229 (Del.Ch.2002) (denying a motion for preliminary injunction because plaintiffs made no showing of lack of good faith on the part of the directors of the insolvent corporation and stating that "even where the law recognizes that the duties of directors encompass the interests of creditors, there is room for application of the business judgment rule.").

FN53. *Credit Lyonnais* at *34 n. 55.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

FN54. Royce de R. Barondes, *Fiduciary Duties of Officers and Directors of Distressed Corporations*, 7 Geo. Mason L.Rev. 45, 66-71 (1998) (arguing that *Credit Lyonnais* should be read to create rights that are "affirmatively enforceable by creditors" against directors of companies in the vicinity of insolvency). Notably, even if one agrees with *Credit Lyonnais*, that the duties of directors of firms in the zone of insolvency should be to maximize the value of the firm as an enterprise, this does not necessarily translate into support for creditor standing to assert fiduciary duty claims in that context. See, e.g., Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors*, 46 Vand. L.Rev. 1485 (1993) (arguing that directors should have the goal of firm value maximization as their objective in this context, in part because stockholders and creditors have interests that diverge from what is best for society, but also contending that creditors should secure fidelity to the goal of firm value maximization through contract and that enforcing the goal of firm value maximization by way of fiduciary duty suits brought by stockholders or creditors would be difficult to achieve in a fair and efficient manner).

FN55. See, e.g., *Official Comm. Of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 968-69 (D.Del.1994) (denying motion to dismiss the fiduciary duty claim of creditors where defendants argued that the company was not insolvent when the relevant decisions were made and that therefore no duties were owed to creditors; the court found that company was within the zone of insolvency and the truth of the allegations could not be decided on a motion to dismiss). *Weaver v. Kellogg*, 216 B.R. 563, 582-84 (S.D.Tex.1997) (holding that 1) directors may owe fiduciary duties to creditors if the corporation was in the "vicinity of insolvency," 2) the determination of those duties rested upon unresolved questions of fact, and 3) that motion for

summary judgment for claim brought by Chapter 11 trustee must therefore be denied).

FN56. The "zone" issue is an admittedly confusing one. For example, once a firm becomes insolvent, there is little doubt that creditors can press derivative claims arguing that directors' pre-insolvency conduct injured the firm, which makes some of the Bankruptcy Court decisions discussing the zone interesting dictum. The more difficult issue is whether there is a zone in which the directors' duties to the firm fundamentally change and whether creditors can assert fiduciary duty claims (e.g. for injunctive relief) before the firm becomes insolvent. If creditors have standing to bring derivative claims in the "zone of insolvency," they will share that standing with stockholders, leading to the possibility of derivative suits by two sets of plaintiffs with starkly different conceptions of what is best for the firm.

Defining the "zone" for these purposes would also not be a simple exercise and talented creditors' lawyers would no doubt press for an expansive view. As our prior case law points out, as discussed above, it is not always easy to determine whether a company even meets the test for solvency. See, e.g., *Keystone Fuel Oil v. Del-Way Petroleum, Co.*, 1977 WL 2572 (Del.Ch. Jun. 16, 1977). Given that reality and the plaintiff-friendly standard that applies to attacks on pleadings, it is not surprising that in the past there have been (and inferably in the future there will be) situations when creditors are accorded standing to assert fiduciary duty claims at the pleading-stage and when, after discovery, courts determine that the companies were not insolvent. Going further and recognizing standing for creditors to bring fiduciary duty claims when a company is in the zone of insolvency would logically require this court to allow creditors standing if the complaint pleads facts that, if true, suggest that a company is within some imprecise and hard-to-define vicinity of insolvency. This means that creditors will be able to get discovery in

Westlaw.

2004 WL 2647593
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 2004 WL 2647593 (Del.Ch.))**

situations when it is ultimately determined that the relevant company was not only solvent, but never even within the so-called zone of insolvency.

FN57. Of course, when a firm is insolvent, creditors do not become residual claimants with interests entirely identical to stockholders, they simply become the class of constituents with the key claim to the firm's remaining assets. As an academic commentator aptly put it, "creditors [of an insolvent corporation] do not enjoy the entire gain of making good decisions, but bear the entire risk loss of making bad ones." Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors, 46* Vand. L.Rev. 1485, 1492 (1993). Because creditors have no interest beyond the debts owed to them, they have no incentive (and much to risk) by encouraging business strategies that would risk the payment of the bulk of their claims but provide some hope that the firm's value will increase to the level at which there could be a return for the equity. It is for this reason that Chancellor Allen's *Credit Lyonnais* decision emphasized the duties of the directors to the firm and their duty to responsibly maximize its value, a duty that might require pursuing a strategy that neither the stockholders nor the creditors would prefer. *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp., 1991 WL 277613, at *34 n. 55 (Del.Ch. Dec.30, 1991).* When a firm is insolvent or near insolvency, the interests of its stockholders and creditors can be starkly divergent, with the stockholders preferring highly risky strategies that creditors would eschew. *Id.; see also* Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty to Creditors, 46* Vand. L.Rev. 1485, 1523 (1993). Despite this divergence, I doubt the wisdom of a judicial endeavor to second-guess good-faith director conduct in the so-called zone. Although it is easy to posit extreme hypotheticals involving directors putting cash in slot machines, the real world is more likely to generate situations when

directors face a difficult choice between pursuit of a plausible, but risky, business strategy that might increase the firm's value to the level that equity holders will receive value, and another course guaranteeing no return for equity but preservation of value for creditors. Absent self-dealing or other evidence of bad faith, by what measure is a court fairly to critique the choice made through an award of damages? My reluctance to go down that road is also influenced by the reality that creditors are not monolithic and that different classes of creditors might have risk preferences that are greatly disparate, with some having interests more like stockholders.

FN58. *Geyer v. Ingersoll Publications Co., 621 A.2d 784, 787 (Del.Ch.1992)* ("[W]hen the insolvency exception [arises], it creates fiduciary duties for directors for the benefit of creditors.").

FN59. *See Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp., 1991 WL 277613, at *34 (Del.Ch. Dec.30, 1991); see also Angelo, Gordon & Co. v. Allied Riser Comm. Corp., 805 A.2d 221, 229 (Del.Ch.2002).*

FN60. The maximization of the economic value of the firm might, in circumstances of insolvency, require the directors to undertake the course of action that best preserves value in a situation when the procession of the firm as a going concern would be value-destroying. In other words, the efficient liquidation of an insolvent firm might well be the method by which the firm's value is enhanced in order to meet the legitimate claims of its creditors.

FN61. *See generally Geren v. Quantum Chem. Corp., 1995 WL 737512, at *3 (2d Cir. Dec. 13, 1995); Automatic Canteen Co. of America v. Wharton, 358 F.2d 587, 590 (2d Cir.1966); Mussetter v. Lyke, 10 F.Supp.2d 944, 964 (N.D.Ill.1998); Jewel Recovery, L.P. v. Gordon, 196 B.R. 348, 354 (N.D.Tex.1996)* (interpreting Delaware law); *Malloy v. Korf, 352 F.Supp. 569,*



2004 WL 2647593                                                    Page 25
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 2004 WL 2647593 (Del.Ch.))**

571-72 (E.D.Wis.1972); *New York Credit Men's Adjustment Bureau v. Weiss,* 305 N.Y. 1, 110 N.E.2d 397, 398 (1953); *see also* Royce de R. Barondes, *Fiduciary Duties of Officers and Directors of Distressed Corporations,* 7 Geo. Mason L.Rev. 45, 64 (1998) (describing the "trust fund doctrine" as the "seminal theory" justifying creditor fiduciary duties).

FN62. *Asmussen v. Quaker City Corp.,* 156 A. 180 (Del.Ch.1931) (establishing the general rule that discrimination in priority between creditors of equal priority by insolvent companies is usually permitted). But, this rule may not apply where the preferred creditor is an insider. *See Pennsylvania Co. for Insurances on Lives and Granting Annuities v. South Broad St. Theatre Co.,* 174 A. 112, 115-16 (Del.Ch.1934); *see also Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 787 (Del.Ch.1992) (discussing *Asmussen's* holding and its exception).

FN63. In this regard, it is worth noting that many insolvent firms operate for years under the protection of Chapter 11. Does Delaware law render their directors' protection under § 102(b)(7) as against liability to their firms inutile? As I explain, I see no rational basis to conclude that the answer is, or should be, yes.

FN64. *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1039 (Del.2004) (directing courts to "look to the nature of the wrong and to whom relief should go" in distinguishing between direct and derivative claims).

FN65. A respected federal bankruptcy judge has recognized the soundness of this reasoning. Consider this excerpt from a decision by Judge Queenan:

It is of course true a trustee in bankruptcy is unable to enforce a claim belonging to a creditor. But the Trustee asserts a claim which belonged to [the company] Healthco, not its creditors. The Trustee contends the defendants breached their fiduciary

duties *owed to Healthco.* Any Healthco claim is an interest in property which passed to the bankruptcy estate. The Trustee can bring any suit Healthco could have brought, including suits against directors and controlling shareholders for breach of fiduciary duty. In complaining that directors authorized a transaction that unduly weakened Healthco, the Trustee is not asserting the claim of creditors. He alleges Healthco was the victim of poor management causing damage to the corporation which necessarily resulted in damage to its creditors by diminishing the value of its assets and increasing its liabilities.
*Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.),* 208 B.R. 288, 300 (Bankr.D.Mass.1997) (emphasis in original) (citations omitted).

FN66. This is not a complete surprise. The number of Delaware cases addressing the precise "fiduciary duties" directors owe to creditors of an insolvent firm is rather small. Much of the more interesting authority on creditor fiduciary duties post-dates the enactment of § 102(b)(7). *See Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 787 (Del.Ch.1992). Also, the clear application of § 102(b)(7) to claims belonging to the corporation might have been thought to address the principal problem, by protecting directors against derivative suits. The leading treatises shed little light on this aspect of § 102(b)(7)'s legislative history.

Moreover, in most instances when a firm is insolvent but believes itself to have a prospect for viability, the firm will seek out the protections of the Bankruptcy Code and attempt to restructure its affairs through the well-articulated body of federal law specifically designed for that purpose. Here, it is not clear why NCT has not availed itself of this method of straightening out its balance sheet and obligations but has instead chosen to engage in an unusual financing structure with its primary creditor, Salkind, that continues payments to her family's eight companies and salaries to management, but that is structured to thwart PRG's

Westlaw.

2004 WL 2647593                                                    Page 26
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
(Cite as: 2004 WL 2647593 (Del.Ch.))

collection efforts.

FN67. Creditors also generally have no expectation that they will be able to recover against the directors or stockholders of firms with whom they contract. Indeed, that is one reason creditors are accorded derivative standing. Because the creditors need to look to the firm for recovery, they are the correct constituency to be granted derivative standing when the firm is insolvent, as they are the constituency with a claim on the corporation's assets, assets which could be increased by a recovery against the directors.

FN68. In so concluding, I am well aware that I depart from the holdings of certain federal cases. These cases suggest that a due care claim belonging to the corporation turns into something else when the right to pursue that claim ends up in the hands of a bankruptcy trustee. See *Pereira v. Cogan*, 2001 WL 243537, at *35-37 (S.D.N.Y. Mar. 8, 2001). In part, the rationale for this transformation is that it is somehow unfair for the exculpatory charter provision to bar claims from parties, such as a bankruptcy trustee who represents all of a company's creditors as a class, because these parties were not parties to the corporate charter. Because of the charter's contractual nature, the argument goes, protection should not extend to third-party creditor claims; because they were not parties to the contract, their rights cannot be curtailed by it. See, e.g., *id.* (holding that an exculpation clause cannot apply to third party creditor claims); Noel D. Humphries, *How Insolvency Changes the Responsibilities of Corporate Directors: The Post-Enron Focus on Corporate Responsibility Means New Scrutiny on How Corporate Directors Conduct Themselves. Here's a Look at How Just the Possibility of Insolvency Tends to Change the Rules of the Game,* 24 Pennsylvania Lawyer 34, May/June 2002, at 37 (noting that neither directors nor the corporation can contract around potential liability to creditors); Model Business Corporation Code Annotated, §

2.02 at 2-16, official comment i (3d. ed.1997) (specifically limiting the provision analogous to § 102(b)(7) to exclude third party liability). In other part, the rationale is that it is somehow not inconsistent with § 102(b)(7) to permit the prosecution of due care claims against directors by a bankruptcy trustee when the identical claims could not be pursued if the corporation was solvent. *Pereira* at *37-38 (concluding that even though a trustee technically sues on behalf of the corporation, he is, somehow, *really* suing on behalf of creditors and that § 102(b)(7) should therefore not apply) (citing *Steinberg v. Buczynski*, 40 F.3d 890, 892- 93 (7th Cir.1994)).

Respectfully, I disagree entirely with this reasoning. As these cases frankly admit, bankruptcy trustees pursue fiduciary duty claims when the conduct at issue is alleged to have injured the corporation as an entity, and therefore the harm affects the entire class of the company's creditors, rather than a specific creditor. *Id.* (citing cases); see also *St. Paul Fire and Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 696-99 (2d Cir.1989) (gathering additional cases regarding general versus specific harm). In other words, bankruptcy trustees pursue fiduciary duty claims that involve conduct that reduces the value of the firm because that reduction necessarily diminishes the (already inadequate) asset pool available to satisfy the claims of creditors.

Not all federal courts have viewed § 102(b)(7) as providing no protection to the directors of an insolvent firm. In *Brandt v. Hicks, Muse & Co., Inc.,* Judge Queenan held that § 102(b)(7) immunized directors from due care claims asserted on behalf of the bankrupt company by a bankruptcy trustee, using reasoning much like that embraced here. See *Brandt v. Hicks, Muse & Co. Inc. (In re Healthco Int'l, Inc.),* 208 B.R. 288, 300, 308 (Bankr.D.Mass.1997).

FN69. See 8 *Del. C.* § 102(b)(7) (prohibiting exculpation for a variety of faithless acts including "(i) for any breach of the director's duty of loyalty

Westlaw.

to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under section 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit.").

FN70. Some commentators have concluded, for example, that § 291 is essentially a "dead letter" that has been replaced by federal bankruptcy law. See David A. Drexler, Lewis S. Black, Jr. & A. Gilchrist Sparks, III, *Delaware Corporate Law and Practice*, § 39.01 at 39-3 (2003); Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 8-11[d] at 8-212--8-213 (Release No. 5, February 2004). But, these same commentators note that § 291 may complement bankruptcy law by allowing a creditor to use its § 291 rights to encourage a bankruptcy proceeding that it could not otherwise force without other creditors' support. See Drexler, § 39.01 at 39-2; Wolfe, § 8-11[d] at 8-213.

Even federal courts that might have to deal with questions of this kind more frequently, however, have been loathe to wade into the intricacies of pleading requirements in this context. See *Stanziale v. Nachtomi*, 2004 WL 1812705 (D.Del. Aug. 6, 2004). In *Stanziale*, the court denied a motion for rehearing by a bankruptcy trustee whose claim against directors had been dismissed on a motion to dismiss. The trustee argued that the court had erroneously applied Rule 23.1 pleading requirements to his claims, which he contended were direct. The court acknowledged the uncertain state of this issue, but rested its denial on the ground that the trustee had failed to meet even the notice pleading requirement to plead non-conclusory facts rebutting the presumptive applicability of the business judgment rule. *Id.*

FN71. *Aronson v. Lewis*, 473 A.2d 805 (Del.1984).

FN72. *Id.* at 809.

FN73. *Id.* at 811-2.

FN74. *Securities and Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 85-6, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

FN75. *Asmussen v. Quaker City Corp.*, 156 A. 180 (Del.1931).

FN76. *Pennsylvania Co. for Insurances on Lives and Granting Annuities v. South Broad St. Theatre Co.*, 174 A. 112, 115-16 (Del.Ch.1934); see also *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 787 (Del.Ch.1992).

FN77. To the extent that the directors are analogized as becoming trustees of a corporate pool of assets for creditors when the corporation is insolvent, it is worth noting that one of the fiduciary duties owed by trustees is that of impartiality. See *McNeil v. McNeil*, 798 A.2d 503, 509 (Del.2002) ("The duties to furnish information and act impartially are not subspecies of the duty of care, but separate duties") (citing Restatement (Second) of Trusts §§ 173, 174 and 183); see also *In re Miller's Estate*, 41 Cal. Rept. 410, 422 (1964) ("It is obvious that the discretion given to a trustee is never unlimited or arbitrary, such as might be exercised by an oriental prince out of Arabian Nights, sitting at the city gate and exercising his own uncontrolled whim as to what is appropriate and just."). The trust law duty of impartiality does not necessarily require equal treatment but it does prohibit a trustee from disadvantaging particular beneficiaries for invidious reasons.

FN78. Complaint at ¶ 31.

FN79. *Id.*

FN80. I note that the important case of *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del.1996) suggests that even a finding of gross negligence would not sustain a damages judgment against independent directors for failing to oversee the affairs of the firm and to prevent wrongdoing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

by company officers. Rather, the plaintiff must plead facts supporting an inference of subjective bad faith. *Id.* at 968 n. 16; *see also Guttman v. Huang,* 823 A.2d 492, 505-07 (Del.Ch.2003).

FN81. The exculpatory charter provision does not protect defendant Hammond, who is not a director but is NCT's CFO. But the complaint fails to plead any facts, as opposed to conclusory statements, regarding the mismanagement claim. As a result, the complaint fails to state any claim as to Hammond on this score.

FN82. The question of to what extent § 102(b)(7) would protect these officer-directors is a complex one. Equally complex is the logic of what fiduciary duties are owed by officer-directors in connection with their own compensation packages. This opinion need not, and does not, address these issues.

FN83. *White v. Panic,* 783 A.2d 543, 544 n. 35 (Del.2001); *Litt v. Wycoff,* 2003 WL 1794724 (Del.Ch. Mar. 28, 2003).

FN84. *See § Del. C. § 102(b)(7)* ("[S]uch provision shall not eliminate or limit the liability of a director: ... (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law....").

FN85. Because it is impossible for non-divine judges to peer into the hearts and souls of directors, this court has recognized the importance of considering relevant circumstantial facts that bear on scienter, which include the substance and effects of the defendants' conduct. See *West Point-Pepperell, Inc. v. J.P. Stevens & Co., Inc.,* 542 A.2d 770, 780-81 (Del.Ch.1988) (noting that the court may review the substance of a business decision to determine if it is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."); *see also Citron v. Fairchild Camera & Instrument Corp.,* 1988 WL 53322, at *16 (Del.Ch.

May 19, 1988) ("A decision made by competent directors that is not explicable on any rational ground, inevitably does raise a question of the *bona fides* of the decision makers.").

FN86. *See In re Ben Franklin Retail Stores, Inc.,* 225 B.R. 646, 653 (Bankr.N.D.Ill.1998), *rev'd in part on other grounds,* 2000 WL 28266 (N.D.Ill.2000) (speculating that incurring unnecessary debt, subjecting assets to unwarranted claims, or unduly risking assets for the benefit of a preferred creditor is essentially diversion of corporate assets and could rise to the level of fiduciary breach); *Bank of America v. Musselman,* 222 F.Supp.2d 792, 800 (E.D.Va.2002) (collecting cases holding that, where self dealing occurs, directors may breach fiduciary duties owed to creditors); William Meade Fletcher, *Fletcher Cyc. Corp.* § 1185 (Perm. Ed.) ("[I]t would seem true beyond argument that such an action [a creditor suit against directors for misappropriation or diversion of corporate property] will lie where the corporation has become insolvent."); *see also Pennsylvania. Co. for Insurances on Lives and Granting Annuities v. South Broad St. Theatre Co.,* 174 A. 112, 115-16 (Del.Ch.1934) (noting that discrimination between creditors of equal priority is not permitted where such preference involves self-dealing; *Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 787 (Del.Ch.1992) (same).

FN87. *RGC Int'l Investors, LDC v. Greka Energy Corp.,* 2001 WL 312454, at *10 n. 45 (Del.Ch. Mar. 7, 2001) ("Equity historically 'follows the law' and does not create remedies where the parties' behavior is already closely regulated by the law.") (citing 27A Am.Jur.2d *Equity* § 113 (1996)).

FN88. In its complaint, PRG argues certain apparent tort and contract claims as breaches of fiduciary duty. Specifically, PRG alleges that NCT and its CEO Parrella reneged on a promise to sell stock owned by an NCT subsidiary in order to pay the judgment owed to PRG. That is a contract or misrepresentation claim that PRG has directly

Westlaw.

2004 WL 2647593                                                                              Page 29
--- A.2d ----, 2004 WL 2647593 (Del.Ch.)
**(Cite as: 2004 WL 2647593 (Del.Ch.))**

against NCT (and perhaps Parrella), not a claim for breach of fiduciary duty. In so concluding, I acknowledge that the same difficulties that are involved in determining when a claim for breach of fiduciary duty brought by a stockholder is direct or derivative might also arise in the case of claims brought by creditors of insolvent corporations. In general, however, there seems to be utility in applying fiduciary duty law quite cautiously, to avoid unduly benefiting creditors by enabling them to recover in equity when they could not prevail on legal tort or contract claims. At the same time, as noted earlier, the fact of NCT's insolvency might influence the application of traditional torts, like common law fraud, by enabling PRG to recover for cases of material omission. These and other complexities bear serious consideration later in the case.

FN89. Despite agreeing not to seek a stay, NCT does make a half-hearted attempt to suggest that discovery should be stayed, lest it overlap discovery in the Connecticut action or go forward while a dispositive motion is pending. NCT contends that they agreed not to seek a *general* stay, but remain free to seek stays of *particular* discovery. That is semantic hair-splitting. In any event, I have denied the pending motion to dismiss and the Connecticut action involves different questions from those raised here. Any remaining concerns would be better served by a motion to consolidate discovery, rather than stay it.

FN90. Del. Ct. Ch. R. 26(b)(1); *Gower v. Beldock,* 1998 WL 200267 (Del.Ch. Apr. 21, 1998).

FN91. See *In re MAXXAM, Inc./Federated Development Shareholders Litigation,* 1993 WL 125533 (Del.Ch. Apr. 13, 1993).

FN92. *Van De Walle v. Unimation, Inc.,* 1984 WL 8270 (Del.Ch. Oct. 15, 1984) (citations omitted).

FN93. *Id.* (citations omitted).

FN94. Amended S-1 at 72 ("NCT has no legally binding assurance that Ms. Salkind will continue funding NCT in the near-term or that the amount, timing and duration of funding from her will be adequate to sustain our business operations."). Nevertheless, NCT asks PRG and this court to assume, preclusively, exactly that.

FN95. See *Banks v. Cristina Copper Mines, Inc.,* 99 A.2d 504 (Del.Ch.1953) (holding that if the condition of insolvency has been removed since filing for a receiver, no receiver should be appointed).

FN96. See Del. Ct. Ch. R. 37(a)(4).

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**4**

STATE OF ILLINOIS  )
                   ) SS
COUNTY OF LAKE     )

## IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
## LAKE COUNTY, ILLINOIS

Doerge Capital, et al,                )
                                      )        04 L 0873
            vs.                       )
                                      )    Gen. No. _____
Marcus Lemonis, et al                 )
                                      )        FILED

### CERTIFICATE OF ATTORNEY                    OCT 27 2004

Pursuant to Administrative Order No. _____85-7_____, I hereby certify that:

☐     There has been no previous voluntary or involuntary dismissal of the subject matter of
      this litigation.

☑     There has been a previous voluntary or involuntary dismissal of the subject matter of
      this litigation and at the time of the dismissal Case No. 02 L 889 _____ was
      assigned to The Honorable Raymond J. McKoski _____.

☐     There is no other litigation presently pending in this County involving the parties to
      and/or subject matter of this lawsuit.

☐     There is presently pending other litigation in this County involving the parties to or
      subject matter of this lawsuit and that case or cases is/are assigned Case No./Nos.
      _____ which is assigned to The Honorable _____

                                      _____
                                      Attorney for Complainant or Petitioner

171-63   8/99

**5**

Westlaw.

Not Reported in A.2d                                                                                      Page 1
2003 WL 723285 (Del.Ch.)
**(Cite as: 2003 WL 723285 (Del.Ch.))**

☞

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware.

VGS, INC., Plaintiff,

v.

David CASTIEL, Virtual Geosatellite Holdings, Inc., and
Ellipso, Inc.,
Defendants,
VIRTUAL GEOSATELLITE HOLDINGS, INC., and
Ellipso, Inc., Counterclaim
Plaintiffs,
and
VIRTUAL GEOSATELLITE, LLC, Counterclaim
Plaintiff-Intervenor,

v.

VGS, INC., Peter D. Sahagen, Thomas Quinn, Neel
Howard, and Sahagen Satellite
Technology Group, LLC, Counterclaim Defendants.

**No. C.A. 17995.**

Submitted Jan. 21, 2003.
Decided Feb. 28, 2003.
As Revised March 10, 2003.

Thomas R. Hunt, Jr., Morris, Nichols, Arsht & Tunnell,
Wilmington, Delaware; William H. Jeffress, Jr., Jamie
Steven Kilbergi, Baker Botts, L.L.P., Washington, D.C., for
Defendant-Counterclaim Plaintiffs David Castiel, Virtual
Geosatellite Holdings, Inc. and Ellipso, Inc., and
Counterclaim Plaintiff-Intervenor Virtual Geosatellite LLC.

Brian A. Sullivan, Werb & Sullivan, Wilmington,
Delaware; William A. Brewer, III, Daniel F. Perez, Thomas
M. Corea, Bickel & Brewer, Dallas, Texas, for
Counterclaim Defendants and Reply-Counterclaim Plaintiffs
SST Global Technology LLC and Peter D. Sahagen.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

I.

**\*1** This action arises out of a long-standing dispute
principally between two people, and the companies they
control. This tale first began when Peter Sahagen attempted
to wrest control of a limited liability company, through the
effectuation of merger, from David Castiel, the company's
founder. Sahagen then sought a declaratory judgment from
this court that the merger was valid. In June 2000, the court
held a trial which resulted in the merger being rescinded.
Castiel and his affiliates filed a counterclaim against
Sahagen and Tom Quinn in that action alleging a breach of
their duty of loyalty. Sahagen and his affiliates then filed an
eleven count cross-counterclaim against Castiel and his
affiliates alleging, among other things, that Castiel
fraudulently induced Sahagen into investing with Castiel,
and that Sahagen and his affiliates have breached several
fiduciary duties that were owed directly to Sahagen or to the
companies he invested in. The first trial did not resolve the
counterclaim or the cross-counterclaim.

Summary judgment must be granted in favor of Castiel and
his affiliates on all but one of the cross-counterclaims.
Claims for fraudulent inducement and negligent
misrepresentation (as well as claims of aiding and abetting
those violations) are precluded for two reasons. First, an
integration clause in the agreements at issue, combined with
the sophistication of the parties and opportunities to conduct
due diligence, precludes Sahagen from arguing that
non-warranted statements can amount to fraudulent
inducement or negligent misrepresentation. Second, the one
statement that was warranted in the agreements at issue was
true and accurate when it was made. Thus there can be no
fraud or negligent misrepresentation.

All but one of Sahagen's claims that Castiel and various of
his affiliates breached their fiduciary duties must fail. These
fiduciary duty claims are derivative in nature and there has
been no demand made on the board of the limited liability
company. Further, Sahagen has failed to demonstrate how
demand would have been futile.

Finally, summary judgment must be granted, in part, in
favor of Castiel and his affiliates on their counterclaim that
Sahagen and Quinn breached their fiduciary duty of loyalty.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                              Page 2
2003 WL 723285 (Del.Ch.)
**(Cite as: 2003 WL 723285 (Del.Ch.))**

This result is dictated by the "law of the case" doctrine, and it will avoid the need to re-litigate previously litigated issues.

## II.

### A. Background

On January 6, 1999, David Castiel formed Virtual Geosatellite, LLC ("Virtual Geo") pursuant to the Delaware Limited Liability Company Act. As originally constituted, the sole member of Virtual Geo was Virtual Geosatellite Holdings, Inc. ("VGHI"). On January 8, 1999, Ellipso, Inc. joined Virtual Geo as a member. Finally, on January 29, 1999, Sahagen Satellite Technology Group, LLC (now known as Sahagen Satellite Technology Global, LLC or "SST Global") was added as a third member. [FN1]

> FN1. The relations between these various parties have been contentious for some time. In particular, there has already been a trial in the Court of Chancery to litigate claims related to a purported merger that was intended to wrest control of Virtual Geo from Castiel. For a more thorough discussion of those events *see VGS, Inc. v. Castiel,* 2000 WL 1277372 (Del.Ch. Aug.31, 2000), *aff'd,* 781 A.2d 696 (Del.2001) (TABLE).

Pursuant to Virtual Geo's Second Amended and Restated Limited Liability Company Agreement (the "LLC Agreement"), VGHI received 660 LLC units (representing 63.46% of the total equity in Virtual Geo), SST Global received 260 LLC units (representing 25%), and Ellipso received 120 LLC units (representing 11.54%). SST Global, which is controlled by Peter Sahagen, contributed the only cash received by Virtual Geo-$5 million. VGHI and Ellipso, both of which are controlled by Castiel, contributed certain licensed intellectual property.

**\*2** Virtual Geo's stated purpose was "to construct, launch and operate a global fixed satellite service system employing nongeostationary satellites in subgeosynchronous elliptical orbits, developing the related [ground] segment and offering the related communication services." [FN2] That system, known as "Virtual Geo," was intended to provide technological advantages believed to be unique among its competitors in the broadband satellite market. Nonetheless, Virtual Geo was a high-risk business venture.

> FN2. LLC Agreement § 4.01(a).

Management of Virtual Geo was vested in a Board of Managers. The LLC Agreement established a three-person Board of Managers consisting of Castiel (the Chairman, appointed by VGHI), Sahagen (the Vice Chairman of Finance, appointed by SST Global), and Tom Quinn (the Secretary, appointed by VGHI).

### B. Sahagen's Investment In Ellipso And Virtual Geo

Sahagen is a "prolific investor" in the technology sector. Sahagen met Castiel through Sahagen's attorney, and after a series of meetings with Castiel and Ellipso's in-house counsel, Sahagen was invited to invest in Virtual Geo and Ellipso. Sahagen then conducted due diligence on Virtual Geo and Ellipso, including hiring a "technical expert" and consulting with his lawyers. Sahagen, through Neel Howard (SST Global's Rule 30(b)(6) representative), had extensive discussions with employees of Ellipso.

Castiel allegedly made several representations to Sahagen during the course of negotiations. Specifically, Castiel allegedly represented that:

. Ellipso had the antenna technology and capability to employ a worldwide two-way television system;

. Ellipso was in full compliance with the FCC regarding its license, and that no further requirements needed to be met;

. Ellipso's license with the FCC was in full force and effect;

. Ellipso's license with the FCC was not subject to any limitations, defenses, or contingencies which might subject it to revocation or cancellation;

. one of Castiel's affiliated entities, Mobile Communications Holdings, Inc. ("MCHI"), had entered into a binding contract with Boeing Company for construction of the first two satellite systems that were to be part of Ellipso's system;

. MCHI and Ellipso were in full compliance with the construction progress milestones and certification

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
2003 WL 723285 (Del.Ch.)
(Cite as: 2003 WL 723285 (Del.Ch.))

Page 3

schedules established by the FCC in issuing the license;

. MCHI had made substantial progress with respect to the deployment of its satellite system and, in connection therewith, MCHI had received a commitment from Boeing to invest $300 million of its own funds in deploying the system;

. SST Global's investment was going to be used only as a bridge until Ellipso and Virtual Geo received a substantial investment from Boeing;

. any funds invested in Virtual GEO would be used for, and devoted exclusively to, the business of Virtual Geo;

. Sahagen's investments would be used prudently, economically, efficiently, and in a manner designed to best achieve Ellipso's and Virtual Geo's business objectives; and

*3 . Castiel would hire a number of persons with impeccable credentials in the satellite and communications industries to manage and operate Virtual Geo.

Neel Howard testified, however, that he was aware of an antenna problem at Ellipso prior to Sahagen's investment in Ellipso. [FN3] Howard also testified that Castiel had a long history of promising investors that he would bring in new management and then refusing to do so. [FN4] Howard told Sahagen about this prior to Sahagen's investment. [FN5]

> FN3. Castiel Parties Op. Br., Ex. B ("SST Global Dep.") at 78.

> FN4. Id. at 60, 63, 68-70.

> FN5. Id.

C. *Ellipso's Financial Condition Deteriorates*

During its existence, Ellipso raised between $75 million and $100 million in investment capital, over $60 million of which had been contributed before the formation of Virtual Geo. By January 1, 1999, Ellipso still had over $15 million in cash on its balance sheet. By December 31, 1999, however, Ellipso and its subsidiary, MCHI had just over $2 million in cash. As of March 31, 2000, Ellipso's financial condition had further deteriorated and its cash had declined to under $350,000 while its liabilities totaled over $360,000. Moreover, Ellipso was losing employees at a rapid rate

during this period.

D. *Castiel Uses Virtual Geo's Cash For Ellipso*

On May 4, 1999, Virtual Geo's Board of Managers approved a cost-sharing arrangement with Ellipso. At that meeting, the Board authorized an agreement whereby Ellipso would "loan" employees to Virtual Geo at the cost of $50,000 per month for six months.

On June 11, 1999, Castiel, acting in his capacity as CEO of both Ellipso and Virtual Geo, executed a cost-sharing Services Agreement between Ellipso and Virtual Geo. The Services Agreement provided for monthly payments from Virtual Geo to Ellipso of $48,748 through December 31, 1999. Essentially, the Services Agreement extended the previously approved cost-sharing arrangement for an additional six months.

On April 19, 2000, Castiel, in his capacity as CEO of Ellipso and Virtual Geo, executed Amendment No. 1 to the Services Agreement. The Amendment was backdated to December 17, 1999. Amendment No. 1 retroactively increased the fees to $100,000 per month for the period January 1 through May 31, 1999. It also retroactively increased to $130,000 per month the fee for the period June 1 through December 31, 1999. Finally, the Amendment increased the fee for the period January 1, 2000 going forward to $156,145 per month. Although the Ellipso Board was presented with, and then approved, a resolution to extend the Services Agreement into 2000, neither the extension to, nor amendment of, the Services Agreement was presented to Virtual Geo's Board for consideration.

In addition to amending the cost-sharing arrangement on a number of occasions, Castiel also determined the salary allocations for Ellipso's employees. A number of witnesses (all of whom are former or current employees of Ellipso/MCHI), testified that Castiel misallocated the time they actually spent working on Virtual Geo matters. [FN6] Further, Castiel may have charged Virtual Geo for Ellipso employees who never worked on Virtual Geo matters. [FN7]

> FN6. *See* Tr. 82-84, 87-89 (Naughton); Tr. 171-72

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



(Incidardi); Tr. 690 (Howard); and Tr. 1296-97 (Blott). Citations to "Tr. __" refer to transcripts from the trial held before then-Vice Chancellor Steele on June 15 through June 23, 2000 that resulted in the opinion referred to in note 1, *supra*.

FN7. *See* Tr. 690 (Howard) ("I can't imagine that you're talking more than four or five employees, six, maybe, at the most, that would be doing any kind of work on Virtual Geo"); Tr. 125 (Lincoln) ("What he gave me was a list of probably 20 people that were working on Virtual Geo, at least according to the list; and there were only five, six people that had done anything for the project").

E. *Virtual Geo Struggles From Its Inception*

*4 As of December 31, 1999, Virtual Geo's current assets amounted to approximately $3 million, and losses for the year ended December 31, 1999 totaled almost $2.2 million. Four months later, Virtual Geo's current assets had declined by almost $500,000. Losses for the four months ended April 30, 2000 were approximately $1.5 million. Further, during the four months ended April 30, 2000, the "amounts due Ellipso" purportedly rose from $78,275 to $1,108,230, and "member's capital" fell from $2,969,316 to $1,497,351.

As Virtual Geo was expending cash at a rapid rate, prospects for obtaining additional capital became increasingly dim. Virtual Geo's last draft business plan, dated January 20, 2000, stated that SST Global's initial $5 million investment in the first quarter of 1999 was merely "seed capital." Such "seed capital" was not expected to carry Virtual Geo through the year 2000. The business plan, therefore, called for a pre-licensing round of venture capital financing in the amount of $25 million sometime between the fourth quarter of 1999 and year-end 2000. Virtual Geo was unsuccessful in obtaining this financing.

F. *Castiel Reneges On His Agreement To Secure Professional Management*

Castiel represented on several occasions that he would hire a number of persons with impeccable credentials in the satellite and communications industries to run Virtual Geo.

FN8. In the fall of 1999, Sahagen introduced a highly qualified management team to Virtual Geo. It became known as the "Dream Team" and consisted primarily of Air Force Lieutenant General Kenneth Minihan, a former director of the National Security Agency and the Defense Intelligence Agency, and Alf Andreassen, who was the former director of Bell Labs and President of AT & T Global Solutions. Virtual Geo's Board of Managers was optimistic about the prospects of hiring such qualified individuals.

FN8. *See* Tr. 848-49 (Sahagen) ("Q. Did Mr.--Doctor Castiel make any promises with respect to what he would do in that regard, concerning the management? A. Absolutely.... He said that he would go about locating just what I said, experienced management in the satellite business. He used the word [sic] 'big names,' meaning people who were accomplished, who had the contacts, had the credibility, had the background to raise billions of dollars for this kind of project); *see also* Tr. 651 (Howard).

After some negotiations, Castiel and Minihan reached agreement on almost every issue, including Castiel's plan for transitioning management control from Castiel to Minihan's team as it accomplished certain milestones, such as bringing a "major" investor to Virtual Geo. Castiel, however, subsequently began to have second thoughts about giving up control of Virtual Geo's operations. Jill Stern, General Counsel for Ellipso and Virtual Geo, drafted a contract so as not to include the progressive change of control issue that Castiel and Stern knew was a condition precedent to the Minihan team's agreement to join Virtual Geo. Unwilling to join Virtual Geo without such a provision in the contract, Minihan chose not to become part of Virtual Geo's management team.

G. *The FCC Declares Ellipso's License To Be Null And Void*

On or about June 30, 1997, Ellipso, through MHCI, became fully licensed by the FCC to launch and operate a complex satellite system (the "1997 License"). Based on the 1997 License, Ellipso was authorized to launch and operate a 16-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.